UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:20-cv-81063-RS

STEVE HARTEL, Individually and on
Behalf of All Others Similarly Situated,

     Plaintiff,

v.

THE GEO GROUP, INC., *et al*.,

     Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS
LEAD PLAINTIFFS' CONSOLIDATED CLASS ACTION AMENDED COMPLAINT
AND INCORPORATED MEMORANDUM OF LAW**

| | |
|---|---|
| **AKERMAN LLP** | **GUNSTER, YOAKLEY & STEWART, P. A.** |
| Three Brickell City Centre | 600 Brickell Avenue, 35th Floor |
| 98 Southeast Seventh Street | Miami, FL 33131 |
| Suite 1100 | Telephone: (305) 376-6000 |
| Miami, FL 33131 | Facsimile: (786) 425-4090 |
| Telephone: (305) 374-5600 | William K. Hill, Esq. |
| Facsimile: (305) 374-5095 | Florida Bar Number: 747180 |
| Brian P. Miller, Esq. | whill@gunster.com |
| Florida Bar No. 0980633 | George S. LeMieux, Esq. |
| brian.miller@akerman.com | Florida Bar Number: 16403 |
| Samantha J. Kavanaugh, Esq. | glemieux@gunster.com |
| Florida Bar No. 0194662 | Ernest "EJ" A. Cox IV, Esq. |
| samantha.kavanaugh@akerman.com | Florida Bar Number: 124652 |
| | ecox@gunster.com |
| ***Counsel for Defendant The GEO Group, Inc.*** | |
| | ***Counsel for Defendants George C. Zoley,*** |
| | ***Brian R. Evans, J. David Donahue, and*** |
| | ***Ann M. Schlarb*** |

Pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) ("PSLRA"), Defendants The GEO Group ("GEO"), George Zoley, Brian Evans, David Donahue, and Ann Schlarb (collectively, "Individual Defendants") move to dismiss the Consolidated Class Action Amended Complaint ("Amended Complaint" or "Am. Compl.").

## INTRODUCTION

In this putative securities class action, Plaintiffs originally seized on a drop in GEO's stock price caused by an announcement in the summer of 2020 by GEO's competitor that the other company was decreasing its dividend payment going forward. Plaintiffs then manufactured a claim that GEO had misled the marketplace about the potential effects of COVID-19 on its facilities and business. Of course, it was no mystery that infections could arise in facilities where prisoners, detainees, or probationers are necessarily kept in close quarters together. That is the nature of GEO's business.  GEO promptly disclosed this risk and outlined the steps it was taking to comply with evolving CDC guidelines.

Defendants moved to dismiss the original complaint pointing out its gross deficiencies. The Court granted the motion to dismiss without prejudice so Plaintiffs could voluntarily amend. But, the Amended Complaint does nothing to fix the obvious problems with Plaintiffs' claims regarding GEO's public disclosures about the effect of the COVID-19 pandemic on its business. GEO's public statements about its efforts to address the pandemic were truthful (Plaintiffs do not even seriously contend to the contrary) and remain immunized by the PSLRA's safe harbor for forward-looking statements. And the decline in GEO's stock price at the end of the class period bears absolutely no causal connection to any prior disclosures about COVID-19.

Apparently recognizing these problems, Plaintiffs have now decided to expand the class period and try a "kitchen-sink" approach, complaining about every bit of bad news about GEO in the last few years. The Amended Complaint is long on words, but woefully short on substance.

Plaintiffs try to tie all of these disparate and factually unconnected threads together by arguing that the *denouement* occurred on August 6, 2020, when GEO announced it had made a prudent decision to reduce its dividend going forward and pay down indebtedness. The stock price declined slightly upon this announcement. Plaintiffs would have this Court believe that announcement suddenly "revealed" all of GEO's prior misdeeds and business difficulties that had been "hidden" from the market. This fatally flawed notion is the crux of their claim, and cannot survive a motion to dismiss.

The Amended Complaint suffers from multiple legal problems that require dismissal. *First*, GEO's public statements that Plaintiffs gripe about are largely forward-looking statements and statements of puffery or corporate optimism that are legally protected under the federal securities laws. *Second*, most of what Plaintiffs complain was hidden actually was in the public domain, either through affirmative disclosure by GEO or in the numerous press articles, lawsuits, and announcements by third parties that Plaintiffs liberally sprinkle throughout their complaint. *Third*, there is no causal nexus between the alleged misrepresentations and the eventual announcement of GEO's intent to reduce dividends and repay debt. *Fourth*, the complaint does not even come close to alleging scienter with the requisite heightened particularity. And, *fifth*, the claims against the Individual Defendants fail. This time, dismissal must be **_with_** prejudice.

## FACTUAL BACKGROUND

### A.    The Amended Complaint's Allegations.[1]

This is a putative securities class action brought against GEO, one of the nation's largest operators of correctional facilities and community reentry services pursuant to contracts with government agencies, under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of a putative class of all purchasers of GEO's common stock between November 7, 2018 and August 5, 2020. Plaintiffs' Amended Complaint also asserts claims against the Individual Defendants for control-person liability under Section 20(a) of the Exchange Act.

Filed in response to the Court's Order on the Prior Motion to Dismiss [ECF No. 20, ¶ 11], Plaintiffs' Amended Complaint alleges that GEO made materially false and misleading statements and/or omissions in various SEC disclosures and earnings calls during the purported class period. Plaintiffs take a shotgun approach, alleging that statements related to almost every aspect of GEO's business—including quality of operations, corporate social responsibility, competitive strengths, business strategies, health and safety, sources of financing, dividend expectations, and COVID-19 procedures—were false and misleading. Am. Compl. ¶¶ 106-201. Plaintiffs claim the "full truth" was ultimately "revealed" on August 6, 2020, when GEO announced it would be reducing its quarterly dividend by nearly 30%, resulting in a 7% drop in the GEO Group stock price. *Id.* ¶ 217.

But, similar to the original Complaint, Plaintiffs ignore GEO's highly relevant risk disclosures and meaningful cautionary statements from the same SEC filings they cherry-pick to

---

[1] We assume the Court's familiarity with the overview of GEO's business in Defendants' Motion to Dismiss Plaintiff's Class Action Complaint (the "Prior Motion to Dismiss") [ECF No. 6].

give an appearance of misrepresentations. Those disclosures warned of the *precise* business risks that could cause a stock price drop, which Plaintiffs now accuse GEO of "concealing," including:

> ➢ GEO's dividend payments may fluctuate, are not guaranteed, and are based on a number of factors;
> ➢ the nature of its business exposes GEO to various types of legal claims, the results of which can never be predicted with certainty;
> ➢ GEO may face the need for additional capital and there can be no assurance that any such financing or refinancing would be available on terms equal to or more favorable than current financing terms – or at all; and
> ➢ there were risks associated with the termination of, non-renewal of, or competitive re-bid of government contracts, as well as the public and government's acceptance of public-private partnerships in general.

With respect to the emergence of the unprecedented COVID-19 pandemic, the SEC filings further cautioned, *inter alia*, that:

> ➢ GEO is unable to predict the impact that the COVID-19 pandemic will have on its financial condition, results of operations and cash flows due to numerous uncertainties;
> ➢ GEO experienced the transmission of COVID-19 at a number of its facilities in the second quarter of 2020;
> ➢ if GEO is unable to mitigate the transmission of COVID-19 at its facilities it could experience a material adverse effect on its financial position, results of operations and cash flows; and
> ➢ although GEO is unable to predict the duration or scope of the COVID-19 pandemic or estimate the extent of the negative financial impact to its operating results, an extended period of depressed economic activity necessitated to combatting the disease, and the severity and duration of the related global economic crisis will adversely impact its future financial performance.

When Plaintiffs' selective references to GEO's SEC filings and earnings calls are placed in their proper context within the myriad meaningful risk disclosures, it is clear that Plaintiffs' claims are nothing more than a strike suit aimed to capitalize on the convergence of a difficult political climate and a global pandemic of unprecedented scale.

**B.     The Amended Complaint Omits Highly Material Disclosures Concerning GEO's Business, Finances and Stock Price.[2]**

The following meaningful risk disclosures and cautionary statements are highly material and dispositive of Plaintiffs' claims. Yet Plaintiffs omit reference to these disclosures.

---

[2] The Court may consider GEO's entire SEC filings—including all risk disclosures and cautionary statements—during the purported class period to determine the sufficiency of Plaintiffs' Amended Complaint. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999); *see also* 15 U.S.C. § 78u-5(e) (court may consider "any cautionary statement accompanying the forward-

1.    **GEO Explicitly Disclosed Risks Associated With Its Dividend Payments.**

Throughout the years, GEO's SEC filings explicitly warned that dividend distribution levels were subject to change, and set forth the factors that would affect dividend levels:

> ***Our cash distributions are not guaranteed and may fluctuate.***
> A REIT generally is required to distribute at least 90% of its REIT taxable income to its shareholders. Our board of directors, **in its sole discretion**, will determine **on a quarterly basis** the amount of cash to be distributed to our shareholders **based on a number of factors including, but not limited to, our results of operations, cash flow and capital requirements, economic conditions, tax considerations, borrowing capacity and other factors, such as debt covenant restrictions that may impose limitations on cash payments and plans for future acquisitions and divestitures**. Consequently, our distribution levels **may fluctuate**.

Ex. G, 2018 10-K, p. 30 (emphasis added)[3]; *see also* Ex. A, 3Q18 10-Q, p. 18, 49.

2.    **GEO Explicitly Disclosed Risks Associated With Litigation.**

GEO likewise warned about its exposure to significant litigation risks, disclosed pending litigation and significant events therein, and explicitly warned that the result of legal claims could not be predicted with certainty, but could materially affect GEO:

> **The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment,** . . . . The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows. **However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.**

Ex. A, 3Q18 10-Q, p. 30 (emphasis added); *see also* Ex. G, 2018 10-K, p. 25-26, 42.

3.    **GEO Explicitly Disclosed Risks Associated With the Ongoing Need for Financing.**

GEO warned investors that they may face the need for additional capital and that, "[t]here can be no assurance that any such financing or refinancing would be available to us on terms equal to or more favorable than our current financing terms, or at all." Ex. A, 3Q18 10-Q, pp. 46, 61.

---

looking statement, which are not subject to material dispute, cited by the defendant"). Defendants are filing these SEC filings concurrently, with highlighting for the Court's convenience.

[3] References to Exhibits are to the exhibits to the Notice of Filing [ECF No. 37]. The page number references are to the pdf page.

### 4.    GEO Explicitly Disclosed Risks Associated With the Termination, Non-Renewal or Competitive Re-Bids of Contracts, as Well as Government and Public Acceptance of Public-Private Partnerships.

GEO warned investors about the risks associated with the termination, non-renewal, or re-bids of contracts, and disclosed the percentage of its contracts that were subject to renewals:

> ***We are subject to the loss of our facility management contracts, due to terminations, non-renewals or competitive re-bids, which could adversely affect our results of operations and liquidity, including our ability to secure new facility management contracts from other government customers.***
> We are exposed to the risk that **we may lose our facility management contracts primarily due to one of three reasons: (i) the termination by a government customer with or without cause at any time; (ii) the failure by a customer to exercise its unilateral option to renew a contract with us upon the expiration of the then current term; or (iii) our failure to win the right to continue to operate under a contract that has been competitively re-bid in a procurement process upon its termination or expiration.** . . . If government agencies were to use these provisions to terminate, or renegotiate the terms of their agreements with us, **our financial condition and results of operations could be materially adversely affected.**

Ex. G, 2018 10-K, p. 36 (emphasis added); *see also id.* p. 23. This included a disclosure that GEO partners with a limited number of governmental customers who account for a significant portion of its revenues, and that those "partners may in the future choose to undertake a review of their utilization of privately operated facilities, or may cancel or decide not to renew our existing contracts with them. The loss of, or a significant decrease in, our current contracts with the BOP, ICE, the U.S. Marshals Service, the State of Florida or any other significant customers could seriously harm our financial condition and results of operations." *Id.* at p. 38. GEO also disclosed that growth was dependent on, *inter alia*, "governmental and public acceptance of public-private partnerships." *Id.* at p. 37; *see also id.* at p. 39, 40.

### 5.    GEO Explicitly Disclosed Risks Associated with COVID-19.

GEO's 2019 10-K for the period ending December 31, 2019 provided a non-exhaustive list of risk factors it could face in its business operations, including an explicit warning related to pandemic outbreaks:

> As owner and operator of secure facilities, processing centers and community reentry centers with operations in many states throughout the United States and multiple foreign countries, we are subject to numerous risks outside of our control, including risks arising from natural disasters, **pandemic outbreaks and other global health emergencies** . . . or similar disruptions that could materially adversely affect our business and financial performance. Such occurrences can result in . . . **disruption of our operations**, **require the evacuation of detainees**

**or our personnel, and require the adoption of specific health protocols or treatments to safeguard the health of our detainees or personnel.** Although it is not possible to predict such events or their consequences, **these events could materially adversely affect our reputation, business and financial condition.**

Ex. T, 2019 10-K, p. 36 (emphasis added).

Once it became known that the novel coronavirus was spreading throughout the world and in the United States, GEO's 2020 first quarter ("Q1") Form 10-Q provided numerous disclosures and cautionary statements related to COVID-19. The "Risks and Uncertainties" section warned about the risks of GEO's inability to mitigate the transmission of COVID-19 in its facilities:

> The Company is closely monitoring the impact of the COVID-19 pandemic on all aspects of its business and geographies, including how it will impact those entrusted in its care and governmental partners. While the Company did not incur significant disruptions during the three months ended March 31, 2020 from the COVID-19 pandemic, *it is unable to predict the impact that the COVID-19 pandemic will have on its financial condition, results of operations and cash flows due to numerous uncertainties.*
>
> …
>
> Additionally, the Company has experienced the transmission of COVID-19 at a small number of our facilities in the second quarter of 2020. *If the Company is unable to mitigate the transmission of COVID-19 at its facilities it could experience a material adverse effect on its financial position, results of operations and cash flows. Although the Company is unable to predict the duration or scope of the COVID-19 pandemic or estimate the extent of the negative financial impact to its operating results, an extended period of depressed economic activity necessitated to combating the disease, and the severity and duration of the related global economic crisis will adversely impact its financial performance.*

Exhibit X, 2020 Q1 Form 10-Q, at p. 7 (emphasis added).

Further, in the "2020 Developments" section of the 2020 Q1 Form 10-Q, GEO included a paragraph on COVID-19, warning about GEO's inability to predict the impact of COVID-19 on its financial condition, results of operations and cash flows. The "Outlook" and "Economic Impact" sections of this SEC report contained additional warnings regarding the economic impacts of COVID-19 on GEO's operations. *Id.* at pp. 36, 46. And, the Form 10-Q supplemented GEO's 2019 Form 10-K with risks associated with the outbreak of COVID-19. *Id.* at p. 50.

Plaintiffs also allege that GEO failed to affirmatively disclose that its COVID-19 response procedures were purportedly inadequate, which subjected residents of GEO's facilities to health risks, and consequently made GEO vulnerable to financial and/or "reputational harm." Am. Compl. ¶ 197. Yet, in addition to specifically outlining its COVID-19 response procedures—

following guidance from the CDC[4]—GEO's SEC filings explicitly warned its shareholders about the risks associated with such reputational harm relating to the alleged or perceived conditions of its private correctional facilities. In its 2019 10-K at page 35, Ex. T, under the heading "[a]dverse publicity may negatively impact our ability to retain existing contracts and obtain new contracts," GEO included the following cautionary statement:

> Any negative publicity about an escape, riot, other disturbance, death or injury of a detainee, **or perceived conditions and access to health care and other services at a facility, including any work program at a facility, under a public-private partnership** … may result in publicity adverse to us and public-private partnerships in general. **Any of these occurrences or continued trends … could have a material adverse effect on our business.**

In addition to these specific disclosures,[5] GEO warns that: "*The risks described below are not the only risks we face. Additional risks not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations.*" Ex. G, 2018 10-K, p. 28 (italics in original). These detailed and prominently featured disclosures placed Plaintiffs—and every GEO shareholder—on notice of the exact types of risks to GEO's stock price that Plaintiffs now claim they were unaware of. *See* Argument § B.2, *infra*, for further discussion.

## ARGUMENT

### A.      The PSLRA Imposes Heightened Pleading Standards.

In order to state a viable claim for securities fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, plaintiffs are required to allege: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the Plaintiff justifiably relied; and (5) that proximately caused the Plaintiff's injury. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1281 (11th Cir. 1999); *see also Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).

In an effort to stem the rampant tide of abusive securities litigation, and dispose of non-meritorious securities fraud claims at the pleading stage, the PSLRA significantly heightened the pleading standards for Section 10(b) claims. *Bryant,* 187 F.3d at 1281. The PSLRA imposes two key requirements and provides that, if they are not satisfied, "the court ***shall***, on the motion of any

---

[4] *See* Statement issued by GEO on its website entitled "GEO Group Has Taken Comprehensive Steps to Address and Mitigate the Risks of COVID-19 to Those in Our Care and Our Employees" ("COVID-19 Response Statement" attached as Ex. AA).

[5] Similar disclosures to the ones cited above can be found in GEO's SEC filings and earnings calls throughout the class period, highlighted copies of which are attached to the Notice of Filing contemporaneously filed with this motion (ECF No. 37].

defendant, ***dismiss the complaint***." 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added).

**First**, Plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief,… [to] state with particularity all facts on which that belief is formed." *Id.* § 78u-4(b)(1). **Second**, Plaintiffs are required "with respect to ***each act or omission alleged*** . . . [to] state ***with particularity*** facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). To satisfy this standard, all of the facts alleged, taken together, must give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

Section 10(b) claims are also subject to Rule 9(b), which requires plaintiffs to plead "(1) precisely what statements were made in which documents or oral representations . . ., and (2) the time and place of each such statement and the person responsible for making . . . same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

In sum, to survive a motion to dismiss a claim brought under §10(b) and Rule 10b-5, the plaintiffs must satisfy, "(1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in [FRCP 9(b)]; and (3) the additional pleading requirements imposed by the [PSLRA]." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

**B.      Plaintiffs Fail to State a Claim Under Section 10(b) Or Rule 10b-5.**

The Amended Complaint fails to plead actionable misstatements, a strong inference of scienter, or loss causation under the applicable standards, and should therefore be dismissed.

**1.      Plaintiffs Merely Rehash Prior Dismissed Claims.**

Plaintiffs' Amended Complaint relies on the same types of allegations previously rejected by Judge Middlebrooks in 2017 in an earlier securities class action against GEO. *See Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308 (S.D. Fla. 2017). In *Mulvaney*, the plaintiffs alleged that GEO made misrepresentations to investors over a four-year period regarding the conditions of their facilities, GEO's compliance with contractual requirements, the efficiency of GEO's operations, and GEO's long-standing partnerships with certain federal agencies. The relied-upon statements were allegedly shown to be untrue by a Department of Justice ("DOJ") Office of Inspector General ("OIG") Report which cited to safety and security concerns in certain GEO

Group facilities, and a subsequent memorandum issued by the DOJ to the Acting Director of the Bureau of Prisons asking him to begin the process of ending the use of privately operated prisons. That announcement caused a 39.58% drop in GEO's share price. *Id.* at 1315-16. Just like here, the *Mulvaney* plaintiffs relied on prisoner lawsuits, fines imposed on GEO, public sentiment, and news articles to weave a narrative in support of their claims.

That narrative failed. Judge Middlebrooks dismissed the *Mulvaney* complaint after finding that it failed to plead false or misleading statements and failed to state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind. *Id.* at 1326. While the Amended Complaint cites to more recent statements in GEO's public filings, it takes the exact same approach taken in *Mulvaney*, and the result should be no different here.

### 2.   GEO's Forward-Looking Statements Are Not Actionable.

Much of the Amended Complaint is barred by the PSLRA safe harbor for forward-looking statements. In each of GEO's pertinent earnings calls, investors were cautioned that:

> [M]uch of the information we will discuss today, including the answers we may give in response to your questions, may include **forward-looking statements regarding our beliefs and current expectations with respect to various matters**. These forward-looking statements are **intended to fall within the Safe Harbor provisions of the securities laws**. Our **actual results may differ materially** from those in the forward-looking statements **as a result of various factors contained in our [SEC] filings**, including the Forms 10-K, 10-Q and 8-K reports.

*See, e.g.*, Ex. B, 3Q-18 Earnings Call (Nov. 7, 2018) at p. 2. GEO's Form 10-K's and 10-Q's during the putative class period also cautioned that:

> "Forward-looking" statements are any statements that are not based on historical information. Statements other than statements of historical facts included in this report, including, without limitation, statements regarding our future financial position, business strategy, budgets, projected costs and plans and objectives of management for future operations, are "forward-looking" statements. **Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate" or "continue" or the negative of such words or variations of such words and similar expressions. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions, which are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements and we can give no assurance that such forward-looking statements will prove to be correct.**

Ex. A, 3Q18 10-Q at p. 46; *see also* Ex. G, 2018 10-K at p. 86-87. As stated above, the SEC filings list the specific risks, uncertainties, and assumptions which bespoke caution as to any reliance on

those forward-looking statements; *precisely* the types of risks Plaintiffs now say they were not made aware of. Plaintiffs nevertheless attempt to rely on such forward-looking statements to plead their securities claim. *See, e.g.*, Am. Compl. ¶ 119 ("We *believe*, we have adequately accounted for known legal cases . . .); ¶ 135 ("We *expect* to continue to enjoy access to cost effective capital to support the expansion of our high quality services."); ¶ 151 ("our annual dividend payments, which we *expect* to remain unchanged") (emphases changed).

These forward-looking statements are subject to the PSLRA's safe harbor provisions. The statute expressly defines certain statements as forward-looking, such as the statements about dividends, capital struct, and future operations Plaintiffs complain about here. 15 U.S.C. § 78u-5(i)(1). A defendant may avoid liability for any forward-looking statement that is false or misleading if the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i)); *see also Philadelphia Fin'l Mgmt. of San Francisco, LLC v. DJSP Enterps., Inc.*, 572 Fed. Appx. 713, 717-18 (11th Cir. 2014); *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (cautionary language adequate where "it tells the reader in detail what kind of misfortunes could befall the company and what the effect could be" even if it does not "explicitly mention *the* factor that ultimately belies [the] forward-looking statement"); *Maeve Inv. Co. Ltd. P'ship v. Teekay Corp.*, No. C16-1908MJP, 2017 WL 5158059, at *5 (W.D. Wash. Nov. 7, 2017) ("statements regarding future dividends and access to funding were forward-looking"); *In re Mako Surgical Corp.*, 2013 WL 2145661, at *6 (S.D. Fla. May 15, 2013) ("[w]e anticipate that our positive results in 2011 will carry forward into 2012" was forward-looking). GEO's forward-looking statements were accompanied by the meaningful cautionary statements set forth in detail above, and therefore are not actionable.[6]

### 3.  Most of Plaintiffs' Claims are Based on Non-Actionable Puffery, Statements of Corporate Optimism, or Opinion.

The bulk of Plaintiffs' allegations are based on statements that are characterized under the law as puffery, corporate optimism, or opinion. These types of statements are not actionable because reasonable investors do not rely on them. *See In re Royal Caribbean Cruises Ltd.*

---

[6] Where the alleged fraud is grounded on forward looking statements, dismissal is required regardless of the state of mind of the speaker, be it negligent, reckless, or even knowing. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 594 F.3d 783, 795 (11th Cir. 2010).

*Securities Litig.*, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) (holding that "[a] statement that is vague, generalized, or 'mere corporate puffery' is immaterial because a reasonable investor would not base a decision on such statements,"); *Philadelphia Fin. Mgmt. of San Francisco v. DJSP Enters., Inc.*, 2011 WL 4591541, at *14, 17 (S.D. Fla. Sept. 30, 2011) (statements about the "efficiency" and "accuracy" of operations and that company was "well positioned" were "non-actionable 'puffery'"); *Mulvaney*, 237 F. Supp. 3d at 1322 ("only material misrepresentations or omissions are actionable."); *Bhatt v. Tech Data Corp.*, 2018 WL 6504375, at *4 (M.D. Fla. 2018) (citing *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1343-44 (M.D. Fla. 2007)).

The Dividend Reduction/Access to Future Capital. The gravamen of the Amended Complaint is that Defendants failed to apprise investors that GEO's dividend was at risk of being reduced due to various operational issues and public scrutiny. *See, e.g.*, Am. Compl. ¶ 109 ("Zoley boasted that GEO's 'dividend is supported by stable and predictable operational cash flows.'"); *see also id.* ¶¶ 110, 114-15, 132-33, 151. Over and over, courts have rejected similar attempts to turn a dividend reduction into a private securities claim. *See, e.g.*, *Walker v. L Brands, Inc.*, No. 2:19-CV-3186, 2020 WL 6118467, at *2 (S.D. Ohio Oct. 16, 2020); *Maeve Inv. Co. Ltd. P'ship v. Teekay Corp.*, No. C16-1908 MJP, 2017 WL 5158059, at *1 (W.D. Wash. Nov. 7, 2017); *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 105 (2d Cir. 1998); *Genna v. Potts*, No. CIV.A. HAR 94-3260, 1995 WL 222043, at *1 (D. Md. Apr. 13, 1995). **This argument, alone, disposes of most of Plaintiffs' claims, and clearly requires dismissal**.

In *Walker*, plaintiff alleged that "in an effort to artificially inflate L Brands common stock, Defendants misleadingly trivialized the risk that the Company may need to cut its dividend." 2020 WL 6118467, at *2. Like here, the plaintiff highlighted language used in L Brands' SEC filings and earnings calls that cash flows and cash balances indicated that the company could "sustain the dividend;" that "the dividend is very safe;" and that "we're confident that we can maintain the dividend." *Id.* at *3-6. The *Walker* court held that such statements constituted "soft information, as opposed to present fact, [and] . . . too vague to be considered material . . . ." *Id.* at *10.

The *Walker* court contrasted the plaintiff's allegations with those in *In re Gen. Elec. Co. Secs. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012), where defendant's optimistic statements were worded as specific guarantees or promises: "The Board has approved management's plan to maintain the current dividend through '09 even in these relatively uncertain economic times at $1.24 a share." *Id.* at 380. GEO made no similar statements. The Amended Complaint cites GEO's

announcements of the specific dividend declared for each quarter, which were true disclosures. Plaintiffs do not claim otherwise; instead, they complain about soft predictions of future ability to pay dividends, like disclosures deemed insufficient to support claims in *Walker* and the cases cited above.

Because the statements at issue here are in the nature of predictive opinion, they are actionable only if they are <u>both</u> subjectively <u>and</u> objectively false—that is, only (1) if the speaker did not genuinely hold the opinion and (2) the opinion lacked a reasonable basis. *Cf. Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, 575 U.S. 175, 189-90 (2015) ("a sincere statement of pure opinion is not an 'untrue statement of material fact'"). Plaintiffs fail to allege that GEO or its relevant executives, did not believe the opinions expressed or that the opinions lacked any reasonable basis at the time they were made. *See Belmont Holdings Corp. v. Sun Trust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 WL 3545389, at *6 (N.D. Ga. Sept. 10, 2010) (dismissing claim "[a]bsent an allegation that Defendants did not believe the statements"); *Genna*, 1995 WL 222043, at *4 (statement that "we *continue to feel* that the current monthly dividend level of $0.26 per share will be sustained through 1994" and other optimistic statements were "mere expressions of optimism and too indefinite to be considered material").

<u>The Quality of GEO's Services.</u> Although the exact same tactic failed in *Mulvaney*, Plaintiffs rely on statements regarding the quality of services provided by GEO, GEO's efficiency and ability to reduce costs for its clients, and the comprehensiveness of its service offerings as a basis for their claims. *See, e.g.,* Am. Compl. ¶ 107 ("high quality services" and "operation of state-of-the-art facilities providing services in *safe, secure and humane environments*"); ¶ 127 ("*our size and breadth of service offerings enable us to generate economies of scale which maximize our efficiencies and allow us to pass along cost savings*"); ¶¶ 128, 140. These types of statements are routinely held not actionable. *See Mulvaney*, 237 F. Supp. 3d at 1320-21; *Philadelphia Fin. Mgmt.*, 2011 WL 4591541, at *14, 17 (statements about the "efficiency" and "accuracy" of operations and that company was "well positioned" were "non-actionable 'puffery'").

<u>The Stability of Customer Partnerships.</u> Plaintiffs also attempt to rely on statements about the stability of GEO's public-private partnerships with their clients. In paragraph 142, for example, Plaintiffs state that during an earnings call, Defendant Donahue commented on a ten-year contract for GEO to continue to operate a facility in New York. Donahue stated, "We **believe** this renewed contract is indicative **of the stability of our long-standing customer partnerships** as our Queens

Facility has been in operation since the 1990s." (emphasis added). Plaintiffs, unable to demonstrate the falsity of Donahue's statement, contend that his "belief" about the "stability" of customer partnerships was misleading because it did not disclose that certain other contracts with other customers were "at risk." Am Compl. ¶ 143. Courts have consistently found such statements to be non-actionable in securities fraud cases. *See, e.g.*, *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (COO's belief that decrease in sales and increase in customer disconnects was an anomaly not related to a new competitor was non-actionable opinion, particularly in light of truthful disclosures in financial statements); *Ladmen Partners, Inc. v. Globalstar, Inc*., No. 07 CIV. 0976 (LAP), 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008) (belief that Company could retain existing customers and attract new customers was non-actionable expression of corporate optimism); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 938 (D.N.J. 1998) (statement that Company "will continue to provide the best in customer service" is immaterial puffery).

The Effect of COVID-19. Plaintiffs continue to allege that GEO's statements about its response to the unprecedented COVID-19 pandemic were false, and that this was "revealed" when the *Intercept* published an article about one GEO facility on June 17, 2020. Am. Compl. ¶¶ 192-197, 212. But, they have added nothing to correct the deficiencies outlined in the Prior Motion to Dismiss. Plaintiffs do not allege that any of the historical statements of fact about cases at GEO's facilities, or its compliance with evolving CDC guidance, or anything in GEO's COVID-19 Response Statement were in any way false or inaccurate as a factual matter. That cases of COVID-19 occurred in GEO facilities, or that inmates previously contracted other infections and needed to be quarantined, does not mean that GEO failed to take appropriate steps to address the pandemic. This is the slimmest reed imaginable upon which to hang a securities fraud claim. Plaintiffs also fail to allege any facts to show that Defendants did not in fact believe the opinions expressed about COVID-19, or that the opinions lacked any reasonable basis. *See Belmont Holdings*, 2010 WL 3545389, at *6 (dismissing claim "[a]bsent an allegation that Defendants did not believe the statements").

4. **The "Truth on the Market" Doctrine Bars Plaintiffs' Claims.**

Just as statements of corporate optimism, or "puffery," are not actionable, so too are alleged misstatements when the market already knows the truth. *See, e.g.*, *Wallace v. Sys. & Computer Tech. Corp.*, 1997 WL 602808 (E.D. Pa. Sept. 23, 1997) ("If the market has become aware of the

allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market would not be misled."); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) ("To prevail on [a fraud on the market] theory, a plaintiff must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression."). A truth-on-the-market defense may be granted on a motion to dismiss "where the company's SEC filings or other documents disclose the very information necessary to make their public statements not misleading." *Wallace*, 1997 WL 602808, at *10. Thus, even if this Court accepts Plaintiffs' characterization of GEO's specific public statements as inaccurate or incomplete, Plaintiffs' claims still fail because the market had access to all of the public information cited in the Amended Complaint, which renders those statements immaterial.

Plaintiffs allege that GEO's stock traded in an efficient market. Am. Compl. ¶ 242. Plaintiffs were adequately informed of the risks of pending lawsuits, public scrutiny, inspector general reports, divestitures from the stock, political decisions to exit private partnerships, and the loss of capital from certain banks. Plaintiffs admit that those matters were widely discussed in GEO's SEC filings, the press, and the public domain. *See, e.g., Id.* ¶¶ 7, 10-12, 14, 19, 21, 53, 57 n.6, 58, 60-62. GEO itself disclosed much of what Plaintiffs complain about, such as the lawsuits filed against GEO, banking decisions, and COVID infections. *See, e.g., id.* ¶¶ 112, 123, 144, 146-47, 157, 162, 168, 179, 192-95; *see also* Notice of Filing [ECF No. 37] (with highlighted disclosures). These disclosures are fatal to all of Plaintiffs' claims since it is axiomatic that "[a] Plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 116-17 (2d Cir. 1982). Much of this was in the public domain even before the class period began. *See* Am. Compl. ¶¶ 112 (wage claim cases filed in 2014 and 2017); ¶¶ 6-7 (activism campaigning banks to stop funding private detention industry beginning in April 2018); *see also Mulvaney*, 237 F. Supp. 3d at 1311 (2016 allegations about GEO's operations similar to those Plaintiffs now claim to have been recently "revealed"). Because "the information that defendants are alleged to have withheld from or misrepresented to the market has entered the market through other channels, the market will not have been misled, and ... plaintiffs' claims ... will fail." *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1409 (citation omitted).

### 5.    __Plaintiffs Have Not Adequately Pled Falsity of GEO Statements.__

Plaintiffs have failed to adequately allege, with particularity, *why* GEO's statements they rely upon were false or misleading. Instead, Plaintiffs repeatedly quote selectively copied portions of GEO's public filings and earnings calls, and then present unrelated reasons purportedly showing the falsity of the referenced statement. Plaintiffs attach a 25-page "Appendix" to the Amended Complaint with all of the alleged misrepresentations (which Defendants address one-by-one in Exhibit BB filed herewith). However, when this Court parses each of those disclosures—as it must on a motion to dismiss—it will find that Plaintiffs' arguments of falsity do not withstand scrutiny.

The pattern repeats throughout the lengthy Amended Complaint. For example, in paragraph 125, Plaintiffs focus on statements in the 2018 10-K that GEO received certain accreditations. Paragraph 126 purports to demonstrate why those representations were false or misleading, but the reasons provided (reports about conditions at two facilities, the affirmance of a class certification case, and a fine paid in relation to one facility) do not actually show that GEO did not have the accreditations it claimed to have. *See also* Am. Compl. ¶¶ 149-50, 164-65, 174-75, 190-91.

Similarly, Plaintiffs highlight statements made by various GEO executives that GEO had, and expected to continue having, access to cost-effective capital. *See, e.g.*, Am. Compl. ¶¶ 135-36. Plaintiffs claim those statements are false by pointing to decisions made by certain "big banks" who, under the weight of political pressure, publicly announced they would later divest from the private detention industry by not renewing certain credit facilities. *See id.* ¶ 137. But the potential future divestiture by certain banks from their long-standing relationships with GEO does not demonstrate (a) that GEO knew when the prior statements were made that unannounced divestitures would occur, or (b) that GEO did not have access to other cost-effective capital from different sources, including other large financial institutions. *See In re Centerline Holdings Sec. Litig.*, 678 F. Supp. 2d 150, 158 (S.D.N.Y. 2009) (failed to show inference of scienter regarding statement of no "concern about access to capital").

Plaintiffs' reliance on SOX certifications also fails. *See* Am. Compl. ¶¶ 130-31, 181-82. "[T]here is nothing in either the [Exchange Act] or the Sarbanes-Oxley Act and implementing regulations that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a Sarbanes-Oxley certification." *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *17 (N.D. Cal. 2007). SOX certifications are insufficient to serve as a basis for a 10(b) claim. *See In re KBR, Inc. Sec. Litig.*, CV H-17-1375, 2018 WL 4208681, at *8 (S.D. Tex. Aug. 31, 2018) (statements contained in SOX certifications not actionable under 10(b) where the allegations do

not challenge the content of the certifications themselves). Relatedly, SOX certifications do not even give rise to an inference of scienter except in very limited circumstances, not applicable here. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-66 (11th Cir. 2006) (SOX certification can only be probative of scienter if signatory was severely reckless that the *financial statements* contained material misstatements or omissions). No material misrepresentations or omissions in GEO's financial statements are alleged.

Finally, Plaintiffs cite repeatedly to GEO's disclosures about pending lawsuits, *e.g.,* Am. Compl. ¶¶ 112, 123, 144, claiming that those statements were misleading because they warned that "The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit," and that "The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows." *E.g.*, *id.* ¶ 144. Plaintiffs claim that these statements were false because Defendant Zoley wrote to ICE and requested that the DOJ take over the defense costs of the lawsuits and reimburse GEO for its previously incurred costs. *Id.* ¶ 145. But, Plaintiffs do not allege that GEO failed to disclose or misstated the actual costs of defense incurred during any particular reporting cycle, or violated any GAAP principles in its method of accounting for such expenses.[7] Plaintiffs also rely on a letter Senator Warren wrote to the SEC about these same issues and urged the SEC to investigate GEO. But, the existence of a pending investigation—not even alleged by Plaintiffs—is not a basis to find fraud as to the matter under investigation. *See Meyer v. Greene*, 710 F.3d 1189, 1200 (11th Cir. 2013) ("the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b)"). A letter written by a politician asking for an investigation to be commenced provides even less of a basis.

### 6.   Plaintiffs Fail to Sufficiently Plead Loss Causation.

Plaintiffs also fail to sufficiently plead that the alleged misstatements caused their losses. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-47 (2005); *see also* 15 U.S.C. §78u-4(b)(4); *Robbins v. Koger Prop., Inc.,* 116 F.3d 1441, 1447 (11th Cir. 1997). Even in a fraud-on-the-market case like this one, "the Plaintiffs must prove not only that a fraudulent misrepresentation artificially

---

[7] Defendants' fully disclosed decision not to accrue a reserve does not give rise to a material misrepresentation as a matter of law. *See Luna v. Marvell Tech. Grp. Ltd*, No. 15-CV-05447-RMW, 2016 WL 5930655, at *7 (N.D. Cal. Oct. 12, 2016) (accrual not required under GAAP even after company had judgment entered against it in litigation).

inflated the security's value but also that 'the fraud-induced inflation that was baked into the Plaintiffs' purchase price was subsequently removed from the stock's price, thereby causing losses to the Plaintiffs.'" *Meyer*, 710 F.3d at 1195. This loss causation requirement can be satisfied by pleading the existence of a corrective disclosure that purportedly revealed ***new*** information about the alleged fraud to the market and caused a price drop. *See Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855 (11th Cir. 2015) (holding that loss causation was inadequately pleaded under fraud-on-the-market doctrine where plaintiffs relied on an OIG investigation, whistleblower case, and equity analyst's report, none of which disclosed actual wrongdoing or qualified as a corrective disclosure establishing causal link for loss).

Plaintiffs fail to make a showing of proximate cause, nor can they given the truthful nature of GEO's alleged misrepresentations and the risk disclosures in its public filings. Plaintiffs' claim is that the reduction of GEO's dividend was a corrective disclosure that revealed the "full truth." But, the Amended Complaint makes clear that the various operational, financial, political, and pandemic-related risks that Plaintiffs claim led to GEO's decision to reduce its dividend were well-known. No new information was revealed when GEO announced a dividend reduction and the stock price declined.

### 7.   Plaintiffs Fail to Plead a Strong Inference of Scienter.

Although Plaintiffs' failure to plead actionable misstatements or loss causation is sufficient to dismiss the Amended Complaint, their claims independently fail because they do not raise a strong inference of scienter. Plaintiffs must, "with respect to ***each act or omission alleged*** . . ., state ***with particularity*** facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see also Tellabs*, 551 U.S. at 314. To determine whether scienter allegations are sufficient, a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id*. The Amended Complaint must satisfy this standard with particular allegations that *each* defendant acted knowingly or in a severely reckless manner. *See Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1323 (S.D. Fla. 2004) (citing *Bryant*, 187 F.3d at 1283-87); Exchange Act § 21D(b)(2), 15 U.S.C. § 78u-4(b)(2). "[A]llegations of motive and opportunity to commit fraud, standing alone, are insufficient to establish scienter in this Circuit." *Bryant*, 187 F.3d at 1285. Rather, the standard is "severe recklessness": "those ***highly unreasonable*** omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an ***extreme*** departure from the standards of

ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendants or is so obvious that the defendants must have been aware of it." *Ziemba.*, 256 F.3d at 1202 (citation omitted); *In re Sunstar Sec. Healthcare Litig.*, 173 F. Supp. 2d 1315, 1319 (M.D. Fla. 2001). In short, a complaint must explain the "why" of alleged securities fraud. *E.g., In re Rexall Sundown, Inc. Sec. Litig.*, 2000 WL 33539428, *3 (S.D. Fla. Mar. 29, 2000).

The Amended Complaint does not even come close to alleging a "strong inference" of scienter, requiring dismissal. Plaintiffs rest on nothing but the insufficient scienter allegation that, "[g]iven the high-profile sources of the scrutiny, GEO's leadership—including its CEO, CFO, SVPs, and Presidents of subsidiaries—were aware of those facts (or severely reckless in purposely ignoring those facts)." Am Compl. ¶ 220; *see also id.* ¶¶ 39-42.

Numerous courts have rejected this type of "they must have known" allegation. "[M]ere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter." *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1286 (S.D. Fla. 2008) (quoting *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002)); *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000) (allegations that individual defendants controlled a company's day-to-day operations, signed public filings with the SEC and were "privy to confidential proprietary information" held insufficient to plead scienter). Plaintiffs' scienter allegations are exactly the type of allegations that have consistently been found to be insufficient to support a strong inference of scienter under the PSLRA. Moreover, with respect to matters such as Plaintiffs' reliance on lawsuits disclosed in GEO's public filings and the decisions by banks not to finance the company going forward, GEO's disclosure of that unfavorable information weighs against an inference of scienter. *See In re BellSouth Corp. Securities Litig.*, 355 F. Supp. 2d 1350, 1375 (N.D. Ga. 2005) ("BellSouth's full disclosure of the Florida late fee proceedings at all relevant times further discredits that Defendants acted with scienter.").

The scienter allegations also are deficient in failing to allege an inference of scienter as to **each** Defendant. The PSLRA requires a complaint to state with particularity facts giving rise to a strong inference that *each separate defendant* acted with scienter with respect to *each act or omission alleged*. *See Smith Gardner*, 214 F. Supp. 2d at 1303 (citing *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1341 (S.D. Fla. 1999)). Plaintiffs fail to allege a scintilla of fact that Defendants had knowledge of any alleged fraud. They refer to no alleged e-mails, memos,

meetings, or other evidence that could give rise to an inference of scienter. Plaintiffs also fail to show how Defendants allegedly stood to personally gain by their alleged fraud. Nothing here logically points to an inference of fraud. The more plausible inference is that GEO was addressing, and promptly disclosing, any challenges it faced in its business, such as relations with lenders, government customers, new legislation, and the COVID pandemic. Plaintiffs' generalized scienter allegations are plainly inadequate under the demanding PSLRA and *Tellabs* standard.[8]

## C.      Count II Fails to State a Section 20(a) Claim Against the Individual Defendants.

First, because Plaintiffs do not state a cause of action for a primary violation of the Exchange Act, Count II for secondary, "control person" liability also fails. Section 20(a) of the Exchange Act imposes liability on certain "control persons" for primary violations of Section 10(b) by a "person liable," i.e., the issuer of securities. *See Laperriere v. Vesta Ins. Group, Inc.*, 526 F. 3d 715, 721 (11th Cir. 2008). To state a claim, a plaintiff must plead a primary violation in compliance with the PSLRA and Rule 9(b). *See In re Royal Caribbean Cruises*, 2013 WL 3295951 at *19 (dismissing Section 20(a) claim where plaintiffs failed to state a claim under Section 10(b)); *Mizzaro*, 544 F. 3d at 1255 (same). Here, because Plaintiffs have not adequately pled a primary violation by GEO, the Section 20(a) claim against the Individual Defendants necessarily fails as well. *See Mulvaney*, 237 F. Supp. 3d at 1326.

Plaintiffs' Section 20(a) claim also fails because Plaintiffs do not sufficiently plead that any of the Individual Defendants had the power to control GEO's business affairs, generally, or the dissemination of the purportedly false and misleading statements alleged, specifically. Control requires that an individual be in "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." *Laperriere*, 526 F.3d at 723 (quotation omitted). A plaintiff must do more than restate a legal conclusion of control. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) ("[C]onclusory allegations of control are insufficient as a matter of law."); *In re Global Crossing, Ltd., Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005).

---

[8] Plaintiffs' sole attempt to specify a writing by one of the Defendants relates to Zoley's letter to ICE requesting that the agency assist GEO with the costs of defending the work program cases in Colorado, Washington, and California. Am. Compl. ¶ 7. But, Plaintiffs fail to demonstrate scienter because they have not alleged that GEO's disclosure about the accounting method used to disclose legal costs, or the amount reflected in each financial statement, was in any way inaccurate.

The Amended Complaint fails to allege facts to support that each Individual Defendant asserted control for purposes of Section 20(a) liability. Rather, the Amended Complaint lumps them together by means of boilerplate allegations that they "participated in the operation and management of GEO, and conducted and participated, directly and indirectly, in the conduct of GEO's business affairs." Am. Compl. ¶ 256. Plaintiffs then make the conclusory statement that "[b]ecause of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GEO disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies." Am. Compl. ¶ 258.

Rather than cite facts sufficient to plead control, the sparse allegations include routine involvement in earnings calls, signing various SEC filings, inexplicable references to forward-looking statements, and rote recitals of the individuals' roles at GEO. Plaintiffs' shotgun pleading contains numerous "allegations" identifying public statements made by the Individual Defendants, but statements alone, without specific control, are insufficient to plead a Section 20(a) claim. Notably, the two newly added Individual Defendants, Donahue and Schlarb, did not even sign the SEC filings. Exs. A-Z. By improperly lumping all of the Individual Defendants together, the Amended Complaint fails to allege specific facts sufficient to establish that any of them effectively "controlled" GEO with respect to the alleged "primary violation" or "acted recklessly in failing to do what they could have done to prevent the primary violation." *Laperriere*, 526 F.3d at 725. At most, the Individual Defendants are alleged to have done their jobs on behalf of the corporate defendant.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants respectfully request that Plaintiffs' Amended Complaint be dismissed in its entirety, this time with prejudice.[9]

---

[9] This is the second complaint filed in this action. If Plaintiffs' claims are dismissed, the Court should find that any further amendment would be futile and the Amended Complaint should be dismissed *with prejudice. See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *19; *Harris,* 182 F.3d at 807-08 (affirming dismissal of securities class action and denial of leave to amend); *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 700 (6th Cir. 2004) ("[T]he purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA").

## REQUEST FOR HEARING UNDER L.R. 7.1(b)

Defendants respectfully request oral argument on the merits of the instant motion. The motion presents intricate and complicated legal issues related to Plaintiffs' claims that are brought under the Securities Exchange Act of 1934. Defendants believe that a hearing on the motion, which would permit an opportunity for the Court to inquire of counsel, would significantly enhance the Court's decision-making process. Plaintiffs' Amended Complaint, which attempts to assert a broad class action, is extensive: it contains 260 numbered paragraphs and specifies more than sixty statements it alleges to be false or misleading that span a period of nearly two years. Oral argument will permit the parties to discuss these allegations in greater depth than space permits in the written briefing. Further, a hearing will enable the parties to fully illuminate the application of the numerous authorities to the facts alleged here. Defendants anticipate that the ruling on the instant motion will be cited by future litigants and trust that a hearing will be helpful to the Court's consideration of this complex area of law. Defendants estimate that one hour would be sufficient for oral argument.

Dated: December 18, 2020

Respectfully submitted,

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL 33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

By: /s/ *Brian P. Miller*
     Brian P. Miller, Esq.
     Florida Bar No. 0980633
     brian.miller@akerman.com
     Samantha J. Kavanaugh, Esq.
     Florida Bar No. 0194662
     samantha.kavanaugh@akerman.com

***Counsel for Defendant The GEO Group, Inc.***

**GUNSTER, YOAKLEY & STEWART, P. A.**
600 Brickell Avenue, 35th Floor
Miami, FL 33131
Telephone: (305) 376-6000
Facsimile: (786) 425-4090

By: /s/ *William K. Hill*
     William K. Hill, Esq.
     Florida Bar Number: 747180
     Primary: whill@gunster.com
     Secondary: mmotola@gunster.com
     George S. LeMieux, Esq.
     Florida Bar Number: 16403
     Primary: glemieux@gunster.com
     Secondary: alevene@gunster.com
     Secondary: eservice@gunster.com
     Ernest "EJ" A. Cox IV, Esq.
     Florida Bar Number: 124652
     Primary: ecox@gunster.com
     Secondary: mmargolese@gunster.com

*Counsel for Defendants George C. Zoley,*
*Brian R. Evans, J. David Donahue, and*
*Ann M. Schlarb*