**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 9:20-81063-CIV-SMITH**

STEVE HARTEL, Individually and on Behalf
of All Others Similarly Situated,

              Plaintiff,

      v.

THE GEO GROUP, INC., GEORGE C.
ZOLEY, BRIAN R. EVANS, J. DAVID
DONAHUE, and ANN M. SCHLARB,

              Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
<u>LEAD PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    STATEMENT OF FACTS ..................................................................................... 2

III.   RELEVANT LEGAL STANDARD ...................................................................... 6

IV.   ARGUMENT ........................................................................................................ 6

        A.    Defendants Made Material Misstatements and Omissions. ............................ 6

                1.    Plaintiffs Allege Why Each Statement Is False or Misleading. .............. 7

                2.    The Misstatements and Omissions Are Material. ................................. 10

                3.    Defendants' Truth-on-the-Market Defense Fails.................................. 12

                4.    The PSLRA's Safe Harbor Does Not Apply. ....................................... 13

                5.    Plaintiffs' Claims Are Different From Those Alleged in Mulvaney...... 15

        B.    Plaintiffs Adequately Allege Scienter. ............................................................ 16

        C.    Plaintiffs Adequately Allege Loss Causation. ................................................ 18

        D.    Plaintiffs Adequately Allege "Control Person" Liability............................... 19

V.     CONCLUSION.................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
568 U.S. 455 (2013) ......................................................................................................... 13

*Aranaz v. Catalyst Pharm. Partners Inc.,*
302 F.R.D. 657 (S.D. Fla. 2014) ..................................................................................... 13

*Bryant v. Dupree,*
252 F.3d 1161 (11th Cir. 2001) ...................................................................................... 21

*Carvelli v. Ocwen Fin. Corp.,*
934 F.3d 1307 (11th Cir. 2019) ........................................................................................ 6

*City of Providence v. Aeropostale, Inc.,*
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ............................................................... 13

*Decker v. Massey-Ferguson, Ltd.,*
681 F.2d 111 (2d Cir. 1982) ........................................................................................... 13

*FindWhat Inv. Grp. v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) ...................................................................... 7, 10, 15, 19

*In re Avon Sec. Litig.,*
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............................................................... 12

*In re BankAtlantic Bancorp, Inc. Sec. Litig.,*
2011 WL 13151674 (S.D. Fla. Apr. 21, 2011) ............................................................... 13

*In re BellSouth Corp. Sec. Litig.,*
355 F. Supp. 2d 1350 (N.D. Ga. 2005) ..................................................................... 18, 19

*In re E.S. Bankest, L.C.,*
2010 WL 1417732 (Bankr. S.D. Fla. Apr. 6, 2010) ...................................................... 18

*In re Equifax Inc. Sec. Litig.,*
357 F. Supp. 3d 1189 (N.D. Ga. 2019) .......................................................................... 18

*In re Flowers Foods, Inc. Sec. Litig.,*
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) .......................................................... 18, 19

*In re Friedman's, Inc. Sec. Litig.,*
385 F. Supp. 2d 1345 (N.D. Ga. 2005) .......................................................................... 18

*In re Gen. Elec. Co. Sec. Litig.,*
857 F. Supp. 2d 367 (S.D.N.Y. 2012) ........................................................................... 12

*In re HD Supply Holdings, Inc. Sec. Litig.,*
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ................................................................ 9, 15, 19

*In re Jiangbo Pharm., Inc., Sec. Litig.,*
884 F. Supp. 2d 1243 (S.D. Fla. 2012) .......................................................................... 19

*In re Paradyne Networks, Sec. Litig.,*
197 F. Supp. 2d 1349 (M.D. Fla. 2002) ......................................................................... 14

ii

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002) ...................................................................... 14

*In re Scientific Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010) ...................................................................... 19

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009) ........................................................................ 14

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ...................................................................................... 13

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................................... 9

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ....................................................................................... 15

*Keippel v. Health Ins. Innovations, Inc.*,
  2019 WL 5698329 (M.D. Fla. Nov. 4, 2019)............................................................... 11

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ........................................................................................ 2

*Laperriere v. Vesta Ins. Grp., Inc.*,
  526 F.3d 715 (11th Cir. 2008) .................................................................................... 20

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2014 WL 6661918 (N.D. Ala. Nov. 19, 2014)............................................................. 13

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.,*
  762 F.3d 1248 (11th Cir. 2014) .................................................................................... 6

*Luczak v. Nat'l Beverage Corp.*,
  812 Fed. App'x 915 (11th Cir. 2020)............................................................................ 6

*Martinek v. AmTrust Fin. Servs., Inc.*,
  2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020) ............................................................ 15

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  2019 WL 5394011 (M.D. Fla. Oct. 16, 2019)................................................... 8, 10, 11

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  2020 WL 1072582 (M.D. Fla. Feb. 14, 2020) ....................................................... 8, 15

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .................................................................................. 19

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014)........................................................................ 14

*Mulvaney v. GEO Grp., Inc.*,
  237 F. Supp. 3d 1308 (S.D. Fla. 2017) ....................................................................... 16

*Nguyen v. Radient Pharm. Corp.,*
  2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ............................................................. 12

iii

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................... 11, 17

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  632 F.3d 762 (1st Cir. 2011)................................................................................ 20

*Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015) .................................................................. 17

*Rudolph v. Arthur Andersen & Co.*,
  800 F.2d 1040 (11th Cir. 1986) ............................................................................ 9

*SEC v. Merchant Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007) ................................................................... 9, 13, 15

*SEC v. Watkins Pencor, LLC*,
  810 F. App'x 823 (11th Cir. 2020)........................................................................ 10

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................................ 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................... 17, 19

*Tucker v. Bradshaw*,
  2013 WL 12249773 (S.D. Fla. July 23, 2013)........................................................ 2

*Tung v. Dycom Indus., Inc.*,
  454 F. Supp. 3d 1244 (S.D. Fla. 2020) .................................................................. 20

*Walker v. L Brands, Inc.*,
  2020 WL 6118467 (S.D. Ohio Oct. 16, 2020))....................................................... 11

*Wallace v. Sys. & Comput. Tech. Corp.*,
  1997 WL 602808 (E.D. Pa. Sep. 22, 1997) ........................................................... 13

**Statutes**

15 U.S.C. § 78t(a)........................................................................................................ 20

15 U.S.C. § 78u-4(b)(1)................................................................................................ 6

17 C.F.R. § 240.10b-5(b).............................................................................................. 7

Lead Plaintiffs[1] respectfully submit this Opposition to Defendants Motion to Dismiss (ECF No. 36) ("Motion" or "MTD").

## I.  INTRODUCTION

From November 7, 2018 to August 5, 2020, inclusive (the "Class Period"), Defendants misrepresented the state of GEO's business. As encapsulated by a letter to the SEC from Senator Elizabeth Warren in the middle of the Class Period:

> I write to bring to your attention what appears to be a series of misleading public statements and omissions of material facts by top executives of The GEO Group, Inc. (GEO), one of the nation's largest for-profit prison operators, concerning several lawsuits against the company. These GEO executives . . . may have violated federal securities laws.
>
> *     *     *
>
> It is difficult to reconcile the dire, ***private*** communications of GEO's top executives about the lawsuits and the failure to disclose any clear financial threat facing the company in SEC filings and on earnings calls.

But the situation was more dire than Senator Warren realized. Lawsuits were only the beginning of GEO's undisclosed problems.

By early August 2019, public backlash against GEO's substandard operations had led the publicly-disclosed banks that provided GEO with credit and term loans—including JPMorgan, BofA, WF, Suntrust, BNP, Fifth Third, Barclays, and PNC—to commit to ending future financing of GEO. As a REIT, GEO had to distribute the vast majority of cash flows as dividends and, in turn, could not properly fund operations without a healthy flow of financing from those lenders. Notwithstanding these facts, Defendants assured investors that GEO's banking relationships and access to capital were stable, cash flows were growing, and dividends were supported.

A series of corrective disclosures proved those statements wrong and caused GEO's stock price to plummet. Shareholders lost tens of millions of dollars. Through this lawsuit Plaintiffs seek to recover those damages on a class-wide basis under § 10(b) of the Exchange Act.

Despite the Complaint's well-pleaded allegations, Defendants raise a series of misplaced challenges. Defendants contend that no statements or omissions were misleading; any such statements or omissions were immaterial to investors; investors knew the truth of those statements or omissions; and any false statements were pure opinions or forward-looking statements with

---

[1] Capitalized terms herein shall have the meaning ascribed to them in the Am. Compl. (ECF No. 33). References to "¶" are to the Am. Compl. Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

1

meaningful cautionary language. Defendants further argue that, even if there were materially false statements, they did not act recklessly or knowingly. Finally, Defendants submit that any misleading statements did not cause losses to investors.

Those arguments recategorize and misconstrue Plaintiffs' allegations. When taken as true with all reasonable inferences construed in Plaintiffs' favor, the Complaint shows that Defendants recklessly or knowingly painted a misleading picture of GEO and investors suffered substantial losses as the truth was revealed. Thus, the Court should deny Defendants' Motion in its entirety.[2]

## II.      STATEMENT OF FACTS

GEO is a leader in the private prison business. ¶2. As a REIT, GEO must distribute at least 90% of its income each year as dividends to shareholders. ¶49. This requirement severely limits GEO's funds to run operations, forcing the Company to rely on capital markets to fund growth investments. *Id*. Accordingly, GEO's continued success depended on lucrative financing deals with large banks like JPMorgan, WF, and BofA, on top of maintaining stable, revenue-generating contracts with federal, state, and local governments. ¶50. This ready access to capital contributed to GEO's maintenance of its quarterly dividend levels – a key metric for investors. ¶52.

Critically, to maintain its dividends, as well as the capital investments that funded operational growth, GEO had to successfully operate its facilities in compliance with a host of contractual and regulatory requirements, while satisfying standards of due process and human rights. ¶53. GEO failed to do so. The Complaint details a number of ongoing human rights violations in GEO's detention centers prior to and throughout the Class Period, including: inadequate medical and mental health care (2012-2015 ¶58, March 2018 ¶61, May 2018 ¶¶62-63); forced labor (¶¶59-60); "unsafe and unhealthy conditions at all of the facilities" (¶63); understaffed facilities resulting in uprisings (June 2019 ¶¶65-67); crises involving suicide, riots, violence, and drug overdoses (June-Sept. 2019 ¶68, Dec. 2019 ¶69); severe overcrowding resulting in "an immediate risk to the health and safety

---

[2] In an effort to undermine the Complaint, Defendants attached 28 exhibits to their Motion. ECF No. 37. Defendants' attempt should be rejected. *See Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018) ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery."). Circumventing the page limits set forth in S.D. Fla. L.R. 7.1.C.2, moreover, Defendants attached 32 extra pages of conclusory arguments. Exhibit BB (ECF No. 37-28); *see also Tucker v. Bradshaw*, 2013 WL 12249773 (S.D. Fla. July 23, 2013) (striking motion exceeding the limit set forth in the local rules).

not just of the detainees, but also DHS agents and officers" (Jan. 2020 ¶69, May 2019 ¶73); and inadequate training and detainee safety (July 2020 ¶72).

As a result of these deficiencies, GEO was subject to multiple fines, investigations, and class actions that posed "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and to continue receiving revenue from those facilities. ¶¶57-74. As GEO's operational deficiencies became public, banks and institutional investors began rethinking their funding of and investments in private prisons. ¶75. In May 2017, for example, JPMorgan stated it would reassess whether to continue to finance private prisons. ¶76. In November 2018, CalSTRS, after a 6-month investigation visiting detention facilities and meeting with senior management to discuss operational processes and risk management efforts, divested its holdings in GEO – approximately $13.7 million. ¶78.

Yet, throughout the Class Period, Defendants did not reveal those fundamental facts to investors. When the Class Period begins in November 2018 (well after JPMorgan's statement and CalSTRS's investigation), Defendants maintained the appearance of business as usual, *i.e.*, that they were not at risk of losing their financing deals with big banks or contracts with governments. ¶8. On November 7, 2018, and February 14, 2019, Defendants touted that GEO's dividend was "supported by stable and predictable operational cash flows." ¶¶109-10, 115. On November 7, 2018, Defendant Zoley also assured investors that GEO has "***consistently helped our government partners meet their correctional and detention challenges*** with the development and operation of state-of-the-art facilities providing services in ***safe, secure and humane environments.***" ¶107. These statements omitted the material fact that, under the increasingly charged political climate, GEO was facing increased scrutiny from its lenders and a risk to profitability. ¶¶108, 111, 116.

Investors were harmed when the truth about these statements was revealed. For example, on March 5, 2019, the truth began leaking out that GEO's financing relationships had cracked under the intense public and political scrutiny, thereby limiting GEO's access to capital. ¶202. That day, *Bloomberg* and *Reuters* reported that JP Morgan had "decided to stop financing private operators of prisons and detention centers." *Id.* Then, on March 10, 2019, U.S. Bank announced it had reduced its credit exposure to GEO to "an immaterial amount," and on March 12, 2019, WF's CEO stated that the bank would exit its relationship with GEO. ¶203. Because of these revelations – indicating that the Company's cashflows, operations, and profits (and, therefore, dividends) were no longer predictable or stable – GEO's share price fell over 11% on March 8, 2019, and another 5% on March 14, 2019, on heavy trading. ¶204.

3

Despite the uncertainty of where GEO would obtain future financing when the public prison industry was under heightened scrutiny, Defendants continued to misleadingly assure investors of "*the stability of our cash flows and the sustainability of our annual dividend payments*" on April 13, 2019 and July 30, 2019. ¶¶132-51. These statements were made after the DHS OIG's May, June, and July 2019 reports revealing several detention centers, including multiple GEO facilities, were violating government standards and calling for immediate action to address the substandard conditions, inadequate medical care, and overcrowding at these facilities. ¶11. Similarly, Senator Warren published her July 24, 2019 letter to the SEC Chairman, calling attention to "*a series of misleading public statements and omissions of material facts by top executives of The GEO Group, Inc.*" ¶60. Senator Warren highlighted the stark difference between GEO's public statements of confidence in its financial position and non-public statements by executives, including Defendant Zoley, expressing GEO's growing financial concerns. ¶60.

Denying the reporting as false, Defendants again misled investors and even doubled down, claiming that GEO was doing so well that it would be able to deleverage. Specifically, on July 30, 2019, Defendant Zoley addressed "the recent media stories regarding overcrowded border patrol facilities and financial institutions discontinuing future financial support for private operators of ICE Processing Centers," unequivocally debunking them as being "driven by a *false narrative* and deliberate mischaracterization of our long-standing role as a quality service provider to ICE." ¶¶146, 159. In the face of decreased financing and increased scrutiny about GEO's operational deficiencies, Zoley assured investors that GEO's "growing earnings *will allow us to naturally deleverage*, while providing support for our *annual dividend payments*, which we expect to *remain unchanged*." ¶¶151-52, 162.

By early August 2019, eight banks had said they would no longer lend to GEO and other private prisons. ¶83. Notably, every bank which had a publicly-disclosed financing relationship with GEO indicated it would be terminating its agreements. *Id*. Despite these mounting pressures, on November 5, 2019, Defendants once again falsely assured investors that the intense scrutiny was not impacting GEO's cash flows or dividend levels. Defendant Zoley specifically reiterated that "this volatility has been driven by a *false narrative* and *deliberate mischaracterization* of our long-standing role as a quality service provider to ICE," "[t]here has been a significant amount of *misinformation regarding our banking partners and access to capital*," and "growing earnings and cash flows will allow us to *deleverage* while providing support for our *annual dividend payments* which we expect to remain *unchanged*." ¶¶15, 159-60.

4

On February 12, 2020, well after the eight largest banks terminated their financing relationship with GEO and in the face of COVID-19, Defendant Evans maintained that GEO "continue[s] to enjoy *access to capital with several dozens of lenders and financial institutions*" and its "*dividend payments continue to be supported by our cash flows and earnings*." ¶170. In the same month, GEO was purportedly conducting a study, which led to the sudden announcement on March 10, 2020, that GEO's five-year $259 million contract with Delaware County was terminating four years early (at a loss of 80% of expected revenue). ¶209.

At the same time, on March 9, 2020 after the market closed—and in the wake of GEO's past operational deficiencies and rising public concern over COVID-19—multiple senators sent a public letter to GEO, pressing for information about the policies and procedures the Company had "in place to prepare for and manage a potential spread of the novel coronavirus among federal prisoners in GEO's custody and among correctional staff at GEO facilities." ¶208. The letter noted that "incarcerated individuals 'are at *special risk* of infection, given their living situations.'" *Id*.

In response to the revelation on March 9, 2020, regarding the special risk of COVID-19 in GEO's facilities, and on March 10 regarding GEO's loss of over $200 million in future revenue, GEO's share price plummeted over 29% after two days of heavy trading. ¶210.

Nonetheless, Defendants continued to assure investors that GEO's cashflows and dividend levels would remain the same and that they were equipped for COVID-19. On April 30, 2020, Defendants falsely or misleadingly stated that: (i) "[f]rom the outset of the COVID-19 global pandemic our corporate, regional and field staff have implemented comprehensive steps to address and mitigate the risks of COVID-19 to all those in our care and our employees;" (ii) "[a]ll of our facilities *operate safely* and *without overcrowded conditions*;" (iii) "most of our facilities have had *very few or no cases of COVID-19*;" (iv) we had "*implementat[ed]...quarantine and cohorting procedure*s to isolate confirmed and presumptive cases of COVID-19, including medical isolation and the use of airborne infection isolation rooms;" (v) we had deployed "specialized sanitation teams to *sterilize high-contact areas* of our facilities and have developed *intensive schedules and procedures for the cleaning and disinfecting of facility spaces* above and beyond normal cleaning activities." ¶¶183-85, 187-88, 190, 192-96.

Less than two months later, the truth – that GEO's response to COVID-19 was nothing but a "blundering" disaster, impacting its cashflow and dividend – was revealed. ¶212. Before the market opened on June 17, 2020, *The Intercept* published an article entitled "GEO Group's Blundering Response to the Pandemic Helped Spread Coronavirus in Halfway Houses." *Id*. According to the

article "the virus spread not in spite of the facility's efforts to contain it, ***but because of it***," and GEO's "blundering" response included keeping residents in overcrowded conditions without enforcing personal protective measures as COVID-19 diagnoses at the facility increased. *Id*. On this news, GEO's stock price fell over 10% after two days of heavy trading. ¶213.

In sum, the Company's operational deficiencies and contractual and legal violations – highlighted by public and political scrutiny and numerous lawsuits – depleted its previous access to capital. ¶24. At least eight of GEO's financing partners ended their relationships with GEO, and multiple major government contracts were terminated, thereby eliminating GEO's previous revenue streams. *Id*. Those deficiencies and violations, moreover, left GEO unequipped to deal with major COVID-19 outbreaks in its facilities. *Id*. By August 6, 2020, Defendants could no longer conceal the truth and revealed that they would be reducing GEO's quarterly dividend by nearly 30%. ¶217. On this news, GEO's stock price fell nearly 7% after two days of heavy trading. *Id*. By the end of the Class Period, after Defendants' revelations, the stock price had dropped over 55% from the Class Period high. ¶24.

## III.   RELEVANT LEGAL STANDARD

To state a § 10(b) claim, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called 'loss causation.'" *Carvelli v. Ocwen Fin. Corp.,* 934 F.3d 1307, 1317 (11th Cir. 2019). Under the *Basic* presumption, the court is "allow[ed] to presume that an investor relie[d] on public misstatements whenever he b[ought] or s[old] stock at the price set by the market." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.,* 762 F.3d 1248, 1254 (11th Cir. 2014). "[T]he PSLRA requires the complaint to 'specify each statement alleged to have been misleading' and 'the reason or reasons why the statement is misleading.'" *Luczak v. Nat'l Beverage Corp*., 812 Fed. App'x 915, 920 (11th Cir. 2020) (quoting 15 U.S.C. § 78u-4(b)(1)). Nonetheless, on a motion to dismiss, the court "must accept the facts pleaded as true and construe them in a light favorable to [the plaintiff]." *Id.* at 917.

## IV.   ARGUMENT

### A. Defendants Made Material Misstatements and Omissions.

Defendants argue that Plaintiffs failed to state a claim because: (1) Plaintiffs do not allege why each statement is false or misleading; (2) the misstatements and omissions are not material; (3)

6

the truth-on-the-market doctrine bars Plaintiffs' claims; (4) the PSLRA's safe harbor forecloses liability; and (5) the allegations rehash previously dismissed claims. Each argument fails.

### 1.    Plaintiffs Allege Why Each Statement Is False or Misleading.

Defendants argue that Plaintiffs failed to plead particularized facts establishing "*why*" GEO's statements were false or misleading. MTD at 15. Defendants ignore the applicable law, as well as the Complaint's detailed allegations.

"Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat Inv. Grp. v. FindWhat.com,* 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting 17 C.F.R. § 240.10b-5(b)). "A statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Id*. "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *Id*. "Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *Id*.

Under those standards, Defendants misled investors. During the Class Period, Defendants portrayed to investors that:

- GEO operated "state-of-the-art facilities providing services in *safe, secure and humane environments*" (¶107);

- "[a]ll of our facilities *operate safely* and *without overcrowded conditions*" (¶192);

- when COVID-19 emerged, "most of our facilities have had *very few or no cases of COVID-19*" and we had "*implementat[ed]… quarantine and cohorting procedure*s to isolate confirmed and presumptive cases of COVID-19, including medical isolation and the use of airborne infection isolation rooms" (¶193);

- reports of substandard conditions at GEO facilities were "driven by *a false narrative and deliberate mischaracterization* of our long-standing role as a quality service provider to ICE" (¶¶146, 159);

- "[t]here has been a significant amount of *misinformation* regarding our banking partners and access to capital," (¶¶159-60, 162); and

- because of this success—and because reports of substandard conditions and strained banking relationships were false—"dividend payments continue to be supported by our cash flows and earnings," cash flows had "stability;" annual dividend payments" had "sustainability" were expected to "remain unchanged" (¶¶ 109-10, 115, 157, 159-60, 162, 168, 170, 179, 183, 185, 187-88, 198, 200).

That portrayal of GEO was misleading. In reality:

7

- multiple GEO facilities were operating in violation of government standards, with inadequate medical and mental health care; unsafe and unhealthy conditions; understaffed facilities resulting in uprisings; crises involving suicide, riots, violence, and drug overdoses; severe overcrowding resulting in an immediate risk to the health and safety of detainees, DHS agents, and officers; and inadequate training and detainee safety (¶¶11, 58-30, 65-69, 72-73);

- those substandard operations triggered increasing scrutiny by the government, public, and investors (¶¶11, 78)

- the DHS OIG called for immediate action to address GEO's substandard conditions (¶11) and United States senators were accusing Defendants of making "a series of misleading public statements and omissions of material facts" (¶60);

- every bank which had a public-disclosed financing relationship with GEO indicated they would be terminating their agreements with GEO, (¶83);

- a five-year $259 million contract with terminated four years early at a loss of 80% of expected revenue (¶209); and

- GEO's actual response to COVID-19 was a "blundering" disaster and intensified, rather than mitigated, the virus's spread (¶212).

Contrary to Defendants' repeated assurances, the problems faced by GEO were real. Public sources were accurately reporting endemic flaws in its operations. Its finances and dividends were not secure and stable, particularly when the COVID outbreak exacerbated the pervasive, systemic flaws in its facilities. But to prop up GEO's stock price, Defendants denied the reports as "false," "mischaracterization[s]," and "misinformation," assuring investors that the dividends would "remain unchanged."

Thus, Defendants' statements misled investors into believing that GEO had financial stability and systems in place to properly handle the COVID pandemic, when, in truth, GEO did not. To avoid being misleading, moreover, Defendants' statements triggered a duty to disclose the grave defects that existed within GEO's facilities, as well as the threats to operations, revenues and dividends. Nothing more is required to plead falsity. *See, e.g.*, *MAZ Partners LP v. First Choice Healthcare Sols., Inc.,* 2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ("*Maz I*"), *report and recommendation adopted,* 2020 WL 1072582, at *9 (M.D. Fla. Feb. 14, 2020) ("*Maz II*") (Even if a statement appears true on its face, it "is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."); *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 770–71 (11th Cir. 2007) voluntarily "touting" subject to investors triggers duty to disclose related material information).

Attempting to detract from those well-pleaded allegations of falsity, Defendants wrongly contend that three particular categories of statements were not misleading. Each argument

8

contradicts the Complaint's well-pleaded allegations. *First,* Defendants argue that statements relating to GEO's access to financing were not false because Defendants could not have known "unannounced divestitures would occur" and GEO may have had alternative financing. MTD at 15. This argument ignores JPMorgan's May 2017 announcement that it was considering ending its financing relationships with the private prison industry. ¶76. Furthermore, even after eight major banks ended their relationship with GEO by August 2019, Defendants *continued* to assure investors that the intense scrutiny was not impacting GEO's cash flows or dividend levels. These statements gave investors a misleading impression of GEO's state of affairs. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (defendants "could not have reasonably believed the statements made to the public" where they stated the company was "financially solid, despite being aware of the financial precipice on which it stood").

*Second*, Defendants contest the falsity of stating that "[t]he Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows." MTD at 16. In support, Defendants aver that "Plaintiffs do not allege that GEO failed to disclose or misstated the actual costs of defense incurred during any particular reporting cycle, or violated any GAAP principles in its method of accounting for such expenses." *Id.* However, statements can be false or misleading, irrespective of violations of GAAP or specific regulations. *See Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir. 1986) ("A duty to disclose may...be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises."); *In re HD Supply Holdings, Inc. Sec. Litig.,* 341 F. Supp. 3d 1342 (N.D. Ga. 2018) ("[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects.").

As alleged, GEO internally—and in seemingly private communications—characterized these lawsuits as a "potentially catastrophic risk" with "deep[ ] alarm[ ] at the rapidly increasing costs" estimated to be as high as $20 million. ¶62. Based on GEO executives' concerns expressed to ICE, Senator Warren requested that SEC Chairman Clayton investigate the "misleading public statements and omissions of material facts by top executives of The GEO Group, Inc." about the financial "impact of the series of lawsuits against the company." ¶60. These allegations demonstrate that Defendants materially misrepresented GEO's actual state of affairs, regardless of GAAP or other specific regulatory violations. Indeed, a reasonable investor would attach importance to the fact that

9

the Company's executives characterized these lawsuits as "potentially catastrophic." *See SEC v. Watkins Pencor, LLC,* 810 F. App'x 823 (11th Cir. 2020) (finding misstatement material and actionable "if a reasonable man" in making "an investment decision" would "attach importance to the fact misrepresented or omitted").[3]

**Finally**, Defendants incorrectly argue that Plaintiffs failed to plead any other material misrepresentations or omissions in GEO's financial statements, including in the SOX certifications. MTD at 15-16. As alleged, Defendants concealed the adverse truth about GEO's true operations and finances, and they falsely certified that the SEC filings did not contain untrue statements of, or omit, material facts. Defendants also falsely certified that "the information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company." ¶¶130, 181. Thus, GEO's financial statements contained false statements. *See Maz I*, 2019 WL 5394011 at *11 ("[W]here the complaint asserts facts indicating that, at the time of the [SOX] certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their [SOX] certification erroneous, a false or misleading certification may form the basis of a § 10(b) and Rule 10b–5 claim.").

### 2.    The Misstatements and Omissions Are Material.

Defendants argue that the statements regarding the stability of the Company's dividend and customer partnerships, the quality of GEO's services, and the effect of COVID-19 are immaterial puffery, corporate optimism, or opinions. MTD at 10-13. They are wrong.[4]

While "reasonable investors do not base their investing decisions on corporate 'puffery'— generalized, non-verifiable, vaguely optimistic statements," courts have recognized that "the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule." *Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *7 (M.D. Fla. Nov. 4, 2019). "Courts have found that when key executives continually stress a record of corporate compliance as a key to company success, the statements are not considered puffery." *Id.* (collecting cases). "[T]he determination [of] whether a statement is material is 'inherently fact-specific' and

---

[3] Further, any purported cautionary language by Defendants about the unknown outcomes of litigation does not insulate Defendants from liability. *See FindWhat*, 658 F.3d at 1299 ("[T]he inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts.").

[4] Plaintiffs address Defendants' arguments related to "The Quality of GEO's Services" and "The Effect of Covid-19" (MTD 12-13) in Section IV.A.1, above.

requires consideration of a statement in its proper context. And while certain statements might be considered puffery in one context, they may be found actionable in another[.]" *Id.* Accordingly, materiality is a fact question "usually not appropriate at the motion to dismiss stage." *See Maz I*, 2019 WL 5394011 at *11 (collecting cases).

Furthermore, even opinion statements are actionable where the defendant omits material facts that "conflict with what a reasonable investor would take from the statement[s themselves]." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). In other words, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.*

Defendants omitted material facts affecting GEO's dividend and customer relationships. Those omissions conflicted with and undermined Defendants' positive statements about dividends and deleveraging. Thus, Defendants' misstatements and omissions are material.

Defendants also argue that no investor could view their statements that GEO's "dividend is supported by stable and predictable operational cash flows" as material. MTD at 11. This argument misses the mark. Plaintiffs alleged that Defendants mispresented whether (or failed to disclose that) GEO's dividend was materially affected by the Company's ability to obtain financing (*e.g.*, with JPMorgan and WF) and maintain government contracts (*e.g.*, with New Mexico and Delaware County). By misrepresenting the state of GEO's business and the existing risks to the dividend, Defendants made misleading statements (even if GEO never reduced the dividend) because such facts alter the mix of information considered by the reasonable investor.

Furthermore, Defendants' reliance on *Walker v. L Brands, Inc.* is misplaced. *See* MTD at 11-12 (citing 2020 WL 6118467, at *2-10 (S.D. Ohio Oct. 16, 2020)). In that case, the alleged false and misleading statements were vague statements that the company "had the cash flow [to] sustain the dividend;" "the dividend is very safe;" and "we're confident that we can maintain the dividend." Id. at *3-*6. The court found that these statements "of present fact…true at the time it was made; L Brands had the flow cash to maintain the dividend and did maintain the dividend at its prior level." The court noted that "the term 'safe' is not tethered to any kind of objective standard and lacks specificity." *Id.* at *11.

But here, Defendants told investors that the dividend was "safe" as it was "supported by stable and predictable operational cash flow," without disclosing material contemporaneous facts undermining the dividend. As alleged, GEO did ***not*** have stable and predictable cash flow and could

*not* maintain the dividend at its prior level. Hence, Defendants' statements of present fact about the dividend were not objectively true when made and conveyed a misleading impression of GEO's business. *See In re Gen. Elec. Co. Sec. Litig.,* 857 F. Supp. 2d 367, 389 (S.D.N.Y. 2012) ("Plaintiff alleges that Immelt's statements . . . were false and misleading when made in light of the sudden evaporation of GE Capital's deal flow, the extent of its subprime exposure, and the company's continuing liquidity problems. Taking these underlying allegations as true, the SAC plausibly asserts that GE's statements regarding its 2009 dividend were materially false.").[5]

Defendants omitted material facts affecting GEO's dividend and customer relationships. Since those omissions conflicted with and undermined their positive statements about dividends and deleveraging, Defendants' misstatements and omissions are material and actionable.

### 3.      Defendants' Truth-on-the-Market Defense Fails.

Defendants incorrectly argue that the alleged misstatements are not actionable so long as they have elsewhere disclosed the truth, *i.e.* the truth was on the market. MTD at 13-14.

The truth-on-the-market defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Nguyen v. Radient Pharm. Corp.,* 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *15 (S.D.N.Y. Nov. 18, 2019). Defendants must show that "the truth of the matter was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the misrepresentation or omission and as to any individual plaintiff by showing that the individual plaintiff purchased despite knowledge of the falsity of a representation." *In re BankAtlantic Bancorp, Inc. Sec. Litig.,* 2011 WL 13151674, at *4 (S.D. Fla. Apr. 21, 2011). Thus, stripped down, this defense challenges the materiality of alleged misrepresentations and omissions. *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918, at *9 (N.D. Ala. Nov. 19, 2014).

Defendants do not—and cannot—show that the truth about GEO's operations and finances was sufficiently disclosed to investors to outweigh their misleading statements and omissions.

---

[5] Additionally, the *Walker* court relied on *IBM*, where the court found "'I will say again what I said before. I have no real plan, no desire, and I see no need to cut the dividend' to be the kind of mild, wishy-washy optimistic statement that is an inactionable prediction or opinion." *Walker*, 2020 WL 6118467, at *10 (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("*IBM*")). However, the *Walker* failed to note that the Second Circuit's opinion in *IBM* affirmed a grant of **summary judgment** on a full evidentiary record. Accordingly, even those "wishy-washy optimistic statement[s]" had survived the motion to dismiss. *IBM*, 163 F.3d at 108.

Moreover, "for purposes of determining at this early stage in litigation whether the alleged misrepresentation had any impact on the price of [GEO] stock, the Court must disregard evidence that the truth was known to the public." *Aranaz v. Catalyst Pharm. Partners Inc.,* 302 F.R.D. 657, 671 (S.D. Fla. 2014); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 481 (2013) (holding that the district court did not err by disregarding the defendant's truth-on-the-market defense at the class certification stage, which was proffered to rebut the presumption of price impact so as to show that class certification was improper for lack of predominance).[6]

### 4.    The PSLRA's Safe Harbor Does Not Apply.

As shown above, the majority of Plaintiffs' claims center around material omissions of present fact. Nonetheless, Defendants point to three statements in the Complaint that begin with the words "believe" or "expect" to argue that "[m]uch of the Amended Complaint is barred by the PSLRA safe harbor for forward-looking statements." MTD at 9-10. However, Defendants' attempt to invoke the PSLRA safe harbor is unavailing because: (1) the safe harbor does not apply to omissions of then-existing facts; (2) Defendants' cautionary language was inadequate; and (3) the safe harbor does not apply where the risks had already materialized.

***First,*** "the safe harbor does not apply to material omissions." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*12 (S.D.N.Y. Mar. 25, 2013); *Merch. Capital*, 483 F.3d at 768 ("It is well established that a materially misleading omission of past performance information occurs when a promoter makes optimistic statements about the prospects of the business but fails to include past performance information that would be useful to a reasonable investor in assessing those statements.").

Defendants made multiple material omissions that are actionable, irrespective of the safe harbor. *See, e.g.*, ¶220 (alleging Defendants "omitted the degree and effects that the increasing government scrutiny had on GEO's ability to generate cash flows, maintain financing relationships with key lenders, and continue paying stable, predictable dividends").

***Second***, "the safe harbor of the PSLRA only applies to forward-looking statements and not misstatements or omissions of historical or contemporaneous facts." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1216 (M.D. Fla. 2014); *In re Paradyne Networks, Sec. Litig.*, 197 F. Supp. 2d

---

[6] Defendants' cases pre-date the Supreme Court's decision in *Amgen* and, thus, are inapplicable. *See* MTD at 13-14 (citing *Wallace v. Sys. & Comput. Tech. Corp.*, 1997 WL 602808 (E.D. Pa. Sep. 22, 1997); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996); *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116-17 (2d Cir. 1982)).

1349, 1354 (M.D. Fla. 2002) ("because Plaintiffs 10(b) claims arise from omissions of material facts, not statements that Defendants made, the Court finds that the safe harbor provision of the Reform Act does not apply to Plaintiffs' claims.").

As outlined above, Defendants made multiple misrepresentations of current and historical fact (as well as mixed statements). *See, e.g.*, § IV.A.1., *supra* (explaining that Defendants falsely represented that "facilities **operate safely** and **without overcrowded conditions**" and that reports of substandard conditions were "driven by a false narrative and deliberate mischaracterization).

***Third***, to the extent that statements are forward-looking (there are none as Plaintiffs' claims relating to forward-looking statements arise from omissions), the cautionary language supplied by GEO is inadequate. For cautionary language to be "meaningful," "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.*; *see In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362 (N.D. Ga. 2002) ("Boilerplate warnings will not suffice as meaningful cautionary statements . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement."). "A cautionary statement must warn of the alleged misrepresentations sufficiently that 'the risk of real deception drops to nil.'" *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 341 (D. Mass. 2009). Thus, defendants, "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). Whether cautionary language is sufficiently meaningful "is a fact-intensive inquiry that is better suited for disposition after discovery and [therefore] survive dismissal at this early stage." *HD Supply Holdings,* 341 F. Supp. 3d at 1359 (N.D. Ga. 2018).

Defendants have not met their burden. They simply warned that GEO's dividends "are not guaranteed and may fluctuate" and then listed the type of kitchen-sink disclaimers that do not account for the facts known by Defendants at that time. MTD at 4; *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) ("[K]itchen-sink disclaimer, listing garden-variety business concerns that could affect any company's financial well-being" does not constitute "meaningful cautionary language."); *Martinek v. AmTrust Fin. Servs., Inc.*, 2020 WL 4735189, at *13 (S.D.N.Y. Aug. 14, 2020) ("[G]eneralized warning is insufficient to invoke the safe harbor provision of the PSLRA").

***Finally***, to the extent any statement is forward-looking ***and*** accompanied by meaningful cautionary language, the safe harbor does not apply where the warned-of risks had already materialized. *FindWhat*, 658 F.3d at 1299 (Including "general cautionary language regarding a

14

prediction [does] not excuse the alleged failure to reveal known material, adverse facts."). "Defendants' argument that *forward-looking* cautionary statements should immunize their failure to disclose *ongoing* fraud is, quite frankly, absurd." *Maz II*, 2020 WL 1072582, at *6.

Defendants claimed that GEO's facilities were "safe, secure and humane;" increased scrutiny did not pose risks to lender relationships or cash flows; and stories to the contrary were "false narrative[s]," "misinformation," and "mischaracterizations." Defendants further stated that GEO was adequately prepared and successfully responding to the COVID outbreak. When making those statements, GEO's substandard facilities was already causing it to face materialized risks vis-à-vis lost contracts, lost lenders, government scrutiny, lawsuits, and the COVID outbreak.[7]

### 5.    Plaintiffs' Claims Are Different From Those Alleged in Mulvaney.

Defendants argue that Plaintiffs' claims relating to the "Quality of GEO's Services" "[m]erely [r]ehash [p]rior [d]ismissed [c]laims." MTD at 8-9, 12. Defendants are wrong.

In *Mulvaney*, plaintiffs alleged that three types of statements triggered a duty for GEO to disclose inadequate prison conditions: (i) statements about relying on government contracts for a large percent of its revenue; (ii) statements that GEO operates its facilities in accordance with the government contracts; and (iii) statements "touting the strength of GEO Group's relationship with [the Bureau of Prisons]." *Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1318 (S.D. Fla. 2017). Those alleged misrepresentations differ significantly from Plaintiffs' allegations. The Complaint here focuses on misleading statements and omissions relating to GEO's lender relationships, cash flows, and dividends—all as affected by increasing public scrutiny, enhanced governmental scrutiny (including from the U.S. Senate) into GEO's operations and representations to investors, exposure from ongoing and threatened litigation, and fallout from the rising COVID outbreak. The substandard conditions at GEO's facilities exacerbated those issues, but even if every facility had been perfectly compliant, Defendants still misrepresented the existential threats posed by changing public perception, enhanced scrutiny, ongoing litigation, and COVID.

---

[7] Defendants argue that the safe-harbor protects the speaker regardless of state of mind. Not so. *See Merch. Capital*, 483 F.3d at 766-67 ("Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact. . . or if the speaker does not genuinely or reasonably believe them." (*quoting IBM*, 163 F.3d at 107). Here, Defendants knew they were omitting material contemporaneous facts from investors and, therefore, are liable.

Further, in *Mulvaney*, while Judge Middlebrooks found that the amended complaint failed to "plead specific facts showing that GEO Group's services were inadequate, or that its relationship with BOP was strained," he acknowledged that those issues, if true, would have been material. *Id*. at 1322. Here, Plaintiffs provide exacting specificity. *See* §§ II, IV.A.1. Defendants portrayed stability and success, but GEO internally was "deeply alarmed at the rapidly increasing costs in defending these lawsuits" and Senator Warren accused GEO's "top executives" of making "a series of misleading public statements and omissions of material facts." (¶¶7, 11, 60, 222). Senators were concerned about GEO's policies and procedures "to prepare for and manage a potential spread of the novel coronavirus" but Defendants publicly stated that GEO had "implemented comprehensive steps to address and mitigate the risks of COVID-19 to all those in our care and our employees;" "[a]ll of our facilities operate safely and without overcrowded conditions;" and "most of our facilities have had very few or no cases of COVID-19." ¶¶19, 21. In reality, GEO had implemented a "blundering," disastrous response to COVID-19, leading to more lawsuits and court intervention on behalf of detainees. ¶¶22, 212. As stories of GEO's actual troubles emerged, Defendants falsely described them as "false narrative[s]," "deliberate mischaracterization[s]," and "misinformation." ¶¶12, 15, 146-147, 159-160. Unlike in *Mulvaney*, the Complaint provides ample detail that Defendants made materially misleading Class Period statements and omissions.[8]

## B. Plaintiffs Adequately Allege Scienter.

"In order to adequately plead scienter in the Eleventh Circuit, a plaintiff must allege facts creating a 'strong inference' that the defendant acted purposefully or with 'severe recklessness.'" *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.,* 111 F. Supp. 3d 1336, 1359 (S.D. Fla. 2015). A "strong inference" is "cogent" and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). "The inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences." *Tellabs,* 551 U.S. at 323-24. Plaintiffs' allegations should be assessed holistically, not in isolation. *Id.* at 326.

The Complaint satisfies this standard. As high-level executives, Defendants oversaw GEO's large contracts, major litigation, relationships with major lenders, communications with Senators,

---

[8] To the extent Defendants argue these statements were not literally false or were opinions, these arguments fail. *See Sanofi* at 210 ("[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." (citing *Omnicare*, 575 U.S. at 189)).

16

public relations, and COVID-19 response. Armed with that information, Defendants then made statements to investors that contradicted Defendants' knowledge. The inference that they were unaware of GEO's true state—and were not reckless in being unaware—is not more compelling than an inference of recklessness.

More specifically, the Complaint details how and what contemporaneous facts Defendants possessed that differed materially from their public statements. For example, the many lawsuits and government investigations put GEO on notice of the heightened scrutiny and unsafe conditions at its facilities. ¶¶57-74. Similarly, the letter from Senator Warren put Defendants on notice of the heightened scrutiny, ¶¶219-20, and stockholders raised the operational deficiencies with GEO's Board and executives. ¶229. In letters and testimony, Defendant Zoley acknowledged the increased costs of defending lawsuits and emerging health concerns presented by COVID-19. ¶222.

The Complaint also alleges the particular acts demonstrating the knowledge of Defendants Zoley, Evans, Donahue, and Schlarb regarding this increased scrutiny and the risks presented by COVID-19. Defendants Zoley and Evans reassured investors regarding GEO's finances and then downplayed heightened scrutiny on GEO as based on media mischaracterizations. ¶¶223-25. Defendant Donahue demonstrated direct knowledge regarding COVID-19, describing "the implementation of quarantine and cohorting procedures" and the deployment of "specialized sanitation teams to sterilize high-contact areas." ¶225. Defendant Schlarb similarly described GEO's "best practices for the prevention, assessment and management of COVID-19." ¶226. Defendants' misstatements in the face of this knowledge permits a strong inference of scienter. *See In re E.S. Bankest, L.C.*, 2010 WL 1417732, at \*15 (Bankr. S.D. Fla. Apr. 6, 2010) (denying summary judgment in part because "[a] jury could reasonably find that [defendant's] decision to ignore numerous red flags and its repeated violations . . . establishes scienter.").

Seeking to circumvent those well-pleaded allegations indicating scienter, Defendants raise three overarching arguments. ***First***, Defendants argue that Plaintiffs rest on "must have known" allegations. MTD at 18. But they ignore the detailed allegations as to each Defendants' knowledge (*see* ¶¶219-26). Moreover, scienter can be inferred when a defendant's position and responsibilities establish other particular facts probative of scienter. *See In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at \*14 (M.D. Ga. Mar. 23, 2018) (a defendant who "serves as one of the core members of the senior management group necessarily is provided significant information . . . about the financial performance, or failure of performance, over which he has overall operational responsibility"); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1364 (N.D. Ga. 2005) (an

17

officer is "responsible for making statements that appeared in press releases and SEC filings," that "confirm[s] his overall participation in, and responsibility for, management of the Company"). As alleged, each Defendant had a high-level position with access to meaningful communications from government officials and stockholders.

*Second*, Defendants incorrectly contend that Plaintiffs fail to allege scienter as to *each* Defendant. MTD at 18. Plaintiffs allege facts demonstrating each Defendants' knowledge. ¶¶223-27. Furthermore, even if the Court finds that Plaintiffs failed to plead scienter for a particular named defendant, Plaintiffs have created a strong inference that GEO itself acted with the requisite scienter from the allegations as to each executive. *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1246 (N.D. Ga. 2019) ("failure to adequately plead scienter as to individual defendants does not automatically mean that scienter cannot be established against a corporation.").

*Finally*, Defendants rely on *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005) to argue that GEO's disclosure of the unfavorable lawsuits weighs against scienter. MTD at 18. But the defendants in *BellSouth* made substantial disclosures regarding ongoing lawsuits, while determining not to record a reserve against the disclosed lawsuits, which in hindsight had inflated revenues. *BellSouth*, 355 F. Supp. 2d at 1375. Here, Defendants made repeated material misstatements reassuring investors as to the stability of cash flows and dividends, in order to downplay any troubling public disclosures of lawsuits and lender disengagement. ¶¶7-20. Unlike *BellSouth*, therefore, Plaintiffs do not allege that disclosed events caused discrepancies in GEO's accounting; rather, Defendants falsely downplayed the details and risks posed by ongoing litigation, while acknowledging those details and risks privately. *See, e.g. HD Supply Holdings*, 341 F. Supp. 3d at 1361-62 (inferring scienter where defendants contradicted cautionary language and made statements "that there were no surprises and they were right on track"); *compare with BellSouth*, 355 F. Supp. 2d at 1375 ("BellSouth's *full disclosure* of the Florida late fee proceedings at all relevant times further discredits that Defendants acted with scienter.").

In sum, when viewing Plaintiffs' allegations holistically, it is cogent and compelling that Defendants were extremely reckless as to (or had actual knowledge of) the omitted contemporaneous facts. *Tellabs,* 551 U.S. at 314. Accordingly, Defendants' arguments fail.

## C. Plaintiffs Adequately Allege Loss Causation.

Plaintiff "need not show that the defendant's misconduct was the 'sole and exclusive cause' of his injury [only] that the defendant's act was a 'substantial' or 'significant contributing cause.'" *FindWhat*, 658 F.3d at 1309. The disclosure need only reveal "part of the relevant truth—the truth

18

obscured by the fraudulent statements." *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1368 (N.D. Ga. 2010). Further, loss causation can be demonstrated "by showing there were a series of partial disclosures, which revealed the defendant's true financial condition." *In re Jiangbo Pharm., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1265 (S.D. Fla. 2012). "To be corrective, a disclosure need not precisely mirror the earlier misrepresentation, but it must…relate back to the misrepresentation and not to some other negative information about the company." *Meyer v. Greene,* 710 F.3d 1189, 1197 (11th Cir. 2013). Loss causation is not subject to Rule 9. *Flowers Food*, 2018 WL 1558558, at *18-19.

Defendants argue that the Complaint alleges that all of GEO's fraud was revealed in one corrective disclosure on August 6, 2020. *See* MTD at 1, 2, 17 ("Plaintiffs would have this Court believe that [the August 6] announcement suddenly 'revealed' all of GEO's prior misdeeds and business difficulties that had been 'hidden' from the market."). Defendants mischaracterize the Complaint. Plaintiffs allege that the truth was revealed in a series of corrective disclosures – including those on March 5, 2019 (¶202), March 10, 2019 (¶203), March 12, 2019 (*Id.*), July 11, 2019 (¶206), July 17, 2019 (¶207), March 9-10, 2020 (¶¶208-10), June 17, 2020 (¶¶211-13), July 16, 2020 (¶¶214-15) and August 6, 2020 (¶¶216-17) – causing the price of GEO stock to materially decline. ¶235. The Complaint details what each corrective disclosure revealed to the market. Nothing more is required. *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1259 (S.D. Fla. 2020) (finding Defendants' loss causation argument "simply untenable" where they contend that there was not a sufficient connection between "the two partial disclosures and the stock price drop.").

**D. Plaintiffs Adequately Allege "Control Person" Liability.**

Defendants argue that Plaintiffs failed to adequately allege that each Individual Defendant was a control person under Section 20(a). MTD at 19-20. Defendants misapply the facts and law.

Section 20(a) of the Exchange Act provides that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). "[S]ection 20(a) should be construed liberally." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 724 (11th Cir. 2008). "[W]hether control exists [is] dependent on the particular factual circumstances of each case." *Id.* at 723. Accordingly, "resolving that issue on a motion to dismiss is often inappropriate." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011).

19

Plaintiffs adequately allege that the Individual Defendants had the requisite control over GEO. Defendants Zoley and Evans, as CEO and CFO of GEO, had control of the contents of the misleading press releases and public filings disseminated by GEO; signed the SEC filings; and made the materially false and misleading statements.[9] Similarly, Defendant Donahue, as GEO's SVP and President of GEO Secure Services delayed his retirement specifically to help "address[] the challenges and impacts of the Coronavirus," indicating he had control over GEO's response to the virus. ¶97. Finally, Defendant Schlarb, as GEO's SVP and President of GEO Care, controlled information and made false statements on behalf of GEO about its facilities and the best practices for COVID-19. ¶¶37, 196, 226. Those allegations suffice at the pleading stage.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to dismiss should be denied.[10]

---

[9] *See, e.g.*, ¶¶9, 12, 15, 17, 39-42, 107, 109-10, 112, 114-15, 117, 119, 130, 132-33, 135-36, 138, 144, 146-47, 149, 151-52, 155, 157, 159-60, 162, 164, 168, 170, 181, 183, 185, 190, 192, 195, 198, 219, 222-24.

[10] This is Plaintiffs' first filed complaint in this action. Since the filing of the Complaint, moreover, additional relevant information has come to light about Defendants' actionable conduct. Accordingly, Plaintiffs should be granted leave to amend. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("A district court's discretion to dismiss a complaint without leave to amend "is 'severely restricted' by Fed.R.Civ.P. 15(a).").

20

DATED: January 19, 2021                    Respectfully submitted,

**ROCHE CYRULNIK FREEDMAN LLP**

/s/ Constantine P. Economides
Constantine P. Economides (FL# 118177)
Velvel (Devin) Freedman (FL# 99762)
Ivy T. Ngo (pro hac vice)
Southeast Financial Center
200 S. Biscayne Blvd. Suite 5500
Miami, FL 33131
Telephone: (305) 851-5997
Emails: ceconomides@rcfllp.com
       vel@rcfllp.com
       ingo@rcfllp.com

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Emails: nporritt@zlk.com
       aapton@zlk.com

*Co-Lead Counsel for the Class*

**CULLIN O'BRIEN LAW, P.A.**
Cullin O'Brien (FL# 0597341)
6541 NE 21st Way
Fort Lauderdale, Florida 33308
Tel: (561) 676-6370
Fax: (561) 320-0285
E-mail: cullin@cullinobrienlaw.com

*Additional Counsel for Lead Plaintiff James
Michael DeLoach*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
*Additional Counsel for Lead Plaintiff Edward
Oketola*

21

22

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.


/s/ Constantine P. Economides
Constantine P. Economides