# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-81063-CIV-SMITH

STEVE HARTEL, individually and on behalf
of all others similarly situated,

          Plaintiff,

vs.

  THE GEO GROUP, INC., *et al.*,

          Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on Defendants' Motion to Dismiss Lead Plaintiffs'
Consolidated Class Action Amended Complaint [DE 36], Plaintiffs' Opposition [DE 41], and
Defendants' Reply [DE 42].  Plaintiffs' Amended Complaint [DE 33] alleges that the Defendants
violated the Securities Exchange Act of 1934 (the "Exchange Act") by making materially false
and misleading statements about the corporate Defendant, The GEO Group, Inc. (the "Company"
or "GEO").  Once the falsity of the statements became clear, the Company's stock declined in
value, causing Plaintiffs and class members losses and damages.  The Amended Complaint sets
forth two counts: Count I alleges violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),
and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants and Count II alleges violations of
§ 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual Defendants.  Defendants
seek to dismiss both counts.  For the reasons set forth below, the Motion to Dismiss is granted in
part and denied in part.

## I.      THE AMENDED COMPLAINT[1] AND ADDITIONAL INFORMATION[2]

Defendant GEO is a Delaware corporation with its headquarters in Boca Raton, Florida.  It is an equity real estate investment trust ("REIT") specializing in the design, financing, development, and operation of secure facilities, processing centers, and community reentry centers in the United States, Australia, South Africa, and the United Kingdom.  Defendant Zoley is GEO's Chairman of the Board and Chief Executive Officer.  Defendant Evans is GEO's Senior Vice President and Chief Financial Officer and, as such, is responsible for the Company's financial management, acquisitions, and growth initiatives.  Defendant Donahue served as GEO's Senior Vice President and President of GEO Secure Services from January 2016 until he retired in July 2020.  In those roles, he was responsible for the operational oversight of over 24 correctional facilities. Defendant Schlarb is GEO's Senior Vice President and President of the GEO Care division, which encompasses the "GEO Continuum of Care" organization, intensive residential and non-residential programming, youth services, electronic monitoring equipment and services, and community-based immigration services.

GEO was founded in 1984 but was restricted as a REIT in 2013.  As a REIT, GEO is required to distribute at least 90% of its income each year as dividends to shareholders.  As a result, GEO relies on the capital markets to fund growth investments.  At the start of the class period, defined as November 7, 2018 through August 5, 2020, JPMorgan Chase Co. ("JPMorgan") was

---

[1] Plaintiffs' Consolidated Class Action Amended Complaint is 104 pages.  Therefore, what follows is only a brief summary of the Amended Complaint.  As needed, the Court will discuss more specific allegations in the discussion section.

[2] When considering a motion to dismiss a securities fraud action, a court may consider the defendant's SEC filings in evaluating the sufficiency of the plaintiff's allegations.  *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1297 n.15 (11th Cir. 2011).

the largest lender to private prisons, including GEO.  Wells Fargo & Company ("Wells Fargo")
and Bank of America Corporation ("BofA") were also large lenders to GEO.

For the last three decades, GEO has had long-term contracts with the federal government
to provide services for the Federal Bureau of Prisons, U.S. Immigration and Customs Enforcement
("ICE"), and the U.S. Marshal Service, as well as contracts with the Department of Corrections
for the states of Florida, Georgia, Louisiana, Oklahoma, Arizona, New Mexico, California,
Vermont, Virginia, and Indiana to own and/or operate correctional facilities within those states.
The state and federal contracts were regularly renewed.  GEO also provides community correction
and youth and electronic monitoring services in the United States.

In April 2018, after the Trump administration announced its zero-tolerance policy on
immigration, private prison operators, such as GEO, came under increased scrutiny.  On March 5,
2019 several media outlets reported that JPMorgan had decided to stop financing private operators
of prisons and detention centers.  On March 8, 2019, GEO's share price fell over 11%.  Several
other banks quickly followed suit, with U.S. Bank announcing it had reduced its credit exposure
to GEO and Wells Fargo stating that it would exit its relationships with private prison companies.
On March 14, 2019, the price fell another 5%.  By August 2019, eight banks had announced that
they would no longer lend to private prisons, including GEO.  Together the banks represented
87.4% of the credit lines and term loans that previously had been available to GEO to fund its
operations and growth.

In May, June, and July 2019, the U.S. Department of Homeland Security, Office of
Inspector General ("DHS OIG") issued reports finding that several of GEO's facilities were not in
compliance with government standards and called for immediate action to address the substandard
conditions, inadequate medical care, and overcrowding at these facilities.  In July 2019, Senator

Elizabeth Warren published a letter she had written to the SEC Chairman, calling attention to "a series of misleading public statements and omission of material facts by top executives of The GEO Group, Inc." On July 30, 2019, the New York Times ran a story stating that GEO had been dropped by its public relations firm because it did not want to be affected by GEO's poor reputation.

In early 2020, COVID-19 concerns arose.  On March 9, 2020, multiple U.S. senators sent a public letter to GEO noting that incarcerated individuals were at special risk of infection because of their living situation and requesting information about the policies and procedures GEO had in place to prepare for and manage the spread of the novel coronavirus.  Around this time, GEO also terminated a contract 4 years early, losing out on approximately $200 million in future revenue. On March 10, 2020, the Company's share price fell 29%.  On June 17, 2020, an article was published reporting a significant COVID-19 outbreak at a GEO operated halfway house.  The article reported that the spread was because of GEO's response to the pandemic, including keeping residents in overcrowded conditions without enforcing personal protective measures.  The Company's stock price fell over 10% during the next two days.

On August 6, 2020, Defendants announced that they would be reducing GEO's quarterly dividend by nearly 30%.  The stock price then fell nearly 7%.  Lead Plaintiffs, James Michael DeLoach and Edward Oketola, purchased common stock in the Company during the proposed Class Period, November 7, 2018 through August 5, 2020.

The Company is a defendant is several lawsuits arising from the conditions in its facilities and the treatment of people housed at some of its facilities.  GEO has characterized these lawsuits as a "potentially catastrophic risk" and Defendant Zoley expressed concerns to ICE about being "deeply alarmed at the rapidly increasing costs" associated with the lawsuits, estimated to be as

4

high as $20 million.

In September 2018, DHS OIG issued a Management Alert identifying several violations of ICE standards at the GEO-operated facility in Adelanto, California.   DHS OIG found serious issues relating to safety, detainee rights, and medical care at the Adelanto facility.  In May 2019, DHS OIG issued a report warning of "dangerous overcrowding" at a Border Patrol processing center in El Paso, Texas.  In June 2019, DHS OIG published a full report that confirmed violations of government standards at four detention centers, including three GEO-operated centers.   In July 2019, DHS OIG issued another report calling for immediate action at the U.S.-Mexico border. GEO operates one of the largest detention centers in Texas.  In July 2019, amid the reports of the treatment of migrants at the U.S.-Mexico border, the House Oversight and Reform Committee sent letters to GEO demanding information about the hundreds of millions of dollars in government contracts they had received.

On June 27, 2019, GEO announced that after 10 years of managing the Northeast Facility for the state of New Mexico, it terminated the contract.  Shortly after, it came to light that GEO had understaffed the facility, resulting in an uprising in the prison.  The Company ultimately paid $1.3 million in fines for excessive understaffing in violation of its contract with New Mexico.

In February 2020, Delaware County, Pennsylvania began taking steps towards ending its contract with GEO to run the Delaware County Prison.  In June 2020, a report brought to light detailed violations of regulatory standards at the GEO-operated Hector Garza Residential Treatment Center.  In July 2020 the Department of Justice, Office of Inspector General published an audit assessing GEO's performance and compliance with government terms, conditions, laws, and regulations applicable to the contract GEO had been awarded to operate the Robert A. Deyton Detention Facility.  The report found that GEO did not comply with the terms and laws pertaining

to mandatory training and detainee safety and failed to provide staff services.

In 2020, COVID-19 swept the world.  On April 23, 2020, a federal judge ordered the Adelanto Facility to immediately reduce detainee population and to follow all measures recommended by the Centers for Disease Control ("CDC") to contain COVID-19.  On April 13, 2020, detainees at the GEO-operated Broward Transitional Center filed a lawsuit alleging a failure to comply with COVID-19 guidelines.   On April 30, 2020, the court ordered the center to cut the number of people in its custody to 75% and to hand out soap, cleaning materials, and masks to all detainees.  On April 14, 2020, detainees at the Aurora Facility filed a lawsuit accusing GEO of failing to follow CDC recommendations regarding COVID-19.  On April 20, 2020, detainees at the GEO-operated Mesa Verde Detention Center filed a lawsuit alleging that the facility was so overcrowded that social distancing was impossible and no meaningful steps had been taken to reduce the risk of COVID-19 outbreaks.  On June 29, 2021, a lawsuit was filed alleging that GEO had failed to follow proper safety and health protocols at a federal halfway house in Houston, Texas and threatened to discipline residents if they called county or city agencies about COVID-19 testing, information, or to inform them about deaths at the facility.

Plaintiffs maintain that Defendants were aware of or severely reckless in not knowing that GEO's operational deficiencies and contractual and legal violations would cost the Company access to capital after its publicly disclosed financing partners bailed and revenue streams slowed as multiple government contracts were terminated.  The statements that form the basis of Plaintiffs' Amended Complaint can be categorized into five different types of statements:[3, 4]

---

[3] The information in the parenthesis after each statement indicate when and where the statement was made.

[4] The statements set out herein may not be exact quotations but indicate the nature of the statement

1.  Statements about the stability of the dividend, such as:

> • Our dividend is supported by stable and predictable operational cash flows.  (11/7/2018 3Q18 Earnings Call; 2/14/2019 4Q18 Earnings Call; 4/30/2019 1Q19 Earnings Call; 7/30/2019 2Q19 Earnings Call; 2/12/20 4Q19 Earnings Call; 4/30/20 1Q20 Earnings Call.)

> • Continued growth in our cash flows will allow us to naturally deleverage while providing support for our annual dividend payment.  (7/30/19 2Q19 Earnings Call; 11/5/19 3Q19 Earnings Call.)

> • Our strong quarterly results are indicative of the stability of our cash flows and the sustainability of our annual dividend.  (2/25/19 FY18 10-K).

> • The dividend is certainly safe consistent with our forecasts.  (4/30/20 1Q20 Earnings Call).

2.  Statements about the quality of the services the Company provides, such as:

> • We have consistently helped our government partners meet their correctional and detention challenges in safe, secure, and humane environments.  (11/7/2018 3Q18 Earnings Call.)

> • Our facilities have been able to provide high quality services without being impacted by budgetary constraints.  (2/14/2019 4Q18 Earnings Call; 4/30/2019 1Q19 Earnings Call; 2/12/20 4Q19 Earnings Call.)

> • We operate each facility in accordance with our policies and procedures and with the standards and guidelines required under the relevant management contract.  (2/25/2019 FY18 10-K; 2/26/20 FY19 10-K.)

> • Our continuum of care platform enables us to provide consistency and continuity in case management, which we believe results in a higher quality of care for offenders, reduces recidivism, lowers overall costs for our clients, improves public safety and facilitates successful reintegration of offenders back into society.  (2/25/2019 FY18 10-K; 2/26/20 FY19 10-K.)

> • Our expanded and diversified service offerings uniquely position us to bundle our high quality services and provide a comprehensive continuum of care for our clients, which we believe will lead to lower cost outcomes for our clients and larger scale business opportunities for us.  (2/25/2019 FY18 10-K; 2/26/20 FY19 10-K.)

> • We . . . comply with the federal government's performance based National Detention Standards, as well as guidelines set by the independent accrediting entities.  (4/30/2019 1Q19 Earnings Call.)

---

made.

• These headlines have unfortunately been driven by a false narrative and deliberate mischaracterization of our long-standing role as a quality service provider to ICE. (7/30/2019 2Q19 Earnings Call.)

3.  Statements about pending lawsuits, such as:

• Company does not expect any pending claims or lawsuits to have a material adverse effect on its financial condition, results of operations, or cash flows.  (11/8/2018 3Q18 10-Q; 2/25/2019 FY18 10-K; 5/6/2019 1Q19 10-Q; 8/2/2019 2Q19 10-Q; 11/7/19 3Q19 10-Q; 2/26/20 FY19 10-K; 5/6/20 1Q20 10-Q.)

• The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.  (11/8/2018 3Q18 10-Q; 2/25/2019 FY18 10-K; 5/6/2019 1Q19 10-Q; 8/2/2019 2Q19 10-Q; 11/7/19 3Q19 10-Q; 2/26/20 FY19 10-K; 5/6/20 1Q20 10-Q.)

• The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows. (11/8/2018 3Q18 10-Q; 2/25/2019 FY18 10-K; 5/6/2019 1Q19 10-Q; 8/2/2019 2Q19 10-Q; 11/7/19 3Q19 10-Q; 2/26/20 FY19 10-K; 5/6/20 1Q20 10-Q.)

• The Company has adequately accounted for known legal cases in our guidance for 2019. (2/14/2019 4Q18 Earnings Call.)

4.  Statements about availability of funding, such as:

• We expect to continue to enjoy access to cost effective capital to support the expansion of our high quality services.  (4/30/2019 1Q19 Earnings Call.)

• This volatility is directly tied to heightened political rhetoric that . . . is based on a mischaracterization of our role as a service provider and our overall company record. There has also been a significant amount of misinformation regarding our banking partners and our access to capital . . .. Contrary to these misleading claims we continue to enjoy access to capital with several dozens of lenders and financial institutions currently in our senior credit facility. (11/5/19 3Q19 Earnings Call.)

• The handful of bank announcements have not impacted our operations or financial flexibility.  (11/5/19 3Q19 Earnings Call.)

• We continue to enjoy access to capital with several dozens of lenders and financial institutions currently committed under our credit facility. (2/12/20 4Q19 Earnings Call.)

• A syndicate of approximately 65 lenders participate in our Credit Agreement, six of which have indicated that they do not intend to provide new financing to GEO but will honor their existing obligations . . . The banks that have withdrawn participation remain contractually

committed for approximately five years. Additionally, these six banks represent less than 25% of our overall borrowing capacity under our Credit Agreement and the withdrawal of their participation is not expected to negatively impact our financial flexibility. (5/6/20 1Q20 10-Q.)

5. Statements about containing COVID-19 in the Company's facilities, such as:

• Our corporate, regional and field staff have implemented comprehensive steps to address and mitigate the risks of COVID-19 to all of those in our care and our employees. Ensuring the health and safety of all those in our facilities and our employees has always been our number one priority. As a longstanding provider of the central government services we have the experience for the implementation of best practices for the prevention, assessment and the management of infectious diseases.  All of our facilities operate safely and without overcrowded conditions. (4/30/20 1Q20 Earnings Call.)

• These best practices include the implementation of quarantine and cohorting procedures to isolate confirmed and presumptive cases of COVID-19. (4/30/20 1Q20 Earnings Call.)

• We have also deployed specialized sanitation teams to sterilize high-contact areas of our facilities and have developed intensive schedules and procedures for the cleaning and disinfecting of facility spaces above and beyond normal cleaning activities.  (4/30/20 1Q20 Earnings Call.)

Defendants have filed as Exhibits to its Motion to Dismiss its relevant Form 10-Ks and

Form 10-Qs, all of which contain the following statement, under the heading "Forward-Looking

Information:"

"Forward-looking" statements are any statements that are not based on historical information. Statements other than statements of historical facts included in this report, including, without limitation, statements regarding our future financial position, business strategy, budgets, projected costs and plans and objectives of management for future operations, are "forward-looking" statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate" or "continue" or the negative of such words or variations of such words and similar expressions. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions, which are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements and we can give no assurance that such forward-looking statements will prove to be correct.

(*E.g.*, Ex. A [DE 37-1], GEO's 3Q18 10-Q at 46; Ex. G [DE 37-7], GEO's Form 10-K Annual

Report for the fiscal year ended December 31, 2018 at 87.)  The 10-Ks also contained the following

language:

> ***Our cash distributions are not guaranteed and may fluctuate.***
>
> A REIT generally is required to distribute at least 90% of its REIT taxable income to its shareholders. Our board of directors, in its sole discretion, will determine on a quarterly basis the amount of cash to be distributed to our shareholders based on a number of factors including, but not limited to, our results of operations, cash flow and capital requirements, economic conditions, tax considerations, borrowing capacity and other factors, such as debt covenant restrictions that may impose limitations on cash payments and plans for future acquisitions and divestitures. Consequently, our distribution levels may fluctuate.

(*E.g.*, Ex. G, GEO's Form 10-K Annual Report for the fiscal year ended December 31, 2018 at

30).  GEO's 10-Q's contained similar language. (*E.g.,* Ex. A, GEO's 3Q18 10-Q at 18, 49.)  In

addition, during each of the earnings calls, investors were told:

> [M]uch of the information we will discuss today, including the answers we may give in response to your questions, may include forward-looking statements regarding our beliefs and current expectations with respect to various matters. These forward-looking statements are intended to fall within the Safe Harbor provisions of the securities laws. Our actual results may differ materially from those in the forward-looking statements as a result of various factors contained in our [SEC] filings, including the Forms 10-K, 10-Q and 8-K reports.

(*E.g.*, Ex. B [DE 37-2] at 18-19 of 29.)

## II.    MOTION TO DISMISS STANDARD

Claims brought under Rule 10b-5 "must satisfy (1) the federal notice pleading requirements

[set out in Federal Rule of Civil Procedure 8(a)]; (2) the special fraud pleading requirements found

in Federal Rule of Civil Procedure 9(b) . . .; and (3) the additional pleading requirements imposed

by the Private Securities Litigation Reform Act of 1995 ("PSLRA")."  *FindWhat Inv. Grp. v.*

*FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citations and footnote omitted).

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim

showing that the pleader is entitled to relief."  Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief, and a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  When a complaint is challenged under Rule 12(b)(6), a court will presume that all well-pled allegations are true and view the pleadings in the light most favorable to the plaintiff.  *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir. 2007).  However, once a court "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," it must determine whether the well-pled facts "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake."  This requirement can by met by pleading (1) precisely what statements or omissions were made; (2) the time and place the statements were made and by whom; (3) the content of the statements and how they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud.  *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997).  Failure to satisfy the pleading requirements of Rule 9(b) is ground for dismissal of a claim based in fraud.  *FindWhat*, 658 F.3d at 1298.

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.A. § 78u-4(b)(1).  Additionally, if a claim requires proof "the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts

11

giving rise to a strong inference that the defendant acted with the required state of mind."  15

U.S.C.A. § 78u-4(b)(2)(A).  "Although factual allegations may be aggregated to infer scienter,

scienter must be alleged with respect to each defendant and with respect to each alleged violation

of the statute."  *FindWhat*. 658 F.3d at 1296.   If Plaintiffs fail to satisfy the PSLRA's pleading

requirements, the Court "shall" dismiss the claim.  *See* § 78u-4(b)(3)(A).

## III.   DISCUSSION

Section 10(b) of the Exchange Act makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered
> on a national securities exchange . . . , any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as the Commission may
> prescribe as necessary or appropriate in the public interest or for the protection of
> investors.

15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for anyone

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Thus, to state a claim for a violation of § 10(b) and Rule 10b-5, a plaintiff

must allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection

with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic

loss; and (6) a causal connection between the material misrepresentation or omission and the loss,

commonly called 'loss causation.'"  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th

Cir. 2008).

Section 20(a) of the Exchange Act imposes liability on "control persons:"

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C.A. § 78t(a).  Thus, to state a claim under § 20(a) against the individual Defendants, Plaintiffs must allege: (1) that GEO committed a primary violation of the securities law; (2) that the individual Defendants had the power to control the general business affairs of GEO; and (3) that the individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in primary liability.  *See Mizzaro*, 544 F.3d at 1237.

Defendants seek to dismiss all of Plaintiffs' claims for a multitude of  reasons: (1) similar claims were dismissed in a prior lawsuit; (2) forward looking statements are not actionable; (3) puffery, statements of corporate optimism, and statements of opinion are not actionable; (4) Plaintiffs' claims are barred by the "truth-on-the-market" defense; (5) Plaintiffs have not adequately pled falsity; (6) Plaintiffs have failed to adequately plead loss causation; (7) Plaintiffs have failed to adequately plead scienter; and (8) Plaintiffs have failed to adequately allege that the individual Defendants had control for purposes of § 20(a) liability.

### A.    Prior Lawsuit

Defendants' first argument – that Plaintiffs' claims are a rehash of prior dismissed claims – is without merit.  A review of the order in the prior case, *Mulvaney v. GEO Group, Inc.*, 237 F. Supp. 3d 1308, 1316 (S.D. Fla. 2017), indicates that the earlier claims were based on statements made during a different time period.  While the claims were based on similar statements and alleged omissions, the Court must analyze the claims currently before it.  Thus, the Court will not address this argument further, other than to the extent that *Mulvaney* is persuasive authority as to

other arguments raised by Defendants.

### B.      Forward Looking Statements

Defendants argue that many of the statements upon which Plaintiffs rely were forward looking and, as such, are protected by the PSLRA safe harbor provision, 15 U.S.C. § 78u-5.   The safe harbor provision exempts from liability any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).   This safe harbor provision applies regardless of whether the speaker knew of, or was negligent or reckless as to, the falsity of the statement. *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 795 (11th Cir. 2010).   The safe harbor also exempts from liability a forward-looking statement if the plaintiff fails to prove that the person making the statement knew it was false or misleading.   15 U.S.C. § 78u-5(c)(1)(B). Thus, "[s]tatements regarding *future* performance are actionable only if they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them."   *FindWhat Inv. Grp.*, 658 F.3d at 1304 (internal citation and quotation omitted).   The PSLRA defines "forward-looking statement" to include statements about future earnings, future dividends, future operations, or future economic performance.   15 U.S.C. § 78u-5(i)(1).

Defendants argue that every earnings call and all of the relevant Form 10-Ks and 10-Qs contained cautionary language and, thus, many of the statements at issue here are protected under the PSLRA safe-harbor provision.   Plaintiffs argue that the safe harbor provision does not apply because: (1) the safe harbor provision does not apply to omissions of then-existing facts; (2) Defendants' cautionary language was inadequate; and (3) the safe harbor provision does not apply

where the risks had already materialized.

### 1.      *Statements About the Dividend*

Defendants made numerous statements about the dividend, several were made repeatedly: (1) our dividend is supported by stable and predictable operational cash flows; (2) continued growth in our cash flows will allow us to naturally deleverage while providing support for our annual dividend payment; (3) our strong quarterly results are indicative of the stability of our cash flows and the sustainability of our annual dividend; and (4) the dividend is certainly safe consistent with our forecasts. Defendants argue that all of these are protected forward-looking statements.

Defendants contend that the numerous statements that the dividend is supported by stable and predictable operational cash flows are protected forward-looking statements. To the extent that Plaintiffs argue that these statements were about future dividends, the statements are forward looking and non-actionable under the safe harbor provisions because Defendants made no guarantees and Plaintiff has not sufficiently pled that Defendants knew these statements were false when made. To the extent that these statements were based on Defendants' financial position at the time the statements were made, they are not forward looking and, thus, not protected under the safe harbor provision.

The second statement has been taken out of context. The larger context of the statement makes it clear that the statement was forward looking: "We believe that our growing earnings and cash flows will allow us to deleverage, while providing support for our annual dividend payments which we expect to remain unchanged. We believe that our strong quarterly financial results, several new project openings and new procurement activity are indicative of the stability of our cash flows and the sustainability of our dividend payments." This statement about continued growth is a forward-looking statement protected by the safe harbor provision of the PSLRA, 15

U.S.C. § 78u-5.  Thus, this statement is not actionable.

The last two statements about the sustainability and safety of the dividend are also forward-looking statements.  Neither is worded as a guarantee and Plaintiffs have not shown that Defendants did not believe the statements when made.

### 2. *Statements About GEO's Services*

Only one of the statements about GEO's services is forward looking: our expanded and diversified service offerings uniquely position us to bundle our high-quality services and provide a comprehensive continuum of care for our clients, which we believe will lead to lower cost outcomes for our clients and larger scale business opportunities for us.  Plaintiffs have not pled adequate facts to establish that this statement was false when made.  Further, both 10-Ks in which it was made contained cautionary language.  Thus, this statement is not actionable.

### 3. *Statements About Access to Capital*

Defendants made one forward-looking statement about its access to capital: that it expects to continue to have access to cost effective capital.  Plaintiffs argue that Defendants failed to disclose material facts about this statement because once JPMorgan and Wells Fargo stopped financing GEO other big banks were likely to follow suit and because key government contracts were likely to be terminated or not renewed.  However, Plaintiffs' argument that other banks would likely follow suit is mere speculation.  Further, the cancellation of some contracts would not necessarily impede GEO's access to capital.  Moreover, Plaintiffs have not adequately alleged that this statement constituted a guarantee or that Defendants did not believe it when made.  Thus, this is a forward-looking statement that is not actionable under the safe harbor provision.

### 4. *Statements About Pending Lawsuits*

Three of the statements Defendants made about the pending lawsuits contain forward

looking statements: (1) the Company does not expect any pending claims or lawsuits to have a material adverse effect on its financial condition, results of operations, or cash flows; (2) the Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit; and (3) the Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.  While each of these statements is forward looking or contains a forward-looking component, as discussed in more detail below, Plaintiffs have adequately pled that Defendants knew these statements were false when made.

### C.      Puffery, Corporate Optimism, and Opinion

Defendants argue that most of the statements at issue are non-actionable puffery, statements of corporate optimism, or opinion.   "Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015)).  Thus, puffery is not actionable because "[e]xcessively vague, generalized, and optimistic comments—the sorts of statements that constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle—that is, they're not material."  *Carvelli*, 934 F.3d at 1320.  However, before granting a motion to dismiss based on puffery, a court must be sure that the alleged misrepresentations are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Id.* at 1320-21 (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

### 1.      *Statements About the Dividend*

Defendants repeatedly made the statement that the dividend is supported by stable and

predictable operational cash flows.  Defendants argue that courts have held that this type of statement about dividends is not actionable under § 10(b).  Plaintiffs argue that the statements were false and misleading, because Defendants failed to disclose material contemporaneous facts that undermined the stability of the dividend.   As set out above, to the extent that these statements were forward looking, they are not actionable.  To the extent that the statements were statements of current fact, they are not the same as the statements in the cases cited by Defendant.  Those statements were either forward looking or vague.  Thus, Defendants' repeated statement that the dividend is supported by stable and predictable operational cash flows is not puffery.

### 2.   *Statements About Access to Capital*

Defendants also argue that the statements about the Company's access to future capital are puffery for the same reasons that the statements about the dividends are puffery.  These statements: (1) GEO continues to enjoy access to capital, despite the announcements of JPMorgan, Wells Fargo, and others and (2) the bank announcements have not impacted GEO's operations or financial flexibility are more than mere puffery.  Plaintiffs have pled that access to financing was critical to GEO's operations, particularly given its structure as a REIT.  Thus, most investors would consider this information material.

### 3.   *Statements About GEO's Services*

Defendants contend that the statements about the quality of GEO's services are puffery. These statements include: (1) we have consistently helped our government partners meet their correctional and detention challenges in safe, secure, and humane environments; (2) our facilities have been able to provide high quality services without being impacted by budgetary constraints; (3) we operate each facility in accordance with our policies and procedures and with the standards and guidelines required under the relevant management contract; (4) our continuum of care

platform enables us to provide consistency and continuity in case management, which we believe results in a higher quality of care for offenders, reduces recidivism, lowers overall costs for our clients, improves public safety and facilitates successful reintegration of offenders back into society; (5) our expanded and diversified service offerings uniquely position us to bundle our high quality services and provide a comprehensive continuum of care for our clients, which we believe will lead to lower cost outcomes for our clients and larger scale business opportunities for us; (6) we . . . comply with the federal government's performance based National Detention Standards, as well as guidelines set by the independent accrediting entities; and (7) these headlines have unfortunately been driven by a false narrative and deliberate mischaracterization of our long-standing role as a quality service provider to ICE.

Statement 5, above, has already been found nonactionable as a forward-looking statement. Statements 1, 2, 4, 5, and 7 are clearly puffery. They are the definition of "puffery" – generalized, vague, nonquantifiable statements of corporate optimism. These statements "do not assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell [GEO's] securities." *Philadelphia Fin. Mgmt. of San Francisco, LLC v. DJSP Enterprises, Inc.*, No. 10-61261-CIV, 2011 WL 4591541, at *14 (S.D. Fla. Sept. 30, 2011) (citations omitted). Thus, these statements are not material and not actionable.

That leaves statements 3 and 6, above, which address the Company's compliance with standards, their own, the government's, and accrediting entities'. These statements are more than mere puffery. Thus, they are material.

Defendants also seek to dismiss claims based on statements they made about the stability of GEO's partnerships with its clients, such as "[w]e believe this renewed contract is indicative of the stability of our long-standing customer partnerships as our Queens facility has been in

19

operation since the 1990s." Defendants argue this sort of statement has consistently been found to be nonactionable. The Court agrees. This is a vague, generalized, and optimistic comment about a renewed contract. It is not actionable.

### D.   Falsity

Defendants contend that Plaintiffs have failed to adequately allege, with the particularity required by Rule 9(b) and the PSLRA, why the statements upon which Plaintiffs rely were false or misleading. Thus, Defendants seek dismissal of all claims. In addressing this argument, the Court will only discuss the statements that have not already been found to be non-actionable.

#### 1.   Statements About COVID-19

Defendants argue that Plaintiff has failed to sufficiently plead that any of Defendants' statements about COVID-19 were false.[5] The Court agrees. Plaintiffs have not alleged in the Amended Complaint any facts that would demonstrate that Defendants' statements about addressing COVID-19 in their facilities were false. Plaintiffs have not alleged facts indicating that GEO did not implement comprehensive steps to address and mitigate the risks of COVID-19 to all of those in its care and its employees, did not implement best practices including the implementation of quarantine and cohorting procedures to isolate confirmed and presumptive cases of COVID-19, and did not deploy specialized sanitation teams to sterilize high-contact areas of its facilities or develop intensive schedules and procedures for the cleaning and disinfecting of facility spaces above and beyond normal cleaning activities.

Plaintiffs argue that Defendants' statements misled investors into believing that GEO had the financial stability and systems in place to properly handle the COVID-19 pandemic when it

---

[5] Defendants raise these arguments in the section of their Motion addressing puffery. However, the arguments in the Motion are about Plaintiffs' failure to adequately plead falsity.

did not.  However, none of the statements about addressing COVID-19 are anything other than statements about how GEO was addressing the COVID-19 pandemic in its facilities.  And, Plaintiffs have not alleged any facts that would make these statements false or misleading. Plaintiffs have not alleged that GEO was not doing what it said it was doing to address COVID-19 in its facilities.  Thus, Plaintiffs' claims based on these statements must be dismissed.

### 2.      *Statements About Access to Capital*

Defendants also maintain that Plaintiffs have not adequately alleged facts demonstrating that Defendants' statements about access to cost-effective capital were false.  While Plaintiffs have alleged that numerous big banks ultimately stopped funding private prisons, Plaintiffs have not alleged any facts demonstrating that Defendants' statements about its ability to obtain funding from others were false or misleading at the time the statements were made.  Nor have Plaintiffs alleged facts showing that Defendants knew or should have known about the divestiture announcements prior to the banks making them.  Thus, Plaintiffs' claims based on the statements regarding GEO's ability to obtain funding must be dismissed.

### 3.      *Statements About GEO's Services*

Defendants seek dismissal of Plaintiffs' claims based on Defendants' statements about GEO's having obtained certain certifications and following certain policies and procedures. Plaintiffs have not pled facts sufficiently demonstrating that these statements were false when made.  Plaintiffs have not presented any facts indicating that GEO did not have the certifications it stated that it had.  Thus, the claims based on these statements are dismissed.

### 4.      *Sarbanes-Oxley Certification*

Defendants also argue that Plaintiffs cannot base a claim for securities fraud on an alleged misstatement in a Sarbanes-Oxley ("SOX") certification.  Plaintiffs allege that Defendants falsely

certified in their 2018 and 2019 10-Ks that "the information contained in the [10-K] fairly represents, in all material respects, the financial conditions and results of operations of the Company."  While, under certain circumstances, a SOX certification may form the basis of a § 10(b) and Rule 10b-5 claim, *see MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2019 WL 5394011, at *11 (M.D. Fla. Oct. 16, 2019), *report and recommendation adopted*, No. 619CV619ORL40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020), and cases cited therein, here Plaintiffs have not adequately pled the falsity of the statement in the SOX certifications upon which they base their claim.  Plaintiffs have not adequately pled that at the time of the certifications the statements were false – that the 10-Ks did not accurately represent the financial conditions or results of operations of the Company.

### 5.      Statements About the Dividend

To the extent that Defendants' statements that the dividend is supported by stable and predictable operational cash flows are not forward looking, Plaintiffs have failed to allege facts to show that, at any of the times the statement was made, it was not currently true.  The dividends were issued and GEO was able to pay the dividends from its cash flows.  Thus, this claim is dismissed.

### 6.      Statements About Pending Lawsuits

Finally, Defendants maintain that Plaintiffs have not adequately pled the falsity of GEO's disclosures regarding pending lawsuits.  Defendants repeatedly made three statements about pending lawsuits: (1) the Company does not expect any pending claims or lawsuits to have a material adverse effect on its financial condition, results of operations, or cash flows; (2) the Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit; and (3) the Company

does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.  The Company made a fourth statement during the February 14, 2019 earnings call: the Company has adequately accounted for known legal cases in our guidance for 2019.

Plaintiffs have alleged that, in communications with ICE, Defendants characterized the lawsuits as a "potentially catastrophic risk" that exposed the Company to "tens of millions" in potential damages and up to $20 million in legal expenses.  Further, Plaintiffs have alleged that on May 30, 2018, in a letter to ICE, Zoley stated that "[w]e are deeply alarmed at the rapidly increasing costs in defending these lawsuits without reimbursement from ICE, or assistance in the defense by the Department of Justice (DOJ.)"  Thus, Plaintiffs have adequately pled that these statements were false or misleading.

**E.** **The "Truth on the Market" Doctrine**

Defendants argue that the "Truth on the Market" Doctrine bars all of Plaintiffs' claims. Under the Truth on the Market Doctrine, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  Plaintiffs argue that the Court should not consider the Truth on the Market defense at this stage of the litigation.  Regardless, given that the only remaining claims are based on statements about the potential costs of pending lawsuits the Truth on the Market defense fails at this point.  Plaintiffs have alleged that the excessive costs of the lawsuits were not known to the market at the time the statements about the lawsuits were made.  Thus, this defense is not a basis for dismissal at this stage of the proceedings.

**F.** **Loss Causation**

Defendants argue that Plaintiffs have not sufficiently pled loss causation – that there is a

causal connection between the material misrepresentation or omission and Plaintiffs' loss.  In a fraud-on-the-market case, such as this, a plaintiff can plead loss causation by pleading that the share price fell significantly after the truth became known.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Thus, a plaintiff can circumstantially demonstrate loss causation in fraud-on-the-market cases by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*FindWhat Inv. Grp.*, 658 F.3d at 1311–12 (footnote omitted).

The Court will only address whether Plaintiffs have sufficiently pled loss causation as to the remaining claims – the claims based on Defendants' statements about the pending lawsuits.  Plaintiffs have pled that on July 17, 2019, reputable news sources published articles revealing GEO's requests to ICE to help cover the costs of litigation because GEO could not bear the costs of defense on its own.  Over the next two days, GEO's share price fell over 7.9%.  This is sufficient to plead loss causation.

### G.    Scienter

Defendants maintain that Plaintiffs' claims fail because Plaintiffs have failed to raise a strong inference of scienter.  To plead scienter, a plaintiff must "with respect to each act or omission alleged . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute."  *FindWhat Inv. Grp.*, 658 F.3d

at 1296.  To establish scienter under § 10(b) and Rule 10b-5, a plaintiff must show "either an

'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'"  *Mizzaro v. Home Depot,*

*Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271,

1282 (11th Cir. 1999)).  The Eleventh Circuit has described "severe recklessness:"

> Severe recklessness is limited to those highly unreasonable omissions or
> misrepresentations that involve not merely simple or even inexcusable negligence,
> but an extreme departure from the standards of ordinary care, and that present a
> danger of misleading buyers or sellers which is either known to the defendant or is
> so obvious that the defendant must have been aware of it.

*Mizzaro*, 544 F.3d at 1238 (quoting *Bryant*, 187 F.3d at 1282 n.18).  If a plaintiff fails to satisfy

the scienter pleading requirement, a court must dismiss the complaint.  *FindWhat Inv. Grp.*, 658

F.3d at 1296-97 (citing 15 U.S.C. § 78u–4(b)(3)(A)).

Plaintiffs have adequately pled scienter as to GEO's statements about the potential costs of

the lawsuits against GEO.  Plaintiffs have pled that Zoley sent a letter to ICE on May 30, 2018,

stating that "[w]e are deeply alarmed at the rapidly increasing costs in defending these lawsuits

without reimbursement from ICE, or assistance in the defense by the Department of Justice

(DOJ.)"  Plaintiffs have also alleged that, in communications with ICE, Zoley characterized the

lawsuits as a "potentially catastrophic risk" that exposed the Company to "tens of millions" in

potential damages and up to $20 million in legal expenses.  Despite these concerns, GEO continued

to state in its 10-Qs and 10-Ks that: (1) the Company does not expect any pending claims or

lawsuits to have a material adverse effect on its financial condition, results of operations, or cash

flows; (2) the Company has not recorded an accrual relating to these matters at this time, as a loss

is not considered probable nor reasonably estimable at this stage of the lawsuit; and (3) the

Company does not expect the outcome of any pending claims or legal proceedings to have a

material adverse effect on its financial condition, results of operations or cash flows.  This is

sufficient to create a strong inference that Defendants GEO and Zoley acted with an intent to deceive or with severe recklessness. Plaintiffs have not, however, adequately pled scienter as to the other individual Defendants, because Plaintiffs have not alleged any facts indicating that the other individual Defendants knew about the impact the costs of the lawsuits were having on the Company. Scienter must be pled with particularity as to each defendant. Plaintiffs have not done that as to Evans, Donahue, and Schlarb.

### H.      Plaintiffs' § 20(a) Claims

Defendants argue that Count II, Plaintiffs' "control person" claims against the individual Defendants, must be dismissed because Plaintiffs have failed to allege a primary violation of the Exchange Act and because Plaintiffs have failed to allege with particularity that the individual Defendants asserted the requisite level of control over GEO. As set out above, to state a claim under § 20(a) against the individual Defendants, Plaintiffs must allege: (1) that GEO committed a primary violation of the securities law; (2) that the individual defendant had the power to control the general business affairs of GEO; and (3) that the individual defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.

Plaintiffs have adequately pled a claim against Defendant Zoley. Zoley was the Chairman of the Board and CEO of GEO during the entire class period, as such he has the power to control the general business affairs of GEO. According to the Amended Complaint, he was the one who reached out to ICE about the costs and potential liability arising from the lawsuits. Thus, he had the requisite power to directly or indirectly control or influence the policies relating to the lawsuits. This is sufficient to plead a claim under § 20(a). Plaintiffs, however, have failed to adequately plead claims against any of the other individual Defendants. They have not pled that any facts that

demonstrate that the other individual Defendants were involved in or had any control over the issues arising from the lawsuits. Thus, the § 20(a) claims against Evans, Donahue, and Schlarb are dismissed.

Accordingly, it is

**ORDERED** that:

1.    Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Class Action Amended Complaint [DE 36] is **GRANTED in part and DENIED in part:**

a)    Count I is DISMISSED to the extent it is based on any statements other than the statements about the pending lawsuits and against Defendants Evans, Donahue, and Schlarb.

b)    Count II is DISMISSED as to Defendants Evans, Donahue, and Schlarb.

2.    By **October 4, 2021,** Plaintiffs shall file a second amended complaint in accordance with this Order. The second amended complaint shall not allege any claims based on statements that the Court has found non-actionable as forward looking or as puffery, corporate optimism, or opinion. Further, the second amended complaint shall not add any additional statements as the basis of its claims.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 23rd day of September, 2021.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

cc:    All Counsel of Record