# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 20-81063-CIV-SMITH

| | |
|---|---|
| STEVE HARTEL, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>THE GEO GROUP, INC. and GEORGE C. ZOLEY,<br><br>                    Defendants. | **CONSOLIDATED CLASS ACTION SECOND AMENDED COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs James Michael DeLoach ("DeLoach") and Edward Oketola ("Oketola") (together, "Lead Plaintiffs"), individually and on behalf of all others similarly situated hereby bring this Consolidated Class Action Second Amended Complaint (the "Complaint") against The GEO Group, Inc. ("GEO" or the "Company") and George C. Zoley ("Zoley") (collectively, "Defendants"). The allegations herein are based on Lead Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by GEO; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; and media reports about the Company. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Lead Plaintiffs' investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired GEO common stock during the period from November 9, 2018 to August 5, 2020, inclusive (the "Class Period"), and were damaged thereby. The action is brought against GEO and Zoley for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Founded in 1984, GEO is purportedly the first fully integrated equity real estate investment trust ("REIT") specializing in the design, financing, development, and operation of secure facilities, processing centers, and community reentry centers. It operates internationally, with over 127 facilities in the U.S., Australia, South Africa, and the United Kingdom. GEO is also purportedly a leading provider of enhanced in-custody rehabilitation, post-release support, electronic monitoring, and community-based programs. The Company's worldwide operations include the ownership and/or management of, among other facilities, private prisons, detention centers and halfway houses in the U.S. Simply put, GEO is a leader in the private prison business.

3.      At the time GEO restructured to become a REIT in 2013, there was significant room to grow because the U.S. had the largest prison population in the world and private prisons represented less than 10% of a $74 billion market. But the private prison model has always had critics and controversies, including public outcry about how inmates were treated and accusations that the government guaranteed high occupancy rates when it awarded a contract. In addition, historically, the profitability of private prisons decreased in recessions with fewer arrests made and when changes in governments disfavored private prisons.

4.      After becoming a REIT, GEO was required to distribute at least 90% of its income each year as dividends to shareholders. That structure has allowed GEO to avoid corporate-level taxation, because its shareholders are taxed on the dividends. As a consequence, GEO has had limited funds with which to run its operations and has had to rely on the capital markets to fund growth investments. Accordingly, GEO's continued success—as well as that of peer companies, like CoreCivic, Inc. ("CoreCivic")—depended on lucrative financing deals with large banks like JPMorgan Chase Co. ("JPMorgan"), Wells Fargo & Company ("WF"), and Bank of America Corporation ("BofA"), on top of maintaining stable, revenue-generating contracts with federal, state, and local governments. Those financing deals and government contracts, in turn, required GEO to comply with a host of regulatory requirements while maintaining standards of due process and human rights.

5.      A key signal to investors that GEO was in fact successfully operating its facilities and obtaining sufficient capital from lenders was a stable, predictable dividend. In order for GEO to sustain or increase its stock price or dividend levels, it was critical that the Company maintain and operate an increasing number of profitable prisons and detention facilities that were also safe, effective, and legally-compliant. A stable dividend reflected solid business performance and ensured that GEO's stock price maintained or increased in value.

6.      Going into the Class Period, JPMorgan was far and away the largest lender to private prison behemoths GEO and CoreCivic, holding $254 million of their debt as of June 2017.[1] WF and BofA also provided revolving credit, term loans, and bond underwriting to GEO (and CoreCivic), helping them fund facility construction and general operations. But in 2018 while

---

[1] Morgan Simon, *In Wake of Wells Fargo Hearing, Private Prison Stocks Take Big Hit*, FORBES MEDIA LLC, (Mar. 15, 2019), https://www.forbes.com/sites/morgansimon/2019/03/15/in-wake-of-wells-fargo-hearing-private-prison- stocks-take-big-hit/?sh=b9ff3e71a3b5.

JPMorgan, BofA, and WF raised over $1.8 billion in debt for GEO and CoreCivic, activists who had long been campaigning the banks to stop funding the private prison industry gained momentum after the Trump administration adopted the Zero Tolerance Policy on immigration in April 2018.

7.      The concomitant scrutiny on GEO was substantial. For example, the activism prompted the Teachers' Retirement Board of the California State Teachers' Retirement System ("CalSTRS") to conduct a 5-month investigation beginning in July 2018 involving visits to GEO's detention facilities and meetings with senior management. CalSTRS ultimately divested all of its holdings in GEO. At the same time, GEO was facing multiple class actions that posed "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and to continue receiving revenue from those facilities. Indeed, Defendant Zoley indicated to U.S. Immigration and Customs Enforcement ("ICE") that he was "deeply alarmed" about the "tens of millions" in potential damage exposure and the "rapidly increasing" expenses to defend the lawsuits, estimating in May 2018 that the cost could be as much as $20 million. That considerable financial exposure would erode GEO's net income, which in 1Q18, for example, had been only $34.9 million. In other words, the amount of liability faced by GEO could immediately eradicate 57% of GEO's quarterly profit. Defendant Zoley was right to be "deeply alarmed." There was an existential threat to GEO's profitability and dividends. Worse yet, the pressures and exposure that GEO faced as of May 2018 were growing more severe.

8.      Yet, throughout the Class Period, Defendants did not reveal those fundamental facts to investors and instead misrepresented GEO's stability and publicly portrayed the company in a materially misleading light. In November 2018, when the Class Period begins, Defendants maintained the appearance of business as usual, *i.e.,* that their financing deals with big banks and

contracts with governments would continue as a matter of course. On November 7, 2018 and February 14, 2019, Defendants touted that GEO's dividend continued to be supported by stable and "predictable operational cash flows."[2] Defendants also confirmed the Company's liquidity of $374 million on November 7, 2018 and $350 million on February 14, 2019 "in available capacity under our revolving credit facility in addition to and accordion feature of $450 million under our credit facility."

9. Further, on November 7, 2018, while acknowledging the results of the mid-term elections that resulted in a Democratically controlled House of Representatives (a party historically opposed to private prisons), Defendant Zoley reminded investors of GEO's "three-decade-long record in providing high-quality services under both Democratic and Republican administrations at the federal and state levels" and assured them that GEO has "consistently helped our government partners meet their correctional and detention challenges with the development and operation of state-of-the-art facilities providing services in safe, secure and humane environments," noting that its "facilities are under constant operational scrutiny by onsite government monitors and special inspections by government agencies and third-party accrediting organizations." In truth, GEO was facing increased scrutiny from its lenders about its ability to continue to be profitable under the increasingly charged political climate.

10. But after the market opened on March 5, 2019, the truth began leaking out that GEO's financing relationships had cracked under the intense public and political scrutiny, thereby limiting GEO's access to capital. That day, *Bloomberg* published an article entitled "JPMorgan Ends Financing of Private Prisons After Criticism" and Reuters reported that "JPMorgan Chase & Co has decided to stop financing private operators of prisons and detention centers, which have

---

[2] Unless otherwise noted, internal citations are omitted, and emphasis is added throughout.

become targets of protests over Trump administration policies." Then, on March 10, U.S. Bank announced that it had reduced its credit exposure to GEO and CoreCivic to "an immaterial amount" and on March 12, in response to New York Congresswoman Alexandria Ocasio-Cortez grilling WF Chief Executive Officer ("CEO") Timothy Sloan about its financing of private prison companies like GEO, he responded, "[w]e will exit that relationship." Because of these revelations— indicating that the Company's cashflows, operations, profits, (and therefore) dividends were no longer predictable or stable—GEO's share price fell over 11% on March 8, 2019, and another 5% on March 14, 2019, after heavy trading. As *Forbes* reported the next day, "[t]he stocks of private prison leaders GEO Group and CoreCivic are down 16% and 8%, respectively today since last Tuesday — the day when the country's largest bank, JPMorgan Chase, publicly announced that they will take their money out of the private prison industry[.]"

11.     Despite the uncertainty of where GEO would obtain future financing when the public prison industry was under heightened scrutiny, Defendants continued to misleadingly assure investors of "the stability of our cash flows and the sustainability of our annual dividend payments" on April 13, 2019 and July 30, 2019. Such scrutiny increased after the U.S. Department of Homeland Security's ("DHS") internal watchdog, the Office of Inspector General ("OIG"), issued reports in May, June, and July 2019 revealing several detention centers, including multiple GEO facilities, were operating in violation of government standards and called for immediate action to address the substandard conditions, inadequate medical care, and overcrowding at these facilities. The scrutiny increased again after U.S. Senator Elizabeth Warren published her July 24, 2019 letter to the SEC Chairman, calling attention to "***a series of misleading public statements and omissions of material facts by top executives of The GEO Group, Inc.***" and highlighting the stark difference between the Company's public statements expressing confidence in its financial position and its

non-public communications by corporate executives, including Defendant Zoley, regarding the Company's growing financial concerns.

12.     Yet Defendants denied the reporting as false and even doubled down by claiming that GEO was doing so well that it would be able to deleverage. Specifically, on July 30, 2019, Defendant Zoley addressed "the recent media stories regarding overcrowded border patrol facilities and financial institutions discontinuing future financial support for private operators of ICE Processing Centers," unequivocally debunking them as being "driven by a false narrative and deliberate mischaracterization of our long-standing role as a quality service provider to ICE." He further assured investors that GEO's "growing earnings will allow us to naturally deleverage, while providing support for our annual dividend payments, which we expect to *remain* unchanged."

13.     That same day, the New York Times ran a story entitled "Edelman, Public Relations Giant, Drops Client Over Border Detention Centers."[3] The Times reported that "GEO Group . . . was being battered by negative media attention in the uproar over reports that the United States was separating migrant children from their parents at the Mexican border. Lawmakers were demanding access to detention facilities." According to "several employees" Edelman dropped GEO as a client because GEO's reputation was so bad, Edelman was concerned its own reputation would be stained by any affiliation with GEO. See *id*. Defendant Zoley did not respond to the Times request for an interview. *Id*.

---

[3] Tiffany Hsu, *Edelman, Public Relations Giant, Drops Client Over Border Detention Centers*, THE NY TIMES, (July 20, 2019), https://www.nytimes.com/2019/07/30/business/edelman-geo-border-detention.html#:~:text=In%20a%20statement%20to%20The,clients%2C%E2%80%9D%20the%20statement%20said.&text=Edelman%20has%20touted%20its%20strong,tobacco%2C%20coal%20or%20firearms%20businesses (last visited Nov. 17, 2020).

14.     By early August 2019, eight banks – including JPMorgan, BofA, WF, SunTrust

Banks, Inc. ("SunTrust"), BNP Paribas SA ("BNP"), Fifth Third Bancorp ("Fifth Third"), Barclays

Plc ("Barclays") and PNC Bank ("PNC") – said they would no longer lend to private prisons,

including GEO (and CoreCivic). Together, these eight banks represented an estimated \$2.35

billion, or 87.4%, of the credit lines and term loans that previously had been available to GEO and

CoreCivic to fund their operations and growth. Notably, there were no other banks which had a

public-disclosed financing relationship with GEO. Then, in October 2019, California Governor

Gavin Newsom signed a bill committing "not to enter into a contract with a private, for profit

prison facility located in or outside the state."[4]

15.     Despite these mounting pressures, on November 5, 2019, Defendants once again

assured investors that the intense scrutiny was not impacting GEO's cash flows or dividend levels.

Defendant Zoley specifically reiterated that "this volatility has been driven by a false narrative and

deliberate mischaracterization of our long-standing role as a quality service provider to ICE,"

"[t]here has been a significant amount of misinformation regarding our banking partners and

access to capital," and "growing earnings and cash flows will allow us to deleverage while

providing support for our annual dividend payments which we expect to remain unchanged."

16.     By 2020, GEO's circumstances had deteriorated further. The global COVID-19

pandemic was clearly making its way across the U.S., and GEO was wholly unequipped. GEO had

previously failed to implement adequate preventative and safety measures to deal with infectious

diseases in its facilities, leading to massive, lengthy outbreaks and quarantines and exposing the

Company to numerous costly lawsuits. Yet GEO had not updated its measures and was no better

---

[4] California Assembly Bill 32, Detention facilities: private, for-profit administration services,
(last visited Nov. 17, 2020).

equipped against COVID-19. The already-imminent threats to the Company's cash flows and dividends would only exacerbate, particularly as political scrutiny of the prison industry continued. However, Defendants continued concealing the truth from investors.

17.     Specifically, as the COVID-19 crisis unfolded, Defendants said nothing about its likely negative impact on the Company's cash flows and dividend payment. Instead, on February 12, 2020, Chief Financial Officer ("CFO") Brian R. Evans ("Evans") maintained that GEO "continue[s] to enjoy access to capital with several dozens of lenders and financial institutions" and its "dividend payments continue to be supported by our cash flows and earnings."

18.     CFO Evans made this statement despite Delaware County officials commissioning a study in February 2020 to determine what was needed to transition Pennsylvania's only private prison back to being publicly run. The contract, that GEO terminated 4 years early (and at a loss of 80% of expected revenue), was a five-year $259 million contract.

19.     In the wake of that silence, and rising public concern over COVID-19, multiple senators sent a public letter to GEO on March 9, 2020 after the market closed, pressing for information about the policies and procedures the Company had "in place to prepare for and manage a potential spread of the novel coronavirus among federal prisoners in GEO's custody and among correctional staff at GEO facilities." In addition, the letter noted that "incarcerated individuals 'are at *special risk* of infection, given their living situations.'"

20.     In response to the revelation on March 9, 2020, regarding the special risk of COVID-19 in GEO's facilities and on March 10 regarding GEO's loss of a contract worth over $200 million in future revenue, the Company's share price plummeted over 29% after two days of heavy trading.

21.     Nonetheless, Defendants continued to assure investors that GEO's cashflows and dividend levels would remain the same and that they were equipped for COVID-19. On April 30, 2020, Defendants falsely or misleadingly stated that:

- "[f]rom the outset of the COVID-19 global pandemic our corporate, regional and field staff have implemented comprehensive steps to address and mitigate the risks of COVID-19 to all those in our care and our employees;"

- "[a]ll of our facilities operate safely and without overcrowded conditions;"

-  "most of our facilities have had very few or no cases of COVID-19;"

- we had "implementat[ed] . . . quarantine and cohorting procedures to isolate confirmed and presumptive cases of COVID-19, including medical isolation and the use of airborne infection isolation rooms;"

- we had deployed "specialized sanitation teams to *st*erilize high-contact areas of our facilities and have developed intensive schedules and procedures for the cleaning and disinfecting of facility spaces above and beyond normal cleaning activities."

22.     The truth that GEO's actual response to COVID-19 was nothing but a blundering disaster, and likely impacted its cashflow and dividend was revealed less than two months later. *The Intercept* published an article during pre-market hours on June 17, 2020 entitled "GEO Group's Blundering Response to the Pandemic Helped Spread Coronavirus in Halfway Houses." The article reported details of a significant COVID-19 outbreak at the Grossman Center, a halfway house operated by GEO in Leavenworth, Kansas which "was for weeks the hardest hit federal halfway house in the country" in terms of confirmed COVID-19 cases. Citing interviews with residents of the Grossman Center, *The Intercept* reported "that the virus spread not in spite of the facility's efforts to contain it, but because of it" and that GEO's "blundering" response included keeping residents in overcrowded conditions without enforcing personal protective measures even as COVID-19 diagnoses at the facility increased. On the same day, GEO's peer company, CoreCivic (which was facing similarly disastrous results) announced the suspension of its dividend and a reevaluation of its "corporate structure and capital allocation alternatives." That suspension

signaled to the market that, contrary to Defendants' repeated assurances, GEO's dividend likely was not secure or stable. In response to this news, GEO's stock price fell over 10% after two days of heavy trading.

23.     Acutely aware of its desperate need to generate some good publicity, GEO filed a high-profile lawsuit against Netflix in May 2020 before this very Court. *See The GEO Group Inc., et al v. Netflix, Inc.*, Case No. 9:20-cv-80847-RS. The suit alleges that Netflix "defamed" GEO in its show "Messiah" by showing GEO trademarks when exhibiting "scenes of an immigrant detention facility where people were being housed—day and night—in an overcrowded overheated room with a chain-link cage, without beds, sunshine, recreation, or educational opportunities." *Id*. at ECF No. 38. Netflix's motion to dismiss rightly calls GEO out for filing the suit as "a poorly-guised marketing ploy designed to whitewash real-life governmental findings of abuse." *Id*. at ECF No. 27, at 5. In support, Netflix attached the June 2019 OIG report that found inhumane conditions violating ICE standards in two GEO detention centers that housed ICE detainees.

24.     Defendants did not finally reveal the full truth behind their Class Period statements until August 6, 2020. Ultimately, the Company's operational deficiencies and contractual and legal violations – highlighted by public and political scrutiny and numerous lawsuits – diminished GEO's previous access to capital: the majority of its financing partners bailed, and multiple major government contracts were terminated, thereby eliminating GEO's previous revenue streams. Those deficiencies and violations, moreover, left GEO unequipped to deal with multiple major COVID-19 outbreaks in GEO facilities. Those defects reduced the population and GEO's revenue. Instead of disclosing the truth to investors, Defendants repeatedly assured that GEO's dividends were safe and its cashflows were stable. On August 6, 2020, Defendants revealed that they would be reducing GEO's quarterly dividend by nearly 30%. On this news, GEO's stock price fell nearly

7% after two days of heavy trading. At the end of the Class Period, after Defendants' series of revelations, the price had dropped over 55% from the Class Period high.

25. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business. As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of GEO's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

27. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

29. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, GEO is headquartered in this Judicial District.

30. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

31. Lead Plaintiff DeLoach, as set forth in the accompanying certification, incorporated by reference herein, purchased GEO common stock during the Class Period, and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and material omissions alleged herein.

32. Lead Plaintiff Oketola, as set forth in the accompanying certification, incorporated by reference herein, purchased GEO common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and material omissions alleged herein.

33. Defendant GEO is incorporated in Maryland and headquartered in Boca Raton, Florida. GEO's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "GEO."

34. Defendant Zoley serves as GEO's Chairman of the Board and CEO. He has served as CEO since the Company went public in 1994 and served as Vice Chairman of the Board from January 1997 to May of 2002. Mr. Zoley founded GEO in 1984 and served as President and Director from the Company's incorporation in 1988 until it went public. He also serves as a director of several business subsidiaries through which GEO conducts its operations worldwide. Mr. Zoley has bachelor's and master's degrees in Public Administration from Florida Atlantic University and a doctorate degree in Public Administration from Nova Southeastern University.

35. Because of Defendant Zoley's executive position, he had access to the undisclosed adverse information about GEO's business, operations, operational trends, controls, markets, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof.

36. Defendant Zoley was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary

information concerning the Company and its business, operations, controls, growth, products and present and future business prospects as alleged herein. In addition, Defendant Zoley was involved in drafting, producing, reviewing and/or disseminating the false and/or misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

37.     As an officer and controlling person of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act and trade on the NYSE which is governed by the federal securities laws, Defendant Zoley had a duty to promptly disseminate accurate and truthful information with respect to GEO's operations, business, products, markets, management, and present and future business prospects. In addition, Defendant Zoley had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of GEO's publicly-traded shares would be based upon truthful and accurate information. Defendants' false and/or misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

38.     Defendant Zoley, because of his position of control and authority as an Officer and/or Director of GEO, was able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Defendant Zoley was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance or had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendant Zoley is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

39.     Defendant Zoley is liable as a participant in a fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of GEO shares by disseminating materially false and/or misleading statements and/or concealing material adverse facts.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Company Background

#### 1.   GEO's History

44.     Founded in 1984, GEO is purportedly the first fully integrated equity REIT specializing in the design, financing, development, and operation of secure facilities, processing centers, and community reentry centers in the U.S., Australia, South Africa, and the United Kingdom. GEO is also purportedly a leading provider of enhanced in-custody rehabilitation, post-release support, electronic monitoring, and community-based programs. The Company's worldwide operations include the ownership and/or management of, among other facilities, detention centers and halfway houses in the U.S.

45.     At the time GEO restructured to become a REIT in 2013, there was significant room to grow because the U.S. had the largest prison population in the world and private prisons represented less than 10% of a $74 billion market. But the private prison model has always had critics and controversies, including public outcry about how inmates were treated and accusations that the government guaranteed high occupancy rates when it awarded a contract. In addition, historically, the profitability of private prisons decreased in recessions with fewer arrests made and when there changes in governments disfavoring private prisons.

46.     For the last three decades, GEO has had long-term agreements with the federal government to provide services for the Federal Bureau of Prisons ("BOP"), ICE, and the U.S. Marshal Service that were regularly renewed. GEO has also had long-term contracts with several state Department of Corrections ("DOC") owning and/or operating correctional facilities in

Florida, Georgia, Louisiana, Oklahoma, Arizona, New Mexico, California, Vermont, Virginia and Indiana that were regularly renewed.

47.     GEO is one of the two biggest players in private corrections, with more than 89,000 corrections and detention beds in 127 U.S. facilities, as well as 7,600 beds in six international facilities as of mid-2019.

48.     GEO is also the largest provider of community correction, youth and electronic monitoring services in the U.S. In 2017, almost 23% of GEO's revenue came from GEO Care, the division which manages community correction services, including reentry facilities, *i.e.,* halfway houses, day reporting centers, youth service facilities, and electronic monitoring services.

### 2.     Ramifications of GEO's REIT Structure

49.     After becoming a REIT in 2013, GEO was required to distribute at least 90% of its income each year as dividends to shareholders. That structure has allowed GEO to avoid corporate- level taxation, because its shareholders are taxed on the dividends. However, as a consequence, GEO has had limited funds with which to run its operations and has had to rely on the capital markets to fund growth investments.

50.     Accordingly, GEO's continued success—as well as that of peer companies, like CoreCivic—depended on lucrative financing deals with large banks like JPMorgan, WF and BofA on top of maintaining the stable, revenue-generating contracts it had with federal, state and local governments requiring it to comply with a host of regulatory requirements while maintaining standards of due process and human rights.

51.     Going into the Class Period, JPMorgan was far and away the largest lender to private prison behemoths GEO and CoreCivic, holding $254 million of their debt as of June 2017.[5]

---

[5] David Dayen, *JPMorgan Chase Made a Secret $159.5 Million Deal to Finance a Private Prison*, Make

WF and BofA also provided revolving credit, term loans and bond underwriting to GEO (and CoreCivic), helping them fund facility construction and general operations. In 2018 alone, JPMorgan, BofA and WF raised over $1.8 billion in debt over three deals for GEO and CoreCivic.

52.     This ready access to capital contributed to GEO's ability to maintain its quarterly dividend levels, which is a key metric for investors. Beyond being income for investors, the dividends signaled that there was enough cash to be distributed to investors each quarter as a result of GEO's successful operations, growth, and profitability. Moreover, a stable or increasing dividend signaled ongoing business profitability, stability, and strength – not a fleeting windfall based on aberrant performance. Accordingly, in order to sustain or increase the stock price, GEO needed to have sustainable, long-term dividends levels, not fluctuating between high dividends one quarter and low dividends the next.

53.     Critically, to maintain those dividends, as well as the capital investments that funded operational growth, GEO had to successfully maintain and operate its facilities in compliance with a host of contractual and regulatory requirements, while satisfying standards of due process and human rights – all in a sector that was closely watched by extremely active human rights organizations like the Human Rights Watch and increasingly monitored by influential government officials like Senator Warren, Senator Kamala Harris, and Congresswoman Ocasio-Cortez. Any failure would jeopardize GEO's business on numerous fronts. If GEO violated applicable regulations or otherwise infringed due process or human rights of prisoners or detainees, GEO could face extreme public scrutiny, bad publicity, lawsuits, and government investigations, which would almost certainly result in them losing lucrative government contracts and/or funding from the publicly-traded banks that are subject to extensive public and shareholder scrutiny.

THE ROAD NY,  (Dec. 4, 2018), https://maketheroadny.org/jpmorgan-chase-made-a-secret-159-5-million-deal-to-finance-a-private-prison/ (last visited Nov. 17, 2020).

Indeed, banks like JPMorgan, BofA and WF would be hard-pressed to do business with a private prison company that had violated human rights or mistreated its wards. And as explained above, if GEO lost its lucrative government contracts or funding from major banks, it risked its operations and ability to continue growing and be profitable. Indeed, without the government contracts and loans, GEO's ability to continue operating as a REIT would be jeopardized as paying 90% of profits as dividends would be unsustainable. Of course, if GEO's profits lowered, its dividends would be lower, and its share price would crash. Similar issues would occur if GEO exited its REIT structure.

### 3.    *Relevant Standards and Guidelines Applicable to GEO Facilities*

54.    Under its contracts with the BOP and U.S. Marshall Services ("USMS"), both operating under the U.S. Department of Justice ("DOJ"), GEO facilities – including halfway houses and correctional centers – had to obtain and maintain accreditation from the American Correctional Association ("ACA") and the National Commission on Correctional Health Care. Further, each facility's Health Services Administrator ("HSA") and Clinical Director was responsible for the operation of that facility's infectious disease program. Specifically, the HSA must provide infectious disease procedures that incorporate and reference, all applicable standards, guidelines, and recommendations from other federal agencies, including the Department of Health and Human Services ("HHS"), the Centers for Disease Control and Prevention ("CDC"), the Occupational Safety and Health Administration ("OSHA"), and the National Institutes for Occupational Health.

55.    Under its contracts with various state DOC and HHS, each GEO facility – including youth facilities, correctional facilities and halfway houses – must utilize national correctional expected practices provided by the ACA and was responsible for ensuring that its

operations maintain ACA standards.

56.     Under its contracts with ICE, GEO facilities had to adhere to the 2000 National

Detention Standards ("NDS"), ICE's 2008 Performance-Based National Detention Standards

("PBNDS"), or the 2011 PBNDS, as revised in 2016. ICE detainees are held in civil, not criminal,

custody, which is not supposed to be punitive. The PBNDS establish consistent conditions of

confinement, program operations, and management expectations within ICE's detention system.

Since both the NDS and PBNDS were modeled after the ACA, detention centers had to follow

CDC guidelines for the prevention and control of infectious and communicable diseases and

OSHA and applicable state guidelines for managing bio-hazardous waste and decontaminating

medical and dental equipment. Further, each facility had to have written plans addressing the

management of infectious and communicable diseases, including screening, prevention, education,

identification, monitoring and surveillance, immunization (if applicable), treatment, follow-up,

isolation (if indicated) and reporting to local, state and federal agencies. Designated medical staff

also had to notify the ICE Health Service Corps' ("IHSC") Public Health, Safety, and Preparedness

Unit of any detainee with a significant communicable disease and of any contact or outbreak

investigations involving detainees exposed to a significant communicable disease without known

immunity. All ICE facilities are subject to review and recommendation by the DHS's OIG.

**B.      Operational deficiencies led to lawsuits and/or governmental investigations impacting GEO's cashflows.**

57.     Dozens of lawsuits have been filed against GEO over the past two decades,

alleging, *inter alia*, inadequate medical care, deaths, and exploitive labor practices.[6] A number of

those lawsuits did or likely will impact GEO's cashflows and profitability due to the massive legal

---

[6] *GEO Group/GEO Care Rapsheet, Private Corrections Working Group,*
https://www.privateci.org/rap_geo.html (last visited Nov. 16, 2020); *GEO Group, Project on Government Oversight,* https://www.contractormisconduct.org/contractors/253/geo-group (last visited Nov. 16, 2020).

fees and fines and in many cases, the termination of government contracts.

### 1. Deficiencies at the Aurora Facility in Colorado

58.     Notably, a 2017 study of detention facilities found severe health care deficiencies in facilities operated by, *inter alia*, private contractors, including GEO. Specifically, the study— basing its conclusions on information in death reviews by ICE's Office of Detention Oversight ("ODO")—found that one-third of detainee deaths between 2012 and 2015 were due in part to substandard medical care.[7] This report spurred at least one complaint filed in June 2018 by the American Immigration Council and American Immigration Lawyers Association on behalf of current and formerly detained individuals at the GEO-operated Denver Contract Detention Facility in Aurora, Colorado ("Aurora Facility"), demanding an investigation into the facility's inadequate medical and mental health care conditions ("Administrative Complaint").[8]

59.     In an earlier filed lawsuit involving the Aurora Facility, *Menocal v. GEO Grp., Inc.*, No. 14-cv-02887 (D. Colo.), on appeal, *Geo Group, Inc. v. Menocal,* No. 17-cv-1125 (10th Cir.) ("Aurora Forced Labor Case"), the Tenth Circuit in February 2018 affirmed the district judge's certification of a class action brought on behalf of immigrant detainees at the Aurora Facility who accused GEO of using forced labor and unjustly enriching itself by paying them $1 for a day's work. One of the classes certified consisted of detainees who alleged that GEO's Housing Unit Sanitation Policy at the Aurora Facility violated the federal Trafficking Victims Protection Act because it forced them to either take part in a facility cleaning program or face

---

[7] Human Rights Watch, *Systemic Indifference: Dangerous and Substandard Medical Care in US Immigration Detention* (May 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention (last visited Nov. 16, 2020).

[8] American Immigration Counsel, *Complaint Filed with DHS Oversight Bodies Calls for Improvements to Medical and Mental Health Care of Immigrants in Aurora Detention Center* (June 4, 2018), https://www.americanimmigrationcouncil.org/news/complaint-filed-dhs-oversight-bodies-calls-improvements-medical-and-mental-health-care (last visited Nov. 16, 2020).

punishment, including solitary confinement.[9]

60.     This class action was the first of a series of lawsuits questioning GEO's practice of forcing detainees to do manual labor for $1 a day (sometimes less) or face solitary confinement.[10] GEO itself characterized these lawsuits as a "potentially catastrophic risk" in communications to ICE which caught the attention of Senator Warren, who conducted an investigation and sent a letter to the Honorable Jay Clayton, SEC Chairman, on July 24, 2019. In her letter, Senator Warren highlighted "a series of misleading public statements and omissions of material facts by top executives of The GEO Group, Inc." about the financial "impact of the series of lawsuits against the company" in light of non-public communications by corporate executives, including Defendant Zoley, to ICE about GEO being "deeply alarmed at the rapidly increasing costs" estimated to be as high as $20 million.[11]

## 2.     Deficiencies at the Adelanto Facility in California

61.     In March 2018, a state-contracted disability monitor, Disability Rights California, reported widespread lack of medical care and disability accommodation at the GEO-operated facility in Adelanto, California ("Adelanto Facility").[12] On June 18, 2018, stakeholders in the Adelanto Facility expressed immediate concerns regarding its inadequate medical and mental

---

[9] Kevin Penton, *Advocates Say Colo. Detention Site Providing Inadequate Care* (June 5, 2018), https://www.law360.com/articles/1050393/advocates-say-colo-detention-site-providing-inadequate-care (last visited Nov. 16, 2020).

[10] *State of Washington v. The Geo Group, Inc.,* No. 3:17-cv-055806, (W.D. Wash.); *Chao v. GEO Group, Inc.*, No. 3:17-cv-05769 (W.D. Wash.) (collectively, "Washington Forced Labor Cases"); *Novoa v. The Geo Group, Inc.*, No. 5:17-cv-02514 (C.D. Cal.) ("Adelanto Forced Labor Case").

[11] Letter from Elizabeth Warren, U.S. Senator from Mass. to The Honorable Jay Clayton, Chairman for the SEC (June 24, 2019), https://www.warren.senate.gov/imo/media/doc/2019.07.24%20Letter%20to%20SEC%20on%20GEO%20Group's%20Misleading%20Statements.pdf.

[12] Disability Rights Cal., *There Is No Safety Here*, (Mar. 2019) at 17, https://www.disabilityrightsca.org/system/files/file-attachments/DRC_REPORT_ADELANTO-IMMIG_DETENTION_MARCH2019.pdf

health care at a California DOJ meeting in Los Angeles, California.[13]

62.     In September 2018, DHS OIG issued a Management Alert identifying several egregious violations of ICE standards that posed significant health and safety risks, including untimely and inadequate detainee medical care, based on an unannounced inspection of the Adelanto facility in May 2018.[14] In response, Pablo Paez, GEO's executive VP of corporate relations, provided Law360 a statement from the Company published on October 3, 2018 that it was "taking the report's findings 'very seriously' and [was] conducting an 'in-depth review' with its third-party medical services subcontractor."[15] The report was attached as an exhibit filed on September 27, 2019 in the Adelanto Forced Labor Case - one of the "potentially catastrophic" $1 per day cases.[16] It was filed again by Netflix in *GEO v. Netflix*, on August 3, 2020 (ECF No. 27-1).

63.     In June 2019, DHS OIG published its full report from the unannounced inspections of four detention centers including the GEO-operated Aurora Facility, Adelanto Facility, and the LaSalle ICE Processing Center in Louisiana ("LaSalle Facility"). The report confirmed violations of ICE's detention standards and the unsafe and unhealthy conditions at all of the facilities, raising concerns about the environment in which detainees were held.[17]

---

[13] Xavier Becerra, California Attorney General, *The California Department of Justice's Review of Immigration Detention in California*, (Feb. 2019) at 23, https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf.

[14] Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-86: *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California,* (Sept. 27, 2018) at 9, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-86-Sep18.pdf.

[15] Law360, *Report Finds Bad Medical Care, Nooses At Calif. ICE Facility* (Oct. 3, 2018, 5:19 PM EDT), https://www.law360.com/articles/1088999/report-finds-bad-medical-care-nooses-at-calif-ice-facility.

[16] Declaration, *Novoa v. The GEO Group, Inc.*, (C. D. Cal. Sept. 29, 2019) (No. 5:17-cv-02514) (ECF No. 193-27).

[17] Office of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-19-47: *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

64.    These DHS OIG reports contributed to the filing of a proposed class action, *Fraihat v. ICE*, No. 5:19-cv-01546 (C.D. Cal.) ("Substandard Medical Care Case"), on August 19, 2019 on behalf of detainees accusing ICE of shirking its legal obligation to provide adequate medical, mental health and disability accommodations as mandated by federal law and the U.S. Constitution at 158 detention facilities nationwide, including GEO's Adelanto Facility, as well as several other GEO facilities in California and across the country.[18]

### 3.    Deficiencies at the Northeast Facility in New Mexico

65.    On November 7, 2018, during the GEO's third quarter 2018 ("3Q18") earnings call, J. David Donahue, GEO's Senior Vice President ("SVP") and President of the GEO Secure Services (formerly known as GEO Corrections and Detentions), boasted that the Company had amended the contracts for all three of its New Mexico correctional facilities, including the Northeast New Mexico Correctional Facility ("Northeast Facility"), to provide "incremental funding to support wage increases for [GEO] employees." In 2018, approximately 2% of GEO's total revenue of $2.3 billion came from the state of New Mexico. Suddenly, on June 27, 2019, the Company announced that after 10 years of managing the Northeast Facility, "GEO had decided to amicably end its contract," claiming "it [was] no longer feasible to recruit and retain personnel in the region without CPI increases that have not been funded over the last decade."

66.    The reason for the termination became clear in July 2019, when the police department in Clayton, New Mexico and the state police announced an investigation into a September 23, 2017 incident at the medium security Northeast Facility which had 625 beds and required 20 security guards to be fully staffed. That day, a convicted serial killer overtook one of

---

[18] Nicole Narea, *Immigrant Detainees Sue Over 'Deplorable' Medical Care*, Law360 (Aug. 19, 2019), https://www.law360.com/articles/1189505/immigrant-detainees-sue-over-deplorable-medical-care (last visited Nov. 16, 2019).

the just nine guards on duty, leading to the state's most dangerous prison uprising in the past 20 years.

67.     Ultimately, GEO paid $1.3 million in fines during 2018 for excessive understaffing in violation of its contract with the state. When asked about the contract with GEO, state Senator Cisco McSorley said, "I want GEO to fulfill the terms of the contract. ***They say that they're in the business of keeping our prisons safe and secure and they're not doing it***." While there were 204 allocated positions at the Northeast Facility, GEO only had a staff of 120 in late June 2019 when it announced it was ending the contract.

### 4.     *Deficiencies at the Delaware County Prison in Pennsylvania*

68.     After multiple crises in the summer of 2019 involving multiple suicides, prisoner riots, and violence against staff and between prisoners at the GEO-operated Delaware County Prison in Pennsylvania, formerly known as the George W. Hill Correctional Facility ("Delaware County Prison"), Delaware County abolished the two-person appointed Board of Prison Inspectors and replaced it with a Jail Oversight Board ("JOB"), consisting of four county officeholders and three members of the public, on September 25, 2019.

69.     But the Delaware County Prison continued to be extremely poorly run. Notably, from Christmas Eve though Christmas Day 2019, at least eight prisoners were hospitalized, and one prisoner died after an apparent mass drug overdose at the Delaware County Prison which resulted from inexperienced guards at the understaffed facility. Unsurprisingly then, on January 3, 2020, just as the COVID-19 pandemic began spreading throughout the United States, a former Delaware County prisoner filed a lawsuit against GEO, former superintendents and the prison's medical unit alleging, *inter alia*, severe overcrowding.

24

70.     In February 2020, JOB took the preliminary step towards ending Delaware County's contract with GEO by voting to commission a study to determine what was needed to transition the Delaware County Prison back to being publicly run.

### 5.     Deficiencies at the Garza Center in Texas

71.     In June 2020, a report detailing prolonged violations of regulatory standards for compliance from May 1, 2018 to May 1, 2020 at the GEO-operated Hector Garza Residential Treatment Center ("Garza Center") was filed in *M.D. et al. v. Abbott et al.*, No. 2:11-cv-00084 (S.D. Tex.) (ECF No. 875). The Garza Center had a license to serve up to 139 male and female residents between the ages of ten to seventeen. However, after the Department of Family and Protective Services ("DFPS") stated on May 20, 2020 that the Garza Center would be "phasing out their service to children in DFPS conservatorship" based on its "determin[ation] that while improvements were being made, their particular model was not the direction DFPS was going long-term," the Texas Health and Human Services Commission Residential Child Care Licensing Division stated that it "will reevaluate their history for [corrective action] if we receive a new [Reason to Believe] from DFPS."

### 6.     Deficiencies at the Deyton Facility in Georgia

72.     In July 2020, the DOJ OIG published an audit assessing GEO's performance and compliance with the terms, conditions, laws, and regulations applicable to the contract it was awarded to operate the Robert A. Deyton Detention Facility ("Deyton Facility") in Lovejoy, Georgia. The DOJ OIG found that GEO did not comply with the terms and laws pertaining to mandatory training and detainee safety and failed to provide staff services between January 2018 and December 2019 for which it had been paid an estimated $3.1 million.[19]

---

[19] DOJ, *Audit of the U.S. Marshals Service's Contract Awarded to the GEO Group, Incorporated to*

### 7.      *Deficiencies in Border facilities in Texas*

73.      In May 2019, DHS OIG issued a report warning of "dangerous overcrowding"
involving hundreds of adult migrants in standing room only conditions at a Border Patrol
processing center in El Paso, Texas, some of whom had been held in the temporary facilities for
weeks on end. The report also expressed concern that the "overcrowding and prolonged detention
represent an immediate risk to the health and safety not just of the detainees, but also DHS agents
and officers," noting increased incidents of illness even among Border Patrol staff.[20] As discussed
*supra*, DHS OIG then issued a report in June 2019, raising concerns about the treatment and care
at four detention centers including three GEO facilities, the Aurora Facility, the Adelanto Facility,
and the LaSalle Facility. In early July 2019, DHS OIG issued a second report calling for immediate
action at the U.S.-Mexico border. Specifically, the July report raised concerns about the dangerous
overcrowding and prolonged detention of children and adults in not just one Texas facility, but
several detention facilities in the Rio Grande Valley. GEO operates one of the largest family
detention centers in Texas, the Karnes County Residential Center ("Karnes Center"), with 830
beds. While the *Flores* Settlement agreement says family detention facilities are supposed to be
"non-secure," the Karnes Center is surrounded by a brick wall.[21]

74.      In July 2019, the House Oversight and Reform Committee sent letters to GEO,
and other companies managing detention centers, demanding documents and communications
pertaining to the hundreds of millions of dollars in government contracts they had received amid

---

*Operate the Robert. A. Deyton Detention Facility, Lovejoy, Georgia* (July 2020),
https://oig.justice.gov/sites/default/files/reports/20-085_0.pdf.

[20] Ross Ramsey, *Analysis: U.S.-Mexico border detention efforts aren't good enough, according to the government itself*, THE TEXAS TRIBUNE (July 12, 2019), https://www.texastribune.org/2019/07/12/us-mexico-border-detention-efforts-arent-good-enough-government-says/ (last visited Nov. 16, 2020).

[21] Gretchen Frazee, *A Look Inside the Facilities Where Migrant Families are Detained*, PBS (Aug. 26, 2019), https://www.pbs.org/newshour/nation/new-trump-rules-would-detain-families-longer-this-is-where-they-would-stay (last visited Nov. 17, 2020).

the concerning reports of the deplorable treatment of migrants at the southern border. Among these requests, the Committee asked for documents pertaining to compliance (including how GEO ensured compliance with DHS standards), the names and titles of employees who were tasked with upholding DHS standards, and violations at the detention centers and how they were remediated. The committee also asked for all communications with ICE, DHS and HHS leadership, the White House and political appointees.[22]

### C. Public and political scrutiny increasingly drew attention to GEO's operational deficiencies, negatively impacting its access to capital.

#### 1. Intense scrutiny led JPMorgan, U.S. Bank and WF to cut ties with GEO

75.    As more damning information regarding the squalid conditions at detention facilities, the mistreatment of migrants, and the separation of families gained public and political attention in 2017 and 2018, banks began rethinking their funding of the private prison industry and institutional investors began rethinking their decision to invest in private prisons.[23]

76.    As early as May 2017, approximately 250 protestors marched from a branch of WF—another bank branded by protestors as "Corporate Backers of Hate"—to JPMorgan's annual meeting. In response to questions about JPMorgan's role in financing debt for private prisons, including GEO, JPMorgan CEO Dimon stated that the bank would look into whether it should continue to help finance private prisons.[24, 25]

---

[22] Leigh Ann Caldwell, *House Democrats Seek Documents From For-Profit Companies Detaining Migrants*, NBC NEWS (July 11, 2019), https://www.nbcnews.com/politics/congress/house-democrats-seek-documents-profit-companies-detaining-migrants-n1028591 (last visited Nov. 16, 2020).

[23] Rachel Layne, *Private Prisons were Supposed to Thrive Under Trump—Then Came a Backlash*, CBS NEWS (July 29, 2019), https://www.cbsnews.com/news/private-prison-companies-were-supposed-to-thrive-under-trump-instead-theyre-under-fire/ (last visited Nov. 16, 2020).

[24] Jennifer Surane and Felice Maranz, *Dimon Says He'll Look Into Concerns About Private Prison Financing*, BLOOMBERG (May 16, 2017), https://www.bloomberg.com/news/articles/2017-05-16/dimon-says-he-ll-look-into-concerns-on-private-prison-financings (last visited Nov. 16, 2020).

[25] Josh Saul, *Jamie Dimon, Head of JPMorgan Chase, Pressed on Private Prisons, Trump Council Seat*,

77.     In April 2018, an activist organization issued a report revealing that JPMorgan

was by far the largest lender to private prisons, including GEO and CoreCivic. Activists continued

to condemn JPMorgan's financial entanglement with private prisons throughout 2018, arguing that

its professed commitment to human rights did not fit with its funding of for-profit prisons, and

organized another protest of Dimon at a Goldman Sachs conference in December 2018.[26]

78.     In response to the separation of children from their parents under the Zero

Tolerance Policy, the Trump administration adopted in April 2018, CalSTRS, the 11-largest

retirement fund in the world,[27] decided to conduct due diligence on the business practices of both

GEO and CoreCivic. In July 2018, CalSTRS representatives began visiting detention facilities and

conducting meetings with senior management concerning their operational processes and risk

management efforts. By November 2018, CalSTRS had voted to remove all of its holdings from

CoreCivic and GEO, divesting approximately $13.7 million.[28]

79.     GEO was also on notice that it had significant political exposure. The 2018

election cycle saw a surge of candidates and lawmakers promising to forego campaign donations

from private prisons, including GEO.[29] For example, ten members of the U.S. House of

Representatives, two Republicans and eight Democrats, pledged not to take GEO's money,

---

NEWSWEEK (May 16, 2017), https://www.newsweek.com/jpmorgan-chase-jamie-dimon-immigration-private-prison-protest-make-road-610463 (last visited Nov. 16, 2020).

[26] David Dayen, *In These Times, JPMorgan Chase Made a Secret $159.5 Million Deal to Finance a Private Prison*, NEWSWEEK (Dec. 4, 2018), https://maketheroadny.org/jpmorgan-chase-made-a-secret-159-5-million-deal-to-finance-a-private-prison/ (last visited Nov. 16, 2020).

[27] Pensions & Investments, *The P&I Willis Towers Watson 300: World's largest retirement funds*, (Sept. 4, 2017), https://www.pionline.com/article/20170904/INTERACTIVE/170839963/the-p-i-willis-towers-watson-300-world-s-largest-retirement-funds (last visited Nov. 17, 2020).

[28] Michelle Mussuto, *CalSTRS to Divest from Private Prisons CoreCivic and GEO Group to be removed from Teachers' Retirement Fund Portfolio* (Nov. 7, 2018), https://www.calstrs.com/news-release/calstrs-divest-private-prisons-0 (last visited Nov. 16, 2020).

[29] Steve Horn, *Under Pressure, Some Politicians Return Private Prison Campaign Cash*, PRISON LEGAL NEWS (Feb. 5, 2019), https://www.prisonlegalnews.org/news/2019/feb/5/under-pressure-some-politicians-return-private-prison-campaign-cash/ (last visited Nov. 17, 2020).

including House Speaker Paul Ryan and Oklahoma U.S. Senator James Lankford. Other lawmakers made similar pledges, including U.S. House members Eric Swalwell and Karen Bass of California, Ted Lieu of Hawaii, Danny Davis of Illinois, Emanuel Cleaver of Missouri, Hakeem Jeffries of New York, David Price of North Carolina, Filemon Vela, Jr. of Texas and Denny Heck of Washington. By July 2018, every major Democratic candidate for Florida governor publicly refused to accept GEO's money and the Florida Democratic Party banned all donations from private-prison firms.[30]

80.     By 2019, in the wake of the zero-tolerance policy, 250 different organizations had formed the Families Belong Together Coalition and was able to, *inter alia*, collect over 1 million signatures urging JPMorgan and other banks to separate themselves from CoreCivic and GEO.[31] On Valentine's Day 2019, an immigrants' rights group, Make the Road New York, sent a mariachi band and protestors with "Break Up With Prisons" signs to Dimon's Manhattan townhome.[32]

## 2.     *Continued scrutiny limited GEO's ability to access other financing*

81.     In GEO's annual shareholder meeting in May 2019, a majority of shareholders passed a resolution demanding that the Company better report human rights policies and violations to investors by September 2019. GEO's Board initially told investors to vote against the resolution, claiming its internal abuse-monitoring protocols were already adequate, that the requested deadline

---

[30] Jerry Iannelli, *Geo Group's Own Shareholders Concerned About Human Rights in the Company's Prisons*, MIAMI NEW TIMES (May 7, 2019), https://www.miaminewtimes.com/content/printView/11166775 (last visited Nov. 16, 2020); https://www.neveragainaction.com/our-coverage (last visited Nov. 17, 2020).
[31] Dymond Green, Tala Hadavi, *Why Big Banks Could Be Killing Private Prisons*, CNBC (Jan. 2, 2020), https://www.cnbc.com/2020/01/02/why-private-prisons-geo-group-and-corecivic-are-struggling-under-trump.html (last visited Nov. 16, 2020).
[32] Emily S. Rueb, *JPMorgan Chase Stops Funding Private Prison Companies, and Immigration Activists Applaud*, THE NY TIMES, (March 6, 2019), https://www.nytimes.com/2019/03/06/business/jp-morgan-prisons.html (last visited Nov. 16, 2020).

was too soon, and any report would be limited by the Company's confidentiality obligations.[33]

82.     While GEO claimed to be doing all it could to reduce abuse, institutional investor Patricia Zerega said on behalf of shareholders in favor of the resolution, "[w]e want to be able to make a judgment that the company is moving forward…they claim they have very good attention to human rights issues. We want to be able to verify that that's true. It's like that old saying: *Trust but verify*." GEO eventually issued a report in September 2019, after its "position ha[d] evolved."[34] In a letter published in November 2019, institutional shareholders and members of the Interfaith Center on Corporate Responsibility claimed the report fell far short of expectations and failed to meet standards for human rights policies and processes, leaving the Company exposed to numerous legal, reputational and financial risks. The letter pointed to GEO's substandard care as reason for concern, as evidenced by DHS's OIG September 2018 report finding "serious issues relating to safety, detainee rights and medical care" at the Adelanto Facility and the September 2017 riot during which the Northeast Facility had less than half the staff it was required to have.[35]

83.     By early August 2019, the list of banks refusing to loan to private prisons like GEO had grown to at least eight major institutions: JPMorgan, BofA, WF, Suntrust, BNP, Fifth Third, Barclays and PNC. Together these eight banks represented an estimated $2.35 billion, or 87.4%, of the credit lines and term loans that were central to private prisons' operations. As a REIT, GEO (like its peer company, CoreCivic) depended heavily on short-term borrowing through these lines of credit and loans to keep its operations funded day-to-day. But all of the publicly-disclosed banks that provided credit and term loans to GEO had committed to ending future

---

[33] *Geo Group's Own Shareholders Concerned About Human Rights in the Company's Prisons, supra* fn. 24.

[34] *Id.*

[35] Interfaith Center on Corporate Responsibility, *Investors Say GEO Group is Ill-prepared to Guard Against Human Rights Risks* (Nov. 18, 2019), https://www.iccr.org/investors-say-geo-group-ill-prepared-guard-against-human-rights-risks (last visited Nov. 16, 2020).

financing relationships with the private prison industry.[36]

84.     And in October 2019, the largest public pension fund in the U.S., the California Public Employees Retirement System ("CalPERS"), announced that it was divesting all of its holdings – approximately $10.8 million – in GEO and CoreCivic. Following CalPERS' announcement, the California Faculty Association said, "[o]ur union was not going to stand by and watch our pension dollars support these terrible corporations, and we're pleased to see that CalPERS investment analysts have come to the conclusion."[37]

**D.     GEO's reduced cashflows exacerbated operational deficiencies in dealing with COVID-19 which led to further scrutiny on GEO and its eventual dividend cut.**

*1.     GEO was unable to manage well-known and understood infectious diseases leading up to COVID-19*

85.     The record number of people in immigration detention centers due to the Zero Tolerance Policy led to multiple infectious-disease outbreaks at GEO facilities during the Class Period. In the GEO-operated Pine Prairie detention center in Louisiana ("Pine Prairie"), for example, there were 18 confirmed or probable cases of mumps, resulting in 288 detainees being quarantined as of mid-February 2019. Internal Pine Prairie emails reveal concerns raised by medical staff regarding the facility's handling of the outbreak, quarantine protocols and transfer of infected detainees who were contagious, but did not show symptoms of viral diseases.[38]

---

[36] Gin Armstrong, *Private Prisons Now Face 87.4% Financing Gap as Banks Continue to Flee Industry* (Aug. 14, 2019), https://news.littlesis.org/2019/08/14/private-prisons-now-face-87-4-financing-gap-as-banks-continue-to-flee-industry/ (last visited Nov. 16, 2020).

[37] Julie Ainsley, *Biggest Public Pension Fund in U.S. Dumps Private Prison Firms that Run ICE Migrant Detention Centers*, NBC NEWS (Oct. 21, 2019), https://www.nbcnews.com/politics/immigration/biggest-public-pension-fund-u-s-dumps-private-prison-firms-n1063231 (last visited Nov. 16, 2020).

[38] Mica Rosenberg, Kristina Cooke, *Mumps, other outbreaks force U.S. detention centers to quarantine over 2,000 migrants*, REUTERS (Mar. 10, 2019), https://www.reuters.com/article/us-usa-immigration-outbreaks/mumps-other-outbreaks-force-u-s-detention-centers-to-quarantine-over-2000-migrants-idUSKBN1QR0EW (last visited Nov. 16, 2020).

86.     In March 2019, dozens of detainees at the Aurora Facility began a hunger strike to draw attention to the continued spread of infectious diseases, resulting in multiple quarantines. At the time of the hunger strike, more than 200 detainees were under quarantine and of those, approximately 65 had already been under a mumps quarantine for two months and had just been informed that their quarantine would start over and last another 21 days.[39] At one point in March, more than 350 detainees were under quarantine for possible exposure to either mumps or chicken pox or both. The Tri-County Health Department was forced to step in and provide a measles, mumps and rubella vaccination for detainees and staff at the Aurora Facility, allowing quarantine to be lifted on May 20, 2019, but medical staff diagnosed another detainee with mumps just two days later, resulting in 50 or so detainees who were potentially exposed to be placed under quarantine. As of June 4, 2019, 152 detainees were under quarantine.[40]

87.     Reports of the infectious-disease outbreaks led Congressman Jason Crow to initiate an investigation into the health conditions at the Aurora Facility in early 2019. In May 2019, Crow introduced a bill that would require immigration detention facilities, like the Aurora Facility, to comply with site inspection requests from members of Congress within 48 hours.[41]

88.     As of mid-June, ICE had 297 confirmed cases of mumps in 39 ICE facilities since September 2018, including in multiple GEO facilities.[42] The rise in infectious disease outbreaks

---

[39] Tony Kovaleski, *Frustrated Colorado ICE detainees in midst of hunger strike over infectious disease quarantines*, THE DENVER CHANNEL (Mar. 6, 2019), https://www.thedenverchannel.com/news/local-news/frustrated-colorado-ice-detainees-in-midst-of-hunger-strike-over-infectious-disease-quarantines (last visited Nov. 16, 2020).

[40] Conor McCormick-Cavanagh, *Detainees Under Infectious-Disease Quarantine at Immigration Detention Facility*, WESTWORD (June 4, 2019), https://www.westword.com/news/quarantines-back-at-aurora-geo-group-immigration-detention-facility-11365795 (last visited Nov. 16, 2020).

[41] *Id.*

[42] Heather Timmons, Justin Rohrlich, *ICE is Struggling to Contain Spread of Mumps in Its Detention Centers*, QUARTZ (June 14, 2019), https://qz.com/1626803/ice-struggles-to-contain-spread-of-mumps-in-its-detention-centers/ (last visited Nov. 16, 2020).

in 2019 sparked concern from advocates about access to adequate medical care in immigration detention facilities, which was only heightened after the White House proposed to increase the number of immigration family detention beds as part of its 2020 budget.[43]

### 2.    GEO was unable to adequately respond to COVID-19

89.    Already strapped for cash, and still reeling from its failed attempts at harnessing the 2019 infectious disease outbreaks, GEO was wholly unequipped to manage the incoming global COVID-19 pandemic in 2020. Not only did GEO have to address COVID-19 outbreaks in its facilities, but it faced rising legal costs associated with COVID-related litigation and decreased revenue resulting from decreased detainee and inmate populations based on orders and/or guidelines from courts, governments and regulatory agencies.

90.    Throughout the Class Period, including in November 2019, just prior to the start of the COVID-19 pandemic, Defendant Zoley assured the market that "[t]he residential centers we manage on behalf of ICE are highly rated by national accreditation organizations and provide high-quality, culturally responsive services *in safe and humane environment*."

91.    In the ensuing weeks, COVID-19 exploded across the international news scene. By January 30, 2020, the World Health Organization ("WHO") declared COVID-19 a Public Health Emergency of International Concern. By March 11, 2020, the WHO declared COVID-19 a "pandemic." In that declaration, WHO stated that it had "called every day for countries to take urgent and aggressive action. We have rung the alarm bell loud and clear." *Id*. As was easy to predict, by March 26, 2020, the United States had become the country with the highest confirmed cases of COVID in the world. Yet as the WHO "rang the alarm bell loud and clear," while the

---

[43] Nicole Einbinder, *Immigrant Detention Centers are Dealing with Mumps and Chicken Pox Outbreaks, and Thousands Have Been Put Into Quarantine*, INSIDER (Mar. 15, 2019), https://www.insider.com/disease-outbreaks-and-quarantines-in-immigration-detention-centers-spark-concerns-2019-3 (last visited Nov. 16, 2020).

virus traveled across the world, while it shut down countries, and while it slowed the global economy, GEO—a company with a demonstrated history of failing to control known infectious diseases—sat silent.

92.     After being publicly notified of the "special risk" incarcerated and detained individuals faced with regard to infectious diseases on March 9, 2020, GEO confirmed to Law360 that "no coronavirus cases ha[d] been detected" in any of its facilities and that it had "has issued guidance to each of its facilities and updated its policies to include preventing COVID-19." But immigration attorneys stated that such "established protocols and detention standards may not be enough" in light of past "fail[ures] to manage other public health crises," as GEO well knew based on its robust track record of operational deficiencies, particularly in handling infectious diseases.[44]

93.     To be sure, GEO was well aware of the COVID-19 pandemic. It's response to Senator Warren's correspondence makes it clear that "we are fully aware of the emerging health concerns presented by COVID-19."

94.     On March 18, 2020, the ACA published a report providing guidance on how to respond to COVID-19. Recommendations included: evaluating/screening all inmates upon intake and return from court/medical and all outside work locations; conducting noninvasive screenings of everyone for symptoms; formalization of a schedule to ensure cleaning and disinfection of high touch areas multiple times per day; immediate isolation of any inmates that present flu-like symptoms, followed by the enactment of contact precautions and personal protective equipment (place a mask on the inmate); and establishing an ongoing log to record patients presenting with flu-like symptoms to facilitate reporting to local health authorities and others as appropriate.

---

[44] Suzanne Monyak, *Attys Fear Coronavirus Spread In Immigration Detention*, LAW360 (Mar. 11, 2020), https://www.law360.com/articles/1251570/attys-fear-coronavirus-spread-in-immigration-detention- (last visited Nov. 16, 2020).

95.     On March 25, 2020, while confirming that a staffer at the Aurora Facility had been diagnosed with COVID-19, ICE stated that the staffer did not have access to the area where detainees were housed and denied that any quarantines were in place. However, Laura Lunn, managing attorney at the Rocky Mountain Immigrant Advocacy Network, said that its clients had reported that (1) after someone in the A2 dormitory at the Aurora Facility ("A2") had gotten sick, A2 had been sealed off and individuals in A2 were not permitted to leave, including to attend their immigration court hearings, and (2) people held in the Aurora Facility were experiencing flu-like symptoms, but could not verify their illness. A spokesperson for GEO said that none of the Company's employees at the Aurora Facility had been diagnosed with COVID-19.[45]

96.     On the same day, the plaintiffs in the Substandard Medical Care Case, filed an emergency motion to certify a subclass and for preliminary injunction to implement protections against COVID-19.[46,47] On April 20, 2020, the court ordered ICE to promptly evaluate and potentially release thousands of detainees who were at higher risk of contracting or dying from COVID-19, blasting the agency for its "callous indifference to the safety and well-being" of detainees in its care and noting that "[t]he evidence suggests systemwide inaction that goes beyond a mere difference of medical opinion or negligence."[48]

97.     March 25, 2020 was also the first time GEO even specifically mentioned COVID-19 in its public filings with the SEC. Inexplicably, this mention is limited to noting that SVP

---

[45] Suzanne Monyak, *Staffer at Colo. Detention Center Diagnosed With COVID-19*, LAW360 (Mar. 25, 2020), https://www.law360.com/articles/1257221/staffer-at-colo-detention-center-diagnosed-with-covid-19 (last visited Nov. 16, 2020).

[46] Emergency Notice of Motion and Motion for Preliminary Injunction, *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 5:19-cv-01546 (C.D. Cal.) (ECF No. 81).

[47] Emergency Notice of Motion and Motion to Certify Subclasses, *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 5:19-cv-01546 (C.D. Cal.), ECF No. 83.

[48] Order, *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 5:19-cv-01546 (C.D. Cal.), ECF No. 132.

Donahue would be "delaying retirement" and that this delay "will be helpful in addressing the challenges and impacts of the Coronavirus."

98.     On April 13, 2020, detainees in the Adelanto Facility filed a lawsuit seeking to reduce the population at the facility to allow for social distancing during the COVID-19 pandemic, *Kelvin Hernandez Roman et al. v. Chad F. Wolf et al.*, Case No. 5:20-cv-00768 (C.D Cal.). On April 23, 2020, a federal judge granted the preliminary injunction and ordered the Adelanto Facility to immediately reduce detainee population, demanding the release at least 100 detainees by April 27, and 150 more by April 30, and to follow all measures recommended by the CDC, including that "[a]ll detainee common areas and share items…shall be cleaned and disinfected by a professionally trained cleaning staff with appropriate equipment and supplies on a regular basis whenever those common areas and shared items are accessible to detainees." ECF No. 55.

99.     Also on April 13, 2020, across the country, detainees in three South Florida detention centers, including the GEO-operated Broward Transitional Center, filed a lawsuit in federal court alleging that the centers failed to comply with guidelines for preventing the spread of COVID-19 and seeking the release of a proposed class of vulnerable detainees.[49] On April 30, 2020, the Court ordered the centers to cut the number of people in their custody to 75%, and to hand out soap, cleaning materials and masks to all detainees.[50] On June 6, 2020, the Court further ordered the detention centers to improve conditions, limit transfers to address the COVID-19 pandemic, and to no longer place detainees in cohort quarantine without confirming the detainee had COVID-19.[51] Based on credible testimony and sworn declarations, the Court noted that centers had "only partially complied with its own directives or CDC Guidelines" as they reduced

---

[49] Application/Petition (Complaint) for Writ of Habeas Corpus, *Gayle et al. v. Meade et al.*, Case No. 1:20-cv-21553, (S.D. Fl.), ECF No. 1.
[50] Order, *Gayle et al. v. Meade et al.*, Case No. 1:20-cv-21553, (S.D. Fl.), ECF No. 76.
[51] Order, *Gayle et al. v. Meade et al.*, Case No. 1:20-cv-21553, (S.D. Fl.), ECF No. 158.

populations by simply shuffling detainees around to other facilities through transfers conducted in unsanitary conditions and without proper COVID-19 screening, "paint[ing] a grim picture of an agency steeped in deliberate indifference."

100.    On April 14, 2020, detainees in the Aurora Facility filed a lawsuit accusing it of failing to provide enough soap and violating CDC recommendations by keeping detainees in close quarters, pressing the Court to release medically vulnerable detainees during the COVID-19 pandemic. The detainees allege that detention centers are a "hotbed for spread of the virus," particularly where social distancing measures were impossible in the crowded Aurora Facility and "no meaningful measures [have been taken] to curb the spread of the virus at the Aurora facility." Detainees also criticized GEO's failure to conduct widespread testing, despite the fact that two ICE employees who work in the Aurora Facility and three GEO employees who run the Aurora Facility had tested positive for COVID-19.[52] Within 24 hours of the filing, alleging poor management of infectious diseases at the Aurora Facility, 8 of the 14 individuals claimed to be at high risk of contracting COVID-19 were released.

101.    On April 20, 2020, detainees in Yuba County Jail and the GEO-operated Mesa Verde Detention Center (the "Mesa Verde Facility") filed a lawsuit in federal court alleging that the facilities were so crowded that social distancing was impossible and no meaningful steps had been taken to reduce the risk of COVID-19 outbreaks.[53] On June 9, 2020, after noting that "safety improvements came almost entirely from this litigation: ICE acted only because it was ordered to do so, or in response to concerns raised by the Court or the plaintiffs during the proceedings," the

---

[52] Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief, *Leaford Codner et al. v. Coate et al.*, 1:20-cv-01050 (D. Colo.), ECF No. 1.
[53] Class Petition for Writ of Habeas Corpus and Class Complaint or Injunctive and Declaratory Relief, *Angel de Jesus Zepeda Rivas et al. v. David Jennings et al.*, Case No. 3:20-cv-02731 (C.D. Cal.), ECF No. 1.

Court proceeded to order that the facilities "maintain, at a minimum, the status quo that currently exists as it relates to protection from transmission of Covid-19."[54] The Court further noted that "ICE's conduct and attitude towards its detainees at Mesa Verde and Yuba County Jail since the pandemic began have shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at these particular facilities without judicial intervention." Then, on August 6, 2020, the Court ordered the administration of at minimum, weekly, rapid-result COVID-19 tests to all detainees at the Mesa Verde Facility, rejecting GEO and ICE's claims of insufficient testing supplies based on documentary evidence showing that they had avoided widespread testing out of "fear that positive test results would require them to implement safety measures."[55]

102.    Not until May 6, 2020, in the midst of crisis after crisis related to COVID-19 and this deluge of lawsuits and negative Court orders did GEO finally provide a substantive update to investors in its SEC filings. In a Form 8-K filed that day, GEO included an April 30, 2020 press release that "provide[d] an update on the impact of COVID-19 pandemic on GEO."

103.    On June 29, 2020, a complaint was filed in Texas federal court alleging that GEO failed to abide by proper safety and health protocols at a federal halfway house in Houston, Texas and yet threatened to discipline residents if they called county or city agencies for COVID-19 information, testing, or to inform them about any deaths at the facility.[56] The complaint also alleged that GEO had not reported three COVID-19 related deaths at the facility, was not complying with the CDC and BOP's guidance on social distancing or basic cleaning supplies, and was failing to

---

[54] Order Granting Motion for Preliminary Injunction, *Angel de Jesus Zepeda Rivas et al. v. David Jennings et al.*, Case No. 3:20-cv-02731 (C.D. Cal.), ECF No. 229.
[55] Order Granting Motion for Temporary Restraining Order, *Angel de Jesus Zepeda Rivas et al. v. David Jennings et al.*, Case No. 3:20-cv-02731 (C.D. Cal.), ECF No. 500.
[56] Keith Larsen, *Private Prison REIT Threatened Inmates for Reporting Covid-19 Concerns: Lawsuit*, THE REAL DEAL (July 6, 2020), https://therealdeal.com/2020/07/06/private-prison-reit-threatened-inmates-for-reporting-covid-19-concerns-lawsuit/ (last visited Nov. 16, 2020).

provide basic medical care or to conduct screening of staff and/or residents for COVID-19.

104.    On July 13, 2020, Congress' Border Security, Facilitation & Operations Subcommittee held a hearing it titled "Oversight of ICE Detention Facilities: Examining ICE Contractors' Response to COVID-19. Chairwoman Kathleen Rice opened the hearing by remarking on concerns that ICE contractors (including GEO) had not responded appropriately to the COVID-19 outbreak. In her opening statement, Rice noted: "Detention facilities must be held to a high standard at all times, but in this moment, it is of vital importance. ***And yet, over the past few months, it is clear that ICE and its contractors have not taken this outbreak seriously and have not treated it aggressively enough***. More than three thousand detainees, 280 contractors, and at least 45 ICE employees assigned to detention facilities have now tested positive for COVID-19. Sadly, we have lost at least two detainees and five contractors due to complications from the coronavirus after exposure at detention facilities. ***Despite these horrific losses, ICE is continuing normal operations and contractors are following in lock step***."

105.    Defendant Zoley testified at the hearing. In his written statement, he admitted that by the first week of July, there had been 611 positive COVID cases in GEO's ICE facilities alone.

### E.    Defendants' Materially False and Misleading Class Period Statements.[57]

106.    Throughout the Class Period, Defendants were aware or severely reckless in not knowing that GEO's operational deficiencies and contractual and legal violations – as increasingly highlighted by public and political scrutiny and numerous lawsuits – would cost the Company access to capital after its publicly disclosed financing partners bailed and revenue streams after multiple major government contracts were terminated. Defendants were also aware or severely

---

[57] For ease of reference, Plaintiffs have attached hereto a chart of the statements alleged to be false and/or misleading as Appendix A. The particular portions of the statements alleged to be false and misleading are bold and italicized.

reckless in not knowing that the lost financing partners and government contracts left GEO wholly unequipped to deal with COVID-19 in its facilities, which resulted in orders and/or guidelines from courts, governments and regulatory agencies materially reducing populations and thus materially less revenue for the Company.

107.    On November 8, 2018, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018 (the "3Q18 10-Q") which was "duly authorized" by CFO Evans. With respect to "Litigation, Claims and Assessments," the 3Q18 10-Q stated, in relevant part:

> On October 22, 2014, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched as a result of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification which the Company appealed to the 10th Circuit Court of Appeals. On February 9, 2018, a three-judge panel of the appellate court affirmed the class-certification order. A petition for rehearing en banc was denied on March 7, 2018. On October 2, 2018, the U.S. Supreme Court denied the Company's petition for a writ of certiorari on the class certification order. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed – two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the

Colorado suit, also includes claims based that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits*. The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.*

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. *The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.* However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

108.    The statements referenced in ¶ 107 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

109.    On February 14, 2019, during the Company's fourth quarter 2018 ("4Q18") earnings call, CFO Evans stated, "[d]uring the fourth quarter, we recognized -- reorganized our legal representation and strategy with respect to certain legal cases and incurred one-time legal transition expenses. We believe, *we have adequately accounted for known legal cases in our guidance for 2019*."

110.     The statement referenced in ¶ 109 regarding GEO having "adequately accounted for known legal cases" was materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

111.     On February 25, 2019, GEO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"). With respect to "Litigation, Claims and Assessments," the 2018 10-K stated, in relevant part:

> As previously reported and described in our prior periodic reports, including most recently in our Form 10-Q for the quarter ended June 30, 2018, on February 8, 2017, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed — two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits

allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims based that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.***

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.***

112.    The statements referenced in ¶ 111 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

113.    On May 6, 2019, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q") which was "duly authorized" by CFO Evans. With respect to "Litigation, Claims and Assessments," the 1Q19 10-Q stated, in relevant part:

As previously reported and described in the Company's prior periodic reports,

including most recently in our Form 10-K for the year ended December 31, 2018, on February 8, 2017, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. *The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.*

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising

from a prisoner's escape or from a disturbance or riot at a facility. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

114.    The statements referenced in ¶ 113 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

115.    On August 2, 2019, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q19 10-Q") which was "duly authorized" by CFO Evans. With respect to "Litigation, Claims and Assessments," the 2Q19 10-Q stated, in relevant part:

> As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-Q for the quarter ended March 31, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two

lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** We establish accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. Our accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. We do not accrue for anticipated legal fees and costs, but expense those items as incurred.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims, medical malpractice claims, claims relating to the TVPA, product liability claims, intellectual property infringement claims, claims relating to employment laws (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel, inmates or detainees, including damages arising from an escape or from a disturbance or riot at a facility. Expenses associated with legal proceedings may fluctuate from quarter to quarter based on the level of activity required during the different stages of legal proceedings, new developments that arise in the course of the legal proceedings, and the Company's litigation strategy. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of

one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

116.    The statements referenced in ¶ 115 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

117.    On November 7, 2019, GEO filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "3Q19 10-Q") which was "duly authorized" by CFO Evans. With respect to "Litigation, Claims and Assessments," the 3Q19 10-Q stated, in relevant part:

> As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-Q for the quarter ended June 30, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of

the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. The two Washington cases are currently set for trial in March 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. Our accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. We do not accrue for anticipated legal fees and costs, but expense those items as incurred.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims, medical malpractice claims, claims relating to the TVPA, product liability claims, intellectual property infringement claims, claims relating to employment laws (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel, inmates or detainees, including damages

arising from an escape or from a disturbance or riot at a facility. Expenses associated with legal proceedings may fluctuate from quarter to quarter based on the level of activity required during the different stages of legal proceedings, new developments that arise in the course of the legal proceedings, and the Company's litigation strategy. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows.

118.     The statements referenced in ¶ 117 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60).

119.     On February 26, 2020, GEO filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter ended December 31, 2019 (the "2019 10-K"). With respect to "Litigation, Claims and Assessments," the 2019 10-K stated, in relevant part:

As previously reported and described in the Company's prior periodic reports, including most recently in its Form 10-Q for the quarter ended September 30, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification on the TVPA and unjust enrichment claims.

The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. The two Washington cases are currently set for trial in April 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. The Company does not accrue for anticipated legal fees and costs but expenses those items as incurred.

On December 30, 2019, GEO filed a lawsuit for declaratory and injunctive relief challenging California's newly enacted law - Assembly Bill 32 (AB-32) - which bars the federal government from engaging GEO or any other government

contractors to provide detention services for illegal aliens. GEO's claims, as described in the lawsuit, are grounded in authoritative legal doctrine that under the Constitution's Supremacy Clause, the federal government is free from regulation by any state. By prohibiting federal detention facilities in California, the lawsuit argues AB-32 substantially interferes with the ability of USMS and ICE to carry out detention responsibilities for the federal government. Secondly, because AB-32 creates exceptions to the State when using GEO or any government contractors (to alleviate overcrowding), California's statute unlawfully discriminates against the federal government. On December 31, 2019, GEO filed its motion for a preliminary injunction restraining California's Governor and Attorney General from enforcing AB-32 against GEO's detention facilities on behalf of USMS and ICE.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.***

120.     The statements referenced in ¶ 119 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, (i) that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60) and (ii) that if forced to close its facilities by AB-32, GEO "would lose an average of $250 million a year in revenue over the next 15 years, plus the $300 million invested in acquiring and setting up those buildings"

(¶135).

121.    On May 6, 2020, GEO filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the

"1Q20 10-Q") which was "duly authorized" by CFO Evans. With respect to "Litigation, Claims

and Assessments," the 1Q20 10-Q stated, in relevant part:

> As previously reported and described in the Company's prior periodic reports,
> including most recently in its Form 10-K for the year ended December 31, 2019,
> former civil immigration detainees at the Aurora Immigration Processing Center
> filed a class action lawsuit on October 22, 2014, against the Company in the United
> States District Court for the District of Colorado (the "Court"). The complaint
> alleges that the Company was in violation of the Colorado Minimum Wages of
> Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The
> plaintiff class claims that the Company was unjustly enriched because of the level
> of payment the detainees received for work performed at the facility, even though
> the voluntary work program as well as the wage rates and standards associated with
> the program that are at issue in the case are authorized by the Federal government
> under guidelines approved by the United States Congress. On July 6, 2015, the
> Court found that detainees were not employees under the Colorado Minimum Wage
> Order and dismissed this claim. In February 2017, the Court granted the plaintiff-
> class' motion for class certification on the TVPA and unjust enrichment claims.
> The plaintiff class seeks actual damages, compensatory damages, exemplary
> damages, punitive damages, restitution, attorneys' fees and costs, and such other
> relief as the Court may deem proper. In the time since the Colorado suit was initially
> filed, three similar lawsuits have been filed - two in Washington and one in
> California. In Washington, one of the two lawsuits was filed on September 9, 2017
> by immigration detainees against the Company in the U.S. District Court for the
> Western District of Washington. The second lawsuit was filed on September 20,
> 2017 by the State Attorney General against the Company in the Superior Court of
> the State of Washington for Pierce County, which the Company removed to the
> U.S. District Court for the Western District of Washington on October 9, 2017. In
> California, a class- action lawsuit was filed on December 19, 2017 by immigration
> detainees against the Company in the U.S. District Court Eastern Division of the
> Central District of California. All three lawsuits allege violations of the respective
> state's minimum wage laws. However, the California lawsuit, like the Colorado
> suit, also includes claims that the Company violated the TVPA and California's
> equivalent state statute. On September 27, 2019, the California plaintiff class filed
> a motion for class certification of both California-based and nationwide classes.
> The Company filed a response to this motion disputing the plaintiff class' right to
> broad class treatment of the claims at issue. On July 2, 2019, the Company filed a
> Motion for Summary Judgment in the Washington Attorney General's Tacoma
> lawsuit based on the Company's position that its legal defenses prevent the case

from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. Trial for the two Washington cases has been continued until sometime past June 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. The Company does not accrue for anticipated legal fees and costs but expenses those items as incurred.

On December 30, 2019, GEO filed a lawsuit for declaratory and injunctive relief challenging California's newly enacted law - Assembly Bill 32 (AB-32) - which bars the federal government from engaging GEO or any other government contractors to provide detention services for illegal aliens. GEO's claims, as described in the lawsuit, are grounded in authoritative legal doctrine that under the Constitution's Supremacy Clause, the federal government is free from regulation by any state. By prohibiting federal detention facilities in California, the lawsuit argues AB-32 substantially interferes with the ability of U.S. Marshals Service ("USMS") and ICE to carry out detention responsibilities for the federal government. Secondly, because AB-32 creates exceptions to the State when using GEO or any government contractors (to alleviate overcrowding), California's statute unlawfully discriminates against the federal government. On December 31, 2019, GEO filed its motion for a preliminary injunction restraining California's Governor and Attorney General from enforcing AB-32 against GEO's detention facilities on behalf of USMS and ICE. The court granted the parties' joint motion to reschedule the hearing to July 16, 2020.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its

customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.***

122.     The statements referenced in ¶ 121 regarding the Company's legal accruals and the materiality of lawsuits against it were materially false and/or misleading because Defendants misrepresented and failed to disclose, knowingly or recklessly disregarded, (i) that these series of cases alleging violations of the labor laws were "a potentially catastrophic risk to GEO's ability to honor its contracts with the federal government" and exposed the Company to "tens of millions" in potential damages and as high as $20 million in legal expenses (¶¶ 59-60) and (ii) that if forced to close its facilities by AB-32, GEO "would lose an average of $250 million a year in revenue over the next 15 years, plus the $300 million invested in acquiring and setting up those buildings" (¶ 135).

### F.   The Truth Slowly Emerges

123.     Before the market opened on March 5, 2019, *Bloomberg* published an article entitled "JPMorgan Ends Financing of Private Prisons After Criticism," announcing that as part of JPMorgan's "robust and well-established process to evaluate the sectors that [it] serve[s]," it would "no longer bank the private prison-industry," including GEO and CoreCivic. *Reuters* also reported that "JPMorgan Chase & Co has decided to stop financing private operators of prisons and detention centers, which have become targets of protests over Trump administration policies." Other major news outlets ran similar articles over the next couple days, including *The New York Times* on March 6, 2019.

124.     Then, on March 10, 2019, U.S. Bank told the *Washington Post* that it had reduced

its credit exposure to GEO and CoreCivic to "an immaterial amount" and on March 12, 2019, during congressional testimony, in response to Congresswoman Ocasio-Cortez asking why WF was financing companies "involved with the caging of children," WF CEO Sloan responded that it "will exit that relationship."

125.    On these revelations, indicating that the Company's dividend payments may be no longer predictable or stable without its usual long-term financing partners, GEO's share price fell over 11%, or $2.58 per share, to close at $20.35 per share on March 8, 2019 after three days of heavy trading, and another 5.0%, or $1.03 per share, to close at $19.43 per share on March 14, 2019 after two days of heavy trading.

126.    As *Forbes* reported on March 15, 2019, "[t]he stocks of private prison leaders GEO Group and CoreCivic are down 16% and 8%, respectively today since last Tuesday — the day when the country's largest bank, JPMorgan, publicly announced that they will take their money out of the private prison industry."

127.    Before the market opened on July 11, 2019, NBC News published an article titled "House Democrats seek documents from for-profit companies detaining migrants." On this news, indicating political pressure on for-profit prisons, GEO's share price fell over 6.5%, or $1.33 per share, to close at $18.97 per share on July 11, 2019 after a heavy day of trading.

128.    Then, on July 17, 2019, after the market opened, reputable news sources published articles such as "GEO Wants Taxpayers to Foot Bill for Private Prison Exploitation," revealing GEO's pleas to ICE to help cover litigation costs stating in relevant part, "GEO cannot bear the costs of this defense on its own" and "[w]e urgently implore DOJ to take over the defense of these lawsuits and reimburse GEO for its costs." On this news, indicating the Company's serious concern that these lawsuits could have a material effect on its financial condition, results of

operations or cash flow, GEO's share price fell over 7.9%, or $1.48 per share, to close at $17.24 per share on July 19, 2019 after two days of heavy trading.

129.    After the market closed on March 9, 2020, a request for information to GEO about the policies and procedures it had "in place to prepare for and manage a potential spread of the novel coronavirus among federal prisoners in GEO's custody and among correctional staff at GEO facilities" from Senators Elizabeth Warren, Edward J. Markey, Brian Schatz, Cory A. Booker, Amy Klobucher, Tammy Baldwin, Bernard Sanders, Richard Blumenthal, Jeffrey A. Merkley, Chris Van Hollen, Kamala D. Harris, Sherrod Brown, Mazie K. Hirono, Tina Smith and Mark R. Warner ("3/9/20 Senators' Letter") was published on Senator Warren's website. Quoting a March 2, 2020 open letter signed by over 450 public health and legal experts and organizations, the 3/9/20 Senators' Letter stated that "incarcerated individuals 'are at *special risk* of infection, given their living situations,' and 'may also be less able to participate in proactive measures to keep themselves safe, and infection control is challenging in these settings.'"

130.    On the next day, March 10, 2020, the Philadelphia Inquirer reported that after two decades of operating the Delaware County Prison, Pennsylvania's only privatized county prison, GEO suggested December 31, 2020 as the termination date of its current five-year, $259 million contract. GEO's request came after Delaware County took the preliminary step toward ending the contract in February 2020 by voting to commission a study on what was needed to transition the Delaware County Prison back to being publicly run.

131.    In response to the revelation on March 9 regarding the special risk of COVID-19 in GEO's facilities and on March 10 regarding GEO's loss of a contract worth over $200 million in future revenue, the Company's share price plummeted over 29% after two days of heavy trading. As reported on March 11, 2020, because "[p]eople held in immigration detention centers may be

*particularly vulnerable* to the new coronavirus as it spreads across the U.S.," immigration attorneys questioned whether such centers – including the GEO-operated Aurora Facility, Adelanto Facility and Karnes family detention center in Texas were prepared to safeguard detainees' health and access to counsel.[58]

132.    Before the market opened on June 17, 2020, CoreCivic announced that its Board of Directors was reevaluating its "corporate structure and capital allocation alternatives" and "suspend[ing] the Company's quarterly dividend." The revelation that CoreCivic was suspending its dividend and may be dropping its REIT structure indicated that GEO likely would also be suspending or at least cutting its dividend.

133.    In addition, *The Intercept* published an article during pre-market hours on June 17, 2020 entitled "GEO Group's Blundering Response to the Pandemic Helped Spread Coronavirus in Halfway Houses." The article reported details of a significant COVID-19 outbreak at the Grossman Center, a halfway house operated by GEO in Leavenworth, Kansas which "was for weeks the hardest hit federal halfway house in the country" in terms of confirmed COVID-19 cases. Citing interviews with residents of the Grossman Center, *The Intercept* reported "that the virus spread not in spite of the facility's efforts to contain it, but because of it" and that GEO's "blundering" response included keeping residents in overcrowded conditions without enforcing personal protective measures even as COVID-19 diagnoses at the facility increased.

134.    In response to the news about the suspension of CoreCivic's dividend, the coronavirus outbreaks in GEO's facilities, and GEO's mishandling of the pandemic, the Company's stock price fell over 10%, or $1.37 per share, to close at $11.83 per share on June 19, 2020 after two days of heavy trading.

---

[58] Suzanne Monyak, *Attys Fear Coronavirus Spread In Immigration Detention*, Law360 (Mar. 11, 2020), https://www.law360.com/articles/1251570/attys-fear-coronavirus-spread-in-immigration-detention-

135.     On July 16, 2020, major news sources including the LA Times reported that a federal judge had issued a tentative ruling that largely upheld California's ban on private prison contracts, Assembly Bill ("AB") 32, concluding that "AB 32 does not unconstitutionally discriminate against the federal government or its contractors." If forced to close its facilities by AB-32, GEO claimed "it would lose an average of $250 million a year in revenue over the next 15 years, plus the $300 million invested in acquiring and setting up those buildings." Several other major news sources published related articles that day and the next.

136.     On this news, GEO's stock price fell over 5.4% or $0.66 per share, to close at $11.49 per share on July 17, 2020 after two days of heavy trading.

137.     On August 6, 2020, major news sources began reporting that a federal court had ordered GEO and ICE to conduct weekly, rapid-result COVID-19 tests at the Mesa Verde Facility and found that authorities had shown "deliberate indifference to the risk of an outbreak" of COVID-19 over their arguments regarding insufficient testing supplies. The court further noted that authorities had "avoided widespread testing . . . not for lack of tests, but for fear that positive test results would require them to implement safety measures that they apparently felt were not worth the trouble." Several major news sources published related articles that day and the next.

138.     Then, before the market opened on August 6, 2020, the full truth was revealed when GEO announced a nearly 30% reduction in its quarterly dividend from $0.48 per share to $0.34 per share – just enough to allow GEO to remain structured as a publicly traded REIT. In response to the news confirming GEO's cavalier approach to inmate health in the face of COVID-19 and announcing the dividend cut, GEO's stock price fell $0.77 per share, or nearly 7%, to close at $10.67 per share on August 7, 2020 after two days of heavy trading.

## V.      ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

139.     Defendants' material misstatements and omissions, as alleged above, were made intentionally, knowingly, and/or with deliberate recklessness. Those material misstatements and omissions had the purpose and effect of concealing the adverse truth about GEO's true operations, performance, finances, and prospects from the investing public, consequently buoying and artificially inflating the trading price of GEO's common stock. In addition to the foregoing allegations which adequately demonstrate *scienter* alone, the following facts, further demonstrate the strong inference that Defendants' false statements and material omissions were made with actual knowledge of their falsity or with severe recklessness, *i.e.*, *scienter*.

140.     *First*, in a letter sent in the middle of the Class Period to the Chairman of the SEC, Warren has already accused GEO's executives, including Defendant Zoley, of having direct knowledge of, while misrepresenting to investors, the financial issues arising from the operational deficiencies and increasing scrutiny faced by GEO:

> Despite significant ongoing legal concerns, GEO has made a series of public statements through earnings calls and filings with the Securities and Exchange Commission (SEC) *that differ dramatically from the non-public communications by corporate executives*.

That letter, without more, establishes that GEO's executives had knowledge—*i.e.*, that they monitored and communicated, both internally and externally, about the lawsuits and public scrutiny that arose from operational deficiencies. Accordingly, when speaking about GEO's operations, lender relationships, and stable, predictable cash flows and dividends, Defendants knew of (or, at least were severely reckless as to) the realities alleged herein.

141.     *Second*, as exemplified by Senator's Warren letter, Defendants' conduct involved scrutiny from the highest levels of the United States government. Defendants misrepresented and omitted the degree and effects that the increasing government scrutiny had on GEO's ability to

generate cash flows, maintain financing relationships with key lenders, and continue paying stable, predictable dividends. Given the high-profile sources of the scrutiny, GEO's leadership— including its CEO, CFO, SVPs, and Presidents of subsidiaries—were aware of those facts (or severely reckless in purposefully ignoring those facts).

142.    During the Class Period, for example, the heightening scrutiny on GEO's operations involved:

- the 2018 public refusal by every major Democratic candidate for Florida governor to accept GEO's money and Florida Democratic Party's banning of all donations from private-prison firms;

- the March 12, 2019 questions by Congresswoman Ocasio-Cortez to WF's CEO regarding the bank's financing of private prison companies like GEO;

- the May 2019 bill by Congressman Crow to require immigration detention facilities, including all operated by GEO, to comply with site inspection requests from members of Congress within 48 hours;

- the May and June 2019 reports by the DHS OIG regarding unsafe and unhealthy conditions at multiple GEO facilities;

- the July 2019 letter from Senator Warren to the SEC Chairman;

- July 2019 letter from the House Oversight and Reform Committee demanding documents and communications pertaining to government contracts, amid reports of the deplorable treatment of migrants at the southern border;

- the October 2019 law AB-32 enacted in California barring the federal government from "enter[ing] into a contract with a private, for profit prison facility located in or outside the state";

- the March 9, 2020, Senators' Letter requesting information from GEO about its ability to respond to COVID-19;

143.    If Defendant Zoley knew of these high-profile incidents, then he has the requisite knowledge to show scienter. If Defendant Zoley did not know, then he purposefully ignored material information occurring at the highest level of the United States government and affecting GEO's business. Such ignorance by GEO's top executive would be severely reckless and,

therefore, show scienter.

144.    In any case, Defendant Zoley's direct letter to ICE on May 30, 2018, shows his knowledge, specifically that "[w]e are deeply alarmed at the rapidly increasing costs in defending these lawsuits without reimbursement from ICE, or assistance in their defense by the Department of Justice (DOJ)." Moreover, Defendants' receipt of the 3/9/20 Senators' Letter confirms that Defendants were aware of the material issues arising from GEO facilities' preparations and abilities to protect their wards during the COVID-19 pandemic. Indeed, on March 12, 2020, GEO responded to the Senators' Letter, confirming that they were "fully aware of the emerging health concerns presented by COVID-19" and emphasizing GEO's purported "long-standing history of providing safe, secure, and humane conditions at all of its facilities." Additionally, on July 13, 2020, Zoley testified before Congress' Border Security, Facilitation & Operations Subcommittee at a hearing titled "Oversight of ICE Detention Facilities: Examining ICE Contractors' Response to COVID-19." At the hearing, Chairwoman Kathleen Rice stated that "over the past few months, it is clear that ICE and its contractors have not taken this outbreak seriously and have not treated it aggressively enough" and that "[d]espite . . . horrific losses, ICE is continuing normal operations and contractors are following in lock step." Defendant Zoley then testified about whether GEO was properly responding to the COVID-19 outbreak. Defendant Zoley's preparation to testify and testimony before Congress indicate that he prepared himself and had direct knowledge of these topics. If he did not have direct knowledge, then he was severely reckless in testifying before Congress without such knowledge. Thus, Defendants had direct knowledge of (or, at a minimum, were severely reckless as to) the issues identified herein.

145.    ***Third***, Defendant Zoley repeatedly spoke to investors about the precise issues alleged herein. Throughout the Class Period, Defendant Zoley consistently touted GEO's cash

flows and dividends as "stable," "sustainable," "predictable," and "safe," notwithstanding GEO's true state of affairs vis-à-vis operational deficiencies, increasing scrutiny, loss of lenders, and threatened dividends. During the increasing scrutiny in 2019, Defendant Zoley told investors that "a *false narrative* and *deliberate mischaracterization* of our long-standing role as a quality service provider to ICE" were driving "the recent media stories regarding overcrowded border patrol facilities and financial institutions discontinuing future financial support for private operators of ICE Processing Centers." As COVID-19 emerged and pressured GEO's operations already plagued with systemic medical deficiencies, Defendant Zoley once again demonstrated awareness and knowledge, assuring investors that "GEO had implemented comprehensive steps to address and mitigate the risks of COVID-19 to all of those in our care and our employees."

146.    CFO Evans also repeatedly assured investors that GEO's cash flows were "stable," "sustainable" and "predictable," attributed heightened scrutiny on GEO to "a mischaracterization of our role as a service provider and our overall Company record," and conveyed that there was "misinformation regarding our banking partners and our access to capital."

147.    Those comments indicate that Defendant Zoley and GEO's CFO had knowledge (or were severely reckless to the accuracy) of GEO's operations, public scrutiny, ability to address COVID-19 and, in turn, the stability and predictability of cash flows and dividend amount.

148.    *Fourth*, these were the precise issues that other company executives in the private prison sector were addressing. In a May 7, 2020, earnings conference call, for example, CEO Damon Hininger of GEO's peer company, CoreCivic, openly addressed the negative effects of decreased facility population due to COVID-19 and the loss of government contracts, noting that the government's reduction in utilization of the company's facilities "has a material effect on our near term earnings," and that CoreCivic would not provide financial guidance for the second

quarter of 2020 "due to the uncertainties around the length of the COVID-19 pandemic, the timing and pace of the recovery, and policy choices by federal, state and local governments." CoreCivic subsequently acknowledged the "unprecedented challenges posed by the COVID-19 pandemic," the fact that "capital has become increasingly expensive," and the prison giant's need to look for approaches that would improve the company's "credit profile and long-term cost of capital." The statements of CoreCivic and its executives demonstrate that industry leaders had knowledge of the problems plaguing private prison operators, as well as the financial effect these problems would have on the companies and their dividends. This openly addressed knowledge supports an inference that Defendant Zoley had knowledge of the true state of GEO's business (or, at a minimum, were severely reckless as to those facts) when he made the false and misleading statements and omissions to investors.

149.     *Fifth*, shareholders actually raised the operational deficiencies to GEO's Board and executives, including Defendant Zoley and, in turn, the Company had direct knowledge of the violations giving rise to public scrutiny, loss of lenders, loss of contracts, and instability with cash flows and dividends. In July 2018, CalSTRS representatives began visiting GEO's facilities and conducting meetings with GEO's senior management concerning their operational processes and risk management efforts. Based on that investigation, CalSTRS had voted by November 2018 to remove all of its holdings from GEO. Thereafter, in response to a May 2019 shareholder initiative, GEO issued a September 2019 report on the conditions in its facilities and operational issues. Thus, GEO's management had direct knowledge of the issues alleged herein yet continued to misrepresent material facts to investors.

150.     These collective allegations show that Defendant Zoley, as well GEO's other executives, had direct knowledge of the true state of GEO's business (or, at a minimum, were

severely reckless as to those facts). When providing materially false or misleading information to investors and/or making material omission, therefore, Defendants had the requisite scienter to be held liable to those investors who suffered losses.

## VI.   NO SAFE HARBOR

151.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly misleading statements pleaded in the Consolidated Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those misleading forward-looking statements because at the time that each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was misleading, and/or the forward-looking statement was authorized and/or approved by an GEO executive officer who knew that those statements were misleading when made.

## VII.   LOSS CAUSATION

152.    The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class members they represent.

153.    During the Class Period, Plaintiffs and Class members purchased GEO common stock at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the

information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

154.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of GEO common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about GEO's business, operations, and financial performance, as alleged herein.

155.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. Defendants made or caused to be made materially false and/or misleading statements about GEO's financial results, internal controls and related financial metrics and the reliability of their reported results. These material misstatements and/or omissions had the cause and effect of creating in the market a false positive assessment of the Company and its financial performance, internal controls and related well-being, thus causing the Company's securities to be overvalued and the price of its common stock to be artificially inflated at all relevant times. Defendants' materially false and/or misleading statements, as alleged herein, resulted in Plaintiffs and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed in a series of corrective disclosures – including those on March 5, 2019, March 10, 2019, March 12, 2019, July 11, 2019, July 17, 2019, March 9-10, 2020, June 17, 2020, July 16, 2020 and August 6, 2020 – causing the trading price of GEO common stock to

materially decline, and removing the previously embedded artificial inflation.

## VIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

156.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities that purchased or otherwise acquired GEO common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

157.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GEO common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GEO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

160.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GEO;

c.      whether Defendant Zoley caused GEO to issue false and misleading financial statements during the Class Period;

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of GEO common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

161.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

162.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   GEO common stock is traded in an efficient market;

d.   the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.   the Company traded on the NYSE and was covered by multiple analysts;

f.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.   Plaintiffs and members of the Class purchased, acquired and/or sold GEO common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

163.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

164.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violations of § 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

165.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-164 as if fully set forth herein.

166.   This Count is asserted against Defendants is based upon § 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

167. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of GEO common stock during the Class Period.

169. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GEO were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of GEO, their control over, and/or receipt and/or modification of GEO's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GEO, participated in the fraudulent scheme alleged herein.

170.     Defendant Zoley, who is a senior officer and/or director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GEO personnel to members of the investing public, including Plaintiffs and the Class.

171.     As a result of the foregoing, the market price of GEO common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of GEO common stock during the Class Period in purchasing GEO common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

172.     Had Plaintiffs and the other members of the Class been aware that the market price of GEO common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased GEO common stock at the artificially inflated prices that they did, or at all.

173.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

174.     By reason of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of GEO common stock during the Class Period.

## COUNT II
### Violations of § 20(a) of the Exchange Act
### Against Defendant Zoley

175.     Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-164 as if fully set forth herein.

176.     During the Class Period, Defendant Zoley participated in the operation and management of GEO, and conducted and participated, directly and indirectly, in the conduct of GEO's business affairs. Because of his senior position, he knew the adverse non-public information about GEO's current financial position and future business prospects.

177.     As an officer and/or director of a publicly owned company, Defendant Zoley had a duty to disseminate accurate and truthful information with respect to GEO's business practices, and to correct promptly any public statements issued by GEO which had become materially false or misleading.

178.     Because of his position of control and authority as a senior officer, Defendant Zoley was able to, and did, control the contents of the various reports, press releases and public filings which GEO disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, Defendant Zoley exercised his power and authority to cause GEO to engage in the wrongful acts complained of herein. Defendant Zoley therefore, was a "controlling person" of GEO within the meaning of § 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of GEO common stock.

179.     Defendant Zoley, therefore, acted as a controlling person of GEO. By reason of his senior management position and/or being director of GEO, Defendant Zoley had the power to direct the actions of, and exercised the same to cause, GEO to engage in the unlawful acts and conduct complained of herein. Defendant Zoley exercised control over the general operations of

GEO and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

180.      By reason of the above conduct, Defendant Zoley is liable pursuant to § 20(a) of the Exchange Act for the violations committed by GEO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs' demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 4, 2021                    Respectfully submitted,

**ROCHE FREEDMAN LLP**

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman (FL# 99762)
Ivy T. Ngo (*pro hac vice*)
Constantine P. Economides (FL# 118177)
SunTrust International Center
1 S.E. 3rd Avenue, Suite 1240
Miami, FL 33131
Telephone: (305) 851-5997
vel@rochefreedman.com

ingo@rochefreedman.com
ceconomides@rochefreedman.com

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
nporritt@zlk.com
aapton@zlk.com

*Co-Lead Counsel for the Class*

**CULLIN O'BRIEN LAW, P.A.**
Cullin O'Brien (FL# 0597341)
6541 NE 21st Way
Fort Lauderdale, Florida 33308
Tel: (561) 676-6370
Fax: (561) 320-0285
E-mail: cullin@cullinobrienlaw.com

*Additional Counsel for Lead Plaintiff James Michael DeLoach*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Edward Oketola*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

# APPENDIX "A"

| | When/Where | Speaker | False and/or Misleading Statement |
|---|---|---|---|
| 4 | 11/8/2018; 3Q18 10-Q | GEO | On October 22, 2014, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched as a result of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification which the Company appealed to the 10th Circuit Court of Appeals. On February 9, 2018, a three-judge panel of the appellate court affirmed the class-certification order. A petition for rehearing en banc was denied on March 7, 2018. On October 2, 2018, the U.S. Supreme Court denied the Company's petition for a writ of certiorari on the class certification order. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed – two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims based that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.*** |

|   |   |   | The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. |
|---|---|---|---|
| 6 | 2/14/2019; 4Q18 Earnings Call | GEO | During the fourth quarter, we recognized -- reorganized our legal representation and strategy with respect to certain legal cases and incurred one-time legal transition expenses. We believe, we ***have adequately accounted for known legal cases in our guidance for 2019***. |
| 10 | 2/25/2019; FY18 10-K | GEO; Zoley | As previously reported and described in our prior periodic reports, including most recently in our Form 10-Q for the quarter ended June 30, 2018, on February 8, 2017, former civil immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, |

| | | | |
|---|---|---|---|
| | | | punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed — two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims based that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.***<br><br>The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** |
| 23 | 5/6/2019; 1Q19 10-Q | GEO | As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-K for the year ended December 31, 2018, on February 8, 2017, former civil |

immigration detainees at the Aurora Immigration Detention Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuit.***

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination

| | | | claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. |
|---|---|---|---|
| 31 | 8/2/2019; 2Q19 10-Q | GEO | As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-Q for the quarter ended March 31, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the |

Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** We establish accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. Our accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. We do not accrue for anticipated legal fees and costs, but expense those items as incurred.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims, medical malpractice claims, claims relating to the TVPA, product liability claims, intellectual property infringement claims, claims relating to employment laws (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel, inmates or detainees, including damages arising from an escape or from a disturbance or riot at a facility. Expenses associated with legal proceedings may fluctuate from quarter to quarter based on the level of activity required during the different stages of legal proceedings, new developments that arise in the course of the legal proceedings, and the Company's litigation strategy. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of

| | | | these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. |
|---|---|---|---|
| 42 | 11/7/19; 3Q19 10-Q | GEO | As previously reported and described in the Company's prior periodic reports, including most recently in our Form 10-Q for the quarter ended June 30, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from |

proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. The two Washington cases are currently set for trial in March 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. *The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.* The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. Our accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. We do not accrue for anticipated legal fees and costs, but expense those items as incurred.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims, medical malpractice claims, claims relating to the TVPA, product liability claims, intellectual property infringement claims, claims relating to employment laws (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel, inmates or detainees, including damages arising from an escape or from a disturbance or riot at a facility. Expenses associated with legal proceedings may fluctuate from quarter to quarter based on the level of activity required during the different stages of legal proceedings, new developments that arise in the course of the legal proceedings, and the Company's litigation strategy. *The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.* However, the results of these claims or

| | | | |
|---|---|---|---|
| | | | proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. |
| 49 | 2/26/2020; FY19 10-K | GEO; Zoley | As previously reported and described in the Company's prior periodic reports, including most recently in its Form 10-Q for the quarter ended September 30, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since payment the detainees initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's |

Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. The two Washington cases are currently set for trial in April 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. *The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.* The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. The Company does not accrue for anticipated legal fees and costs but expenses those items as incurred.

On December 30, 2019, GEO filed a lawsuit for declaratory and injunctive relief challenging California's newly enacted law - Assembly Bill 32 (AB-32) - which bars the federal government from engaging GEO or any other government contractors to provide detention services for illegal aliens. GEO's claims, as described in the lawsuit, are grounded in authoritative legal doctrine that under the Constitution's Supremacy Clause, the federal government is free from regulation by any state. By prohibiting federal detention facilities in California, the lawsuit argues AB-32 substantially interferes with the ability of USMS and ICE to carry out detention responsibilities for the federal government. Secondly, because AB-32 creates exceptions to the State when using GEO or any government contractors (to alleviate overcrowding), California's statute unlawfully discriminates against the federal government. On December 31, 2019, GEO filed its motion for a preliminary injunction restraining California's Governor and Attorney General from enforcing AB-32 against GEO's detention facilities on behalf of USMS and ICE.

| | | | |
|---|---|---|---|
| | | | The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.*** |
| 60 | 5/6/2020; 1Q20 10-Q | GEO | As previously reported and described in the Company's prior periodic reports, including most recently in its Form 10-K for the year ended December 31, 2019, former civil immigration detainees at the Aurora Immigration Processing Center filed a class action lawsuit on October 22, 2014, against the Company in the United States District Court for the District of Colorado (the "Court"). The complaint alleges that the Company was in violation of the Colorado Minimum Wages of Workers Act and the federal Trafficking Victims Protection Act ("TVPA"). The plaintiff class claims that the Company was unjustly enriched because of the level of payment the detainees received for work performed at the facility, even though the voluntary work program as well as the wage rates and standards associated with the program that are at issue in the case are authorized by the Federal government under guidelines approved by the United States Congress. On July 6, 2015, the Court found that detainees were not employees under the Colorado Minimum Wage Order and dismissed this claim. In February 2017, the Court granted the plaintiff-class' motion for class certification on the TVPA and unjust enrichment claims. The plaintiff class seeks actual damages, compensatory damages, exemplary damages, punitive damages, restitution, attorneys' fees and costs, and such other relief as the Court may deem proper. In the time since the Colorado suit was initially filed, three similar lawsuits have been filed - two in Washington and one in California. In Washington, one of the two lawsuits was filed on September 9, 2017 by immigration detainees against the Company in the U.S. District Court for the Western District of Washington. The second |

lawsuit was filed on September 20, 2017 by the State Attorney General against the Company in the Superior Court of the State of Washington for Pierce County, which the Company removed to the U.S. District Court for the Western District of Washington on October 9, 2017. In California, a class-action lawsuit was filed on December 19, 2017 by immigration detainees against the Company in the U.S. District Court Eastern Division of the Central District of California. All three lawsuits allege violations of the respective state's minimum wage laws. However, the California lawsuit, like the Colorado suit, also includes claims that the Company violated the TVPA and California's equivalent state statute. On September 27, 2019, the California plaintiff class filed a motion for class certification of both California-based and nationwide classes. The Company filed a response to this motion disputing the plaintiff class' right to broad class treatment of the claims at issue. On July 2, 2019, the Company filed a Motion for Summary Judgment in the Washington Attorney General's Tacoma lawsuit based on the Company's position that its legal defenses prevent the case from proceeding to trial. The federal court in Washington denied the Company's Motion for Summary Judgment on August 6, 2019. However, on August 20, 2019, the Department of Justice filed a Statement of Interest, which asked the Washington court to revisit its prior denial of the Company's intergovernmental immunity defense in the case. While the Washington court ultimately elected not to dismiss the case at the time, its order importantly declared that the Company's intergovernmental immunity defense was legally viable, to be ultimately determined at trial. Trial for the two Washington cases has been continued until sometime past June 2020. The Company intends to take all necessary steps to vigorously defend itself and has consistently refuted the allegations and claims in these lawsuits. ***The Company has not recorded an accrual relating to these matters at this time, as a loss is not considered probable nor reasonably estimable at this stage of the lawsuits.*** The Company establishes accruals for specific legal proceedings when it is considered probable that a loss has been incurred and the amount of the loss can be reasonably estimated. However, the results of these claims or proceedings cannot be predicted with certainty, and an unfavorable resolution of one or more of these claims or proceedings could have a material adverse effect on the Company's financial condition, results of operations or cash flows. The Company's accruals for loss contingencies are reviewed quarterly and adjusted as additional information becomes available. The Company does not accrue for anticipated legal fees and costs but expenses those items as incurred.

On December 30, 2019, GEO filed a lawsuit for declaratory and injunctive relief challenging California's newly enacted law - Assembly Bill 32 (AB-32) - which bars the federal government from engaging GEO or any other government contractors to provide detention services for illegal

aliens. GEO's claims, as described in the lawsuit, are grounded in authoritative legal doctrine that under the Constitution's Supremacy Clause, the federal government is free from regulation by any state. By prohibiting federal detention facilities in California, the lawsuit argues AB-32 substantially interferes with the ability of U.S. Marshals Service ("USMS") and ICE to carry out detention responsibilities for the federal government. Secondly, because AB-32 creates exceptions to the State when using GEO or any government contractors (to alleviate overcrowding), California's statute unlawfully discriminates against the federal government. On December 31, 2019, GEO filed its motion for a preliminary injunction restraining California's Governor and Attorney General from enforcing AB-32 against GEO's detention facilities on behalf of USMS and ICE. The court granted the parties' joint motion to reschedule the hearing to July 16, 2020.

The nature of the Company's business exposes it to various types of third-party legal claims or litigation against the Company, including, but not limited to, civil rights claims relating to conditions of confinement and/or mistreatment, sexual misconduct claims brought by prisoners or detainees, medical malpractice claims, product liability claims, intellectual property infringement claims, claims relating to employment matters (including, but not limited to, employment discrimination claims, union grievances and wage and hour claims), property loss claims, environmental claims, automobile liability claims, indemnification claims by its customers and other third parties, contractual claims and claims for personal injury or other damages resulting from contact with the Company's facilities, programs, electronic monitoring products, personnel or prisoners, including damages arising from a prisoner's escape or from a disturbance or riot at a facility. The Company accrues for legal costs associated with loss contingencies when those costs are probable and reasonably estimable. ***The Company does not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows.***