**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case File No. 9:20-cv-81063-RS

STEVE HARTEL, individually and on
behalf of all others similarly situated,

      Plaintiff,

  vs.

THE GEO GROUP, INC., *et al.*,

      Defendants.

               /

---

**SUPPLEMENTAL DECLARATION OF ADAM M. APTON AND IVY T. NGO IN
SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

Adam M. Apton and Ivy T. Ngo hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1. I, Adam M. Apton, am a partner at Levi & Korsinsky, LLP ("L&K"), co-counsel to Lead Plaintiffs James Michael Deloach and Edward Oketola (together, "Plaintiffs"), and the Class.

2. I, Ivy T. Ngo, am counsel at Freedman Normand Friedland LLP ("FNF"), co-counsel to Plaintiffs and the Class.

3. We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the prosecution and resolution of the Action, and if we were called upon as a witness, we could and would testify competently thereto. We respectfully submit this Declaration in support of Plaintiffs' motion for final approval of the proposed Settlement and

1

Plaintiffs' motion for an award of attorneys' fees and reimbursement of expenses.[1]

## I. PRELIMINARY STATEMENT

4. On July 7, 2023, the Court granted preliminary approval of the proposed $3 million cash settlement with Defendants. ECF No. 89. Since then, the Court-approved Claims Administrator has notified potential members of the Settlement Class of the Settlement by mail in accordance with the Preliminary Approval Order. Summary Notice was also published through *Investor's Business Daily* and over PR Newswire.

5. This declaration does not seek to detail each and every event that occurred in the course of the litigation. Rather, it highlights certain key events leading to the Settlement, and the basis upon which Plaintiffs and Lead Counsel recommend its approval. Under any measure, the Settlement is a favorable result for the Settlement Class. Indeed, the $3 million Settlement Amount represents approximately 8.9% of the Settlement Class's potential estimated recoverable damages, which falls squarely in line with historical recoveries in similar cases. The recovery is even more noteworthy when weighed against the risks of continued litigation.

6. While Plaintiffs believed that they had strong arguments in support of their position, there is no question that Defendants' arguments could easily have been accepted by this Court at summary judgment or by a jury at trial. And if the Court or jury ultimately concluded that the stock price declines were not causally related to actionable false or misleading statements, the potential recovery would be reduced dramatically—and potentially to zero. Even a favorable jury verdict would have been subjected to an inevitable and lengthy appeals process, the

---

[1] Unless otherwise indicated herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated May 1, 2023 (the "Stipulation") (ECF No. 86); all citations and internal quotation marks are omitted; and all emphasis is added.

conclusion of which would have been highly uncertain. Accordingly, even if Plaintiffs had prevailed at trial, it is highly questionable as to whether Plaintiffs would have recovered more than (or even as much as) the substantial Settlement Amount.

7.        In light of these arguments and the other risks inherent in continued litigation, Lead Counsel respectfully submits that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the factors applied in courts in the Eleventh Circuit in approving class action settlements, including the factors set forth in Fed. R. Civ. P. 23(e)(2), as well as the additional factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *5-11 (N.D. Ga. Mar. 17, 2020) (analyzing fairness of class action settlement under both Rule 23(e)(2) factors and *Bennett* factors).

8.        In addition, the Settlement is the result after Lead Plaintiffs and Lead Counsel: (1) conducted an extensive investigation of all potential claims that could be asserted against the Company and its executives or others, (2) drafted a detailed amended and second amended complaint, (3) prevailed in part against Defendants' second and third motions to dismiss, (4) conducted fact discovery, (5) retained experts and consultants, (6) participated in lengthy, mediator-assisted settlement negotiations, and (7) drafted appropriate documentation of the Settlement, including the Stipulation and the Notices to be issued to potential Class Members. It was only after all of this that the Parties reached an agreement to settle this Action.

9.        In addition to seeking the Court's final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. To prepare the Plan of Allocation, Lead Plaintiffs engaged Crowninshield Financial Research, a highly experienced economics and market efficiency expert with extensive experience in preparing similar plans.

Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss" amount as calculated pursuant to the Plan.

10.     Lead Counsel also requests an award of attorneys' fees for its efforts, which resulted in a substantial recovery for the Settlement Class in the face of significant risks, and for reimbursement of its litigation expenses. Specifically, Lead Counsel is applying for an attorneys' fee award of 32% of the Settlement Fund (plus interest earned thereon), and for reimbursement of litigation expenses in the amount of $39,727.87, to be paid from the Settlement Fund. Lead Counsel's requested fee is well within the range of fees routinely approved by courts in this Circuit in comparable securities class actions with settlement funds of similar sizes and is amply supported by each of the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), as followed by the Eleventh Circuit in *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), as well as the additional factors often applied by Courts in this District and Circuit. *See Equifax,* 2020 WL 256132, at *32-*40 (applying *Johnson* factors and others in analyzing fee application). The reasonableness of Lead Counsel's requested 32% fee is also confirmed by a lodestar cross-check, which yields a negative multiplier of approximately 0.83x.

11.     This Declaration describes (a) the efforts undertaken by Plaintiffs' Counsel to prosecute the Action; (b) the events leading up to the Settlement with Defendants, and the risks that Lead Plaintiffs and Lead Counsel considered in determining that the Settlement provides an outstanding recovery for the Settlement Class; (c) the Notice provided to members of the Settlement Class; (d) the proposed Plan of Allocation for the Settlement; and (e) Plaintiffs' and Lead Counsel's fee and expense application.

## II.   BACKGROUND OF THE ACTION

12.   The GEO Group, Inc. (the "Company" or "GEO") is an equity real estate investment trust ("REIT") specializing in the design, financing, development, and operation of secure facilities, processing centers, and community reentry centers in the United States, Australia, South Africa, and the United Kingdom. Defendant George C. Zoley has served as the Company's Chairman of the Board and Chief Executive Officer since GEO went public in 1994.

13.   On July 7, 2020, Plaintiff Steve Hartel commenced the Action, filing a securities fraud class action complaint (the "Initial Complaint") against GEO and certain company insiders, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Act Commission ("SEC") Rule 10b-5, promulgated thereunder. ECF No. 1. As such, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), the Court was to appoint a lead plaintiff before the parties could engaged in substantive litigation involving the claims in the Initial Complaint.

14.   On August 12, 2020, Defendants filed a motion to dismiss the Initial Complaint ("First MTD") pursuant to Federal Rules of Civil Procedure ("Rules") 9(b) and 12(b)(6) and the PSLRA. ECF No. 6.

15.   L&K and FNF are both nationally recognized firms for their expertise in securities litigation. Following the filing of the Initial Complaint, L&K and FNF each commenced independent preliminary investigations spanning several weeks. These investigations included a review of GEO's public statements, its filings with the SEC, and analyst reports relating to the Company's business, operational and compliance policies, as well as a review of public information made available through various lawsuits filed against the Company and through

governmental agencies and personnel. In addition, L&K and FNF each began working with various clients who had purchased shares of GEO common stock during the class period set forth in the Initial Complaint and suffered a loss as a result of the alleged wrongdoing.

16. On September 8, 2020, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A), James Michael DeLoach and Edward Oketola each timely moved for appointment as Lead Plaintiff and approval of his selection of Lead Counsel, L&K and FNF, respectively. ECF Nos. 22-23.

17. On September 18, 2020, Messrs. DeLoach and Oketola filed an unopposed motion and stipulation requesting appointment as co-lead plaintiffs and approval of L&K and FNF as co-lead counsel. ECF No. 26. The Court granted Plaintiffs' unopposed motion and stipulation on September 30, 2020. ECF No. 30.

18. L&K and FNF continued their investigation following their appointment as Lead Counsel. The purpose of this further investigation was to obtain additional factual support for the alleged securities fraud violations that would then be used to amend the Initial Complaint. Given the heightened pleading standards for securities fraud violations, additional factual support for the allegations and claims asserted in the Initial Complaint was critical to defeat an anticipated motion to dismiss.

19. Counsel at L&K and FNF spent the next two months extensively researching the alleged claims. This entailed further review of SEC filings submitted by GEO; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; and media reports about the Company. Lead Counsel also consulted with an expert on issues pertaining to market efficiency, loss causation, and damages.

20. On November 17, 2020, Plaintiffs filed a Consolidated Class Action Amended

Complaint (the "Amended Complaint"). ECF No. 33. The Amended Complaint alleged violations of the Exchange Act and Rule 10b-5 as asserted in the Initial Complaint but included a significant amount of additional factual support for these claims. The Amended Complaint expanded the alleged false and misleading statements to include five aspects of GEO's business: 1) the stability of its dividend; 2) the quality of its services; 3) its pending lawsuits; 4) its access to capital funding; and 5) its management of its facilities in response to COVID-19. The expanded theory of liability and additional factual support was the result of Lead Counsel's extensive investigation.

21.     Through its investigation, Lead Counsel learned that from 2014 to present, GEO has faced numerous lawsuits relating to its overall treatment of detainees/inmates, operational policies, and facility maintenance. Some of these lawsuits allege that GEO profited by exploiting civilly detained immigrants by grossly underpaying them to maintain and operate its facilities ("Detainee Litigation"). During the Class Period, Defendants downplayed the Detainee Litigation, repeatedly asserting that: (i) GEO did not expect any pending claims or lawsuits to have a material adverse effect on its financial condition, results of operations, or cash flows; (ii) the Company had not recorded an accrual relating to these matters because a loss was not considered probable or reasonably estimable; and (iii) it did not expect the outcome of any pending claims or legal proceedings to have a material adverse effect on its financial condition, results of operations or cash flows. Defendants also told investors that GEO had adequately accounted for known legal cases in its guidance for 2019.

22.     L&K and FNF, through third-party investigators, also conducted interviews with former employees of GEO to obtain information concerning the Company's business, operational and compliance policies bearing on whether the misconduct alleged by governmental agencies

and personnel and in the pending lawsuits was the result of isolated incidents or companywide. In addition, Lead Counsel corresponded with counsel representing the plaintiffs in the Company's pending lawsuits and industry professionals investigating and monitoring the Company's pending lawsuits and business operations, to obtain information concerning the viability of the pending lawsuits and the financial impact on GEO.

23.     The material obtained by Lead Counsel during its investigation was expansive. It required many hours to digest, evaluate, and incorporate into the Amended Complaint. The product was a comprehensive complaint that provided a complete factual analysis of all public information available at the time that supported claims of securities fraud. For the benefit of context, Lead Counsel's investigation yielded an Amended Complaint that was 106 pages long, more than four times longer than the Initial Complaint.

24.     Despite the expansive allegations contained in the Amended Complaint, Defendants filed a motion to dismiss the Amended Complaint ("Second MTD") on December 18, 2020. ECF No. 36. Defendants argued that pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA, the Amended Complaint failed to meet the heavy pleading requirements for adequately alleging falsity, scienter, and loss causation. Id.

25.     On September 23, 2021, the Court issued an Order denying in part and granting in part Defendants' Second MTD ("September 23 Order"). ECF No. 45. Specifically, the Court denied Defendants' Second MTD as to statements concerning the pending lawsuits against GEO. Id. at 27. The Court also rejected Defendants' premature truth-on-the-market defense, finding that Plaintiffs adequately alleged that Defendants made materially false and misleading statements relating to whether pending claims or legal proceedings will have a material adverse effect on its financial condition, results of operations, or cash flow, and that the truth was revealed

through multiple corrective disclosures, damaging them and the Class. Id. at 22-23. In addition, the Court found that Plaintiffs' allegations created a strong inference that Defendants GEO and George C. Zoley acted with the requisite scienter in making the misstatements, and that Plaintiffs adequately pled loss causation. Id. at 23-26.

26.    The Court set a deadline of October 4, 2021, for Plaintiffs to file a second amended complaint in accordance with the Order. Id. at 27. Specifically, the Court provided that "[t]he second amended complaint shall not allege any claims based on statements that the Court has found non-actionable" and "shall not add any additional statements as the basis of its claims." Id.

27.    On October 4, 2021, Plaintiffs filed their Consolidated Class Action Second Amended Complaint (the "Second Amended Complaint") (ECF No. 46), removing all alleged misrepresentations and omissions that had been dismissed and adding no new statements in support of their claims, as the Court instructed. Plaintiffs otherwise left the pleading intact, including, in pertinent part, Defendants' representations about GEO's legal matters as well as the corrective disclosures that caused Plaintiffs' damages. See id.

28.    Because the Court's September 23 Order denied Defendants' Second MTD, Plaintiffs believed the PSLRA's stay of discovery no longer applied. See 15 U.S.C. § 78u-4(b)(3)(B). Lead Counsel made several attempts in the months following the September 23 Order to collaborate with counsel for Defendants to schedule a Rule 26 conference but were unsuccessful.

29.    Then, despite Plaintiffs' efforts to conform the Second Amended Complaint to the instruction given by the Court in its September 23 Order, on October 18, 2021, Defendants filed a third motion to dismiss ("Third MTD"). ECF No. 47. Yet again, Defendants sought to dismiss the Action at the pleading stage, disregarding the fact that the Court's September 23 Order found

9

that Plaintiffs had already sufficiently stated a claim for relief and warranted discovery on the merits.

30. Lead Counsel continued their efforts to advance the litigation into discovery, however, counsel for Defendants refused. They argued that because the Third MTD was pending, the PSLRA stay had not lifted. On January 26, 2022, Plaintiffs filed a motion to compel a Rule 26 conference or, alternatively, to lift the discovery stay (ECF No. 54); Defendants opposed on February 9, 2022 (ECF No. 55); and Plaintiffs replied on February 16, 2022 (ECF No. 56).

31. On June 21, 2022, the Court issued an Order granting in part and denying in part Defendants' Third MTD, reaffirming its previous holding concerning statements about the Detainee Litigation. ECF No. 63.

32. On July 1, 2022, Defendants filed an Answer to the Second Amended Complaint and discovery commenced shortly thereafter. ECF No. 64.

33. On July 22, 2022, the Parties filed a Joint Scheduling Report, Certificates of Interested Parties and Corporate Disclosure Statements. ECF Nos. 66-68.

34. Between August and November of 2022, Plaintiffs and Defendants served and responded to document demands and interrogatories. While counsel for Plaintiffs and Defendants made significant efforts to work collaboratively throughout the discovery process, disputes quickly arose regarding most aspects of discovery, including but not limited to, the sufficiency of responses provided, the relevant time period for discovery, limitations on custodians and search terms, and the terms of confidentiality and ESI protocols. Consequently, counsel for the Parties engaged in several lengthy conferrals to try to resolve these disputes without the Court's involvement.

35. On December 4, 2022, counsel for Plaintiffs and Defendants engaged in a full-day

10

mediation with mediator Robert A. Meyer. While the mediation was initially unsuccessful, the parties ultimately agreed to resolve the case in response to a "mediator's recommendation" to settle the matter for $3,000,000. The Stipulation, together with the exhibits annexed thereto, reflects the final and binding agreement between the Parties.

36.     On May 8, 2023, Plaintiffs filed the Stipulation and their unopposed Motion for Preliminary Approval of Settlement. ECF Nos. 86, 87. In support of their motion, Plaintiffs also filed: (1) Joint Declaration of Adam M. Apton and Ivy T. Ngo in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement (ECF No. 87-1); (2) Declaration of Joseph Martino of Epiq Class Action and Claims Solutions, Inc Regarding Notice and Administration (ECF No. 87-2); (3) Declaration of James Miachel DeLoach (ECF No. 87-3); (4) Declaration of Edward Oketola (ECF No. 87-4); and (5) a proposed Order Preliminarily Approving Settlement and For Providing Notice to the Class (ECF No. 87-5).

37.     On July 7, 2023, this Court issued an order certifying the Class for settlement purposes, preliminarily approving the Settlement, and approving the proposed Notice, Summary Notice, and Claim Form (the "Preliminary Approval Order"). ECF No. 89. The Preliminary Approval Order further: (1) authorized notice to be given to Settlement Class Members through mailing of the Postcard Notice, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in a national business newswire; (2) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, or the fee and expense application; (3) set a schedule for the filing of final approval papers in support of the proposed Settlement, Plan of Allocation, and Plaintiffs' motion for attorneys' fees and expenses; and (4) set a hearing to determine whether the Settlement should be

11

granted final approval as fair, adequate and reasonable, which hearing is set for November 14, 2023.

## III. THE RISKS OF CONTINUED LITIGATION

38. The Settlement provides the Class with an immediate cash benefit of $3 million, representing not only a substantial portion of their recoverable damages, but a high percentage of maximum damages for a securities class action. Had Plaintiffs continued litigating the Action, they would have faced substantial risks at each step of the process—including at summary judgment and trial—and, even if they had reached trial (which would require substantial additional time and expense), there is no guarantee they would have recovered *anything*, let alone a benefit of this size. Moreover, Plaintiffs would have faced inevitable post-trial motions and appeals that would further delay the Class receiving any monetary benefit, and that would present additional risk that any judgment could be reduced in size or reversed entirely. Accordingly, Plaintiffs believe that the Settlement represents an excellent result for the Class when weighed against the risks of continued litigation, which are discussed further below.

### A. Risks in Proving Liability

39. Plaintiffs would have faced substantial risks at summary judgment and at trial, including the risk that Plaintiffs would not be able to establish the elements of falsity, scienter and loss causation, any one of which could have undermined the viability of the Action in its entirety.

40. While Lead Plaintiffs defeated Defendants' arguments concerning the falsity of GEO's statements concerning their litigation exposure at the motion to dismiss stage, Defendants would have continued to contend that their statements were not false when made or, at minimum, were not material to investors. Moreover, regardless of merit, a jury might subjectively agree with

Defendants' characterizations of the facts and of their statements rather than Plaintiffs' characterizations. Accordingly, the need to prove falsity at trial presented significant risks to Plaintiffs' liability case.

### B.      Risks to Establishing Loss Causation and Damages

41.      Even if Plaintiffs could prevail in demonstrating liability, this case presented challenges in proving loss causation and damages, and, at trial, Plaintiffs would face considerable risk that any judgment they were awarded could be a fraction of their estimated damages or could be lower than the amount of the Settlement.

42.      As discussed in the Joint Declaration submitted in support of Plaintiffs' motion for preliminary approval, Defendants repeatedly challenged whether the revelation on July 17, 2019 disclosing Defendant Zoley's letter to U.S. Immigration and Customs Enforcement on May 30, 3018, led to a statistically significant decline in GEO's stock price. If Plaintiffs were unable to prove that the revelation of Zoley's letter was the proximate cause of the decline in GEO's stock, then any alleged losses would not be attributable to Defendants' misrepresentations and damages would not be recoverable at trial.

43.      Relatedly, Plaintiffs alleged that the truth regarding the Company's inability to maintain its capital funding and/or dividends, as a result of the material adverse effect of its pending lawsuits, was revealed through a series of corrective disclosure throughout the Class Period, with the full truth materializing on August 6, 2020, when the Company announced that it was cutting its dividend by almost 30% to "preserve capital and focus on paying down debt." The Court rejected Plaintiffs' theory in this regard and likely would not have reconsidered its opinion, even if further evidence tended to support Plaintiffs. Thus, Plaintiffs' ability to recover damages was substantially limited.

44.     Plaintiffs also faced a litany of routine obstacles if they continued with the litigation. For example, the Court could deny Plaintiffs' motion for class certification, or Defendants could appeal if Plaintiffs were successful in their efforts to certify a class. In addition, there is also the risk that Defendants could successfully excluded expert testimony at trial under *Daubert*, leaving Plaintiffs unable to establish liability or damages in front of a jury.

### C.     Post-Trial Risks

45.     Even if Plaintiffs were to prevail at summary judgment and at trial, and even if the jury were to award a judgment that is meaningfully larger than the $3 million benefit obtained in the Settlement, Plaintiffs and the Class would still have faced additional risks. Defendants would likely have challenged the damages of each class member in prolonged post-trial proceedings. Moreover, Defendants would likely have appealed any judgment, giving them the opportunity to reassert each of their arguments before a new tribunal.

46.     Given the extent of the litigation risks in this matter, the $3 million Settlement is an exceptional recovery for the Settlement Class, and Lead Counsel believes it is fair, reasonable, adequate, and in the best interests of the Settlement Class.

## IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE ISSUANCE OF NOTICE

47.     Plaintiffs have fully complied with all requirements of the Preliminary Approval Order to date.

48.     First, pursuant to the Preliminary Approval Order, Lead Counsel instructed its Court-approved Claims Administrator, Epiq, to disseminate the Postcard Notice by mail and to publish the Summary Notice. The Postcard Notice and Summary Notice informed Class Members of the terms of the Settlement and Plan of Allocation and of their rights to participate in the

Settlement, object to the Settlement, or exclude themselves from the Settlement Class. To disseminate the Postcard Notice, Epiq obtained information from GEO and from various banks, brokers and other nominees regarding the names and addresses of potential Class members. *See* Declaration of Morgan Kimball filed herewith (the "Epiq Declaration").

49.     This method of providing notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1)(B). The Notice advises members of the Settlement Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the final approval hearing. The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed plan of allocating the Settlement proceeds among members of the Settlement Class.

50.     As explained in the accompanying memorandum of law in support of final approval of the Settlement, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.

51.     Epiq began disseminating the Postcard Notice to potential Class members and nominee owners on July 31, 2023. Epiq Declaration at ¶10. As of September 28, 2023, Epiq had disseminated a total of 5,483 Postcard Notices to potential Class members and nominees. Epiq Declaration at ¶15.

52.     On August 14, 2023, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published in *Business Wire*. Epiq Declaration at ¶5.

53.     Lead Counsel also caused Epiq to establish a dedicated settlement website, www.HartelSecuritiesSettlement.com, to provide potential Class Members with information concerning the Settlement and access to Downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint. Epiq Declaration at ¶16. That website became operational on July 28, 2023. *Id.*

54.     The deadline for Class Members to file objections to the Settlement, Plan of Allocation, and/or Plaintiffs' request for fees and expenses, or to request exclusion from the Class is October 17, 2023. As of September 28, 2023, Lead Counsel has received no requests for exclusion from the Settlement Class, and no objections to the Settlement, Plan of Allocation, or Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses. Epiq Declaration at 23. Lead Counsel will file reply papers to address any objections or exclusions on October 31, 2023.

## V.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT AND CLASS REACTION TO DATE

55.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less any (a) Taxes, (b) Notice and Administration Costs, (c) Litigation Expenses awarded by the Court, (d) attorneys' fees awarded by the Court, and (e) any other fees approved by the Court) must submit a valid Claim Form with all required information postmarked no later than November 25, 2023. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

56.     Lead Counsel consulted with Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel

16

believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

57.     The Plan of Allocation is set forth in the Notice. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

58.     In developing the Plan of Allocation, Plaintiffs' damages expert calculated the estimated amount of artificial inflation in GEO common stock during the Settlement Class Period allegedly caused by Defendants' alleged false and misleading statements and material omissions. In calculating the estimated artificial inflation, Plaintiffs' damages expert considered price changes in GEO common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on those days that were attributable to market or industry forces.

59.     Claimants who purchased and sold all of their GEO shares before the first alleged corrective disclosure or who purchased and sold all of their GEO shares between two dates on which artificial inflation was allegedly removed from the price of GEO stock (that is, they did not hold the shares over a date where artificial inflation was allegedly removed from the stock price) will have no Recognized Loss under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same between the corrective disclosures, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action.

60.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of GEO common stock that were attributable to the misconduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## VI.     THE FEE AND EXPENSE APPLICATION

### A.     Lead Counsel's Request for an Award of Fees

61.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of all Plaintiffs' counsel, for an award of attorneys' fees of 32% of the Settlement Fund (or $960,000, plus interest earned at the same rate as the Settlement Fund) (the "Fee Application"). Lead Counsel also seeks payment of litigation expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $39,727.87 (the "Expense Application"). Lead Counsel further requests the reimbursement of costs related to representation of the Class to each Lead Plaintiff, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). In support of these applications, Lead Counsel has submitted the attached Declarations Adam M. Apton, Ivy T. Ngo, Cullin O'Brien, and Brian Schall ("Fee and Expense Declarations"). The Fee and Expense Declarations lists the lodestar of each Plaintiffs' Counsel, including the amount of time spent by each attorney and professional support staff member on the case, and the expenses for which Lead Counsel seek reimbursement.

62.     Based on the factors discussed below, and on the legal authorities discussed in the accompanying Motion for Attorneys' Fees, Lead Counsel respectfully submits that the request for fees and expenses should be granted.

63.     Lead Counsel's request for a fee based on a percentage of the Settlement Fund is in line with the most typical method of awarding attorney fees in securities and other complex class actions in the Eleventh Circuit and in federal courts nationwide. This method of calculating Lead Counsel's fee is favored because it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time.

64.     Courts in the Eleventh Circuit apply the *Johnson* factors in analyzing whether a requested percentage fee award is reasonable: (1) the time and labor required; (2) the novelty and difficulty of the relevant questions; (3) the skill required to properly carry out the legal services; (4) the preclusion of other employment by the attorney as a result of his acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the results obtained, including the amount recovered for the clients; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the clients; and (12) fee awards in similar cases. *Equifax*, 2020 WL 256132, at \*32; *Johnson*, 488 F.2d at 717-19. Additionally, courts in this Circuit consider factors such as "the number of objections from class members, the risks undertaken by class counsel, and the economics of handling class actions." *Equifax*, 2020 WL 256132, at \*32. As discussed below, and as elaborated more fully in the Motion for Attorneys' Fees, these factors strongly support Lead Counsel's requested award of one-third of the Settlement Fund.

### 1.     The Time, Labor, Difficulty and Skill Involved Support the Requested Fee Award

65.     Lead Counsel are highly skilled and experienced securities litigators, who expended a substantial amount of time and effort litigating the Action—an action that presented

special challenges that were not easy to overcome.

66.     While Plaintiffs believe they developed a strong case, Defendants' fraud was not obvious at the outset, and there were no existing regulatory actions against GEO off of which Plaintiffs could "piggyback." Thus, the case required an extensive investigation, in-depth discovery, and highly skilled advocacy to reach the achieved result.

67.     Successfully pleading securities fraud here presented special challenges that required skilled lawyering. As discussed herein, the case presented a number of complex and difficult issues—particularly in proving loss causation and damages. Lead Counsel's investigation helped Plaintiffs allege additional facts related to the lawsuits and public scrutiny that arose from operational deficiencies, and GEO's knowledge of operational deficiencies and increasing scrutiny, that enabled the Complaint to overcome Defendants' motion to dismiss in part.

68.     As described further *supra*, Plaintiffs engaged in an extensive investigation and drafted a detailed amended and second amended complaint, and successfully opposed Defendants' second and third motions to dismiss. Lead Counsel engaged in fact discovery negotiations, including multiple meet-and-confers with Defendants and substantial amounts of correspondence.

69.     The labor-intensiveness of this case also precluded Lead Counsel from pursuing other matters. As is often the case with complex securities class actions, the attorneys involved would often have to spend significant stretches of time focusing exclusively or near-exclusively on litigating this Action. The investigation, pleading, briefing, and discovery work required by the highly complex and technical matters in this case often required the careful attention of experienced attorneys at Levi & Korsinsky, LLP and Freedman Normand Friedland, LLP.

20

70. Lead Counsel believes that all of these factors support the Requested Fee Award.

### 2. The Outstanding Result Achieved and the Reasonableness of the Fee Request Support the Requested Fee Award

71. The $3 million Settlement achieved in this Action is an excellent result for the Class by any measure. As elaborated further in the Motion for Attorneys' Fees, the Settlement represents 8.9% of the Settlement Class's maximum estimated aggregate damages.

72. Moreover, as elaborated more fully in the Motion for Attorneys' Fees, the requested fee is well within the range typically awarded by this District and other courts in the Eleventh Circuit in complex class actions.

### 3. The Risks and Economics of the Litigation Support the Requested Fee Award

73. The risks undertaken by counsel in this matter and the economic considerations of litigating a complex securities class action such as this one favor approval of the Requested Fee Award.

74. First, as with all contingency fee cases, Plaintiffs faced a substantial risk that they would obtain no fee whatsoever. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the three year-long course of the Action and have collectively incurred

$39,727.87 in litigation expenses in prosecuting the Action for the benefit of the Class, in addition to considerably more expenditure on overhead costs for the attorneys, staff, and resources needed to litigate this action.

75.     Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws. However, as recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private plaintiffs take an active role in protecting the interests of investors. If this important public policy is to be carried out, Plaintiffs' Counsel should be adequately compensated, taking into account the substantial risks undertaken in prosecuting securities class actions.

76.     At each step of the process, Lead Counsel faced a substantial risk that the litigation could end either without remuneration to them or with remuneration far less than the time, effort, and expense put in by Lead Counsel. Lead Counsel could have had their Complaint dismissed in full by the Court after expending the substantial effort needed to perform their investigation and draft their Complaint. And even after surviving that hurdle, were litigation to continue, Lead Plaintiffs could face a granting of summary judgment to Defendants, a total loss at trial, or—even in the event of a victory at trial—a reversal on appeal. Any of these occurrences would have deprived Lead Counsel of the opportunity to earn any fee whatsoever for their years of work and expenditure.

77.     Moreover, even without a total dismissal of the case or a total loss at trial, Lead Plaintiffs have faced, and would continue to face, risks that their case could be reduced in size and value. For example, if it were found that some of the corrective disclosures were not the proximate cause of the alleged losses—whether at summary judgment or trial—the pool of

22

available damages would be a fraction of what it was at the time of the Settlement, meaning that Lead Counsel would earn at best a small fraction of the Requested Fee Award for its substantial work and time.

78.    Additionally, securities class actions such as this one are not only time and labor intensive, but require substantial up-front cost outlays. Lead Counsel not only had to pay for its standard overhead expenses during the entirety of the litigation, but had to cover costs and expenses, including the fees of a loss causation and damages expert, all without guarantee of any recovery.

### 4.    The Reaction of the Settlement Class to the Fee and Expense Applications

79.    The positive reaction of the Settlement Class to the Fee and Expense Applications further supports final approval. The Notice advised Settlement Class Members that Lead Counsel would apply for fees not to exceed one-third of the Settlement Fund, and that the deadline for filing objections to the fee application is October 17, 2023. To date, no member of the Settlement Class has filed an objection to the Settlement, Plan of Allocation, or Lead Plaintiffs' Motion for Attorneys' Fees and Litigation Expenses. Epiq Declaration at ¶23.

80.    Moreover, Plaintiffs evaluated Lead Counsel's fee and expense application and believe it to be reasonable. As discussed in the declarations submitted by Plaintiffs, they believe that the requested fee is fair and reasonable in light of the work counsel performed and the risks of the litigation.

### 5.    Awards in Similar Actions and a Lodestar Cross-Check Support the Requested Fee Award

81.    As set forth more fully in the Motion for Attorneys' Fees, Lead Counsel's request for an award of one-third of the Settlement Fund is in line with fees recently awarded in similar

securities class actions and other complex class actions in this District, Circuit, and around the country. *See, e.g., Fernandez v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2017 WL 7798110, at *4 (S.D. Fla. Dec. 18, 2017) (collecting cases); Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 (Oct. 2017) (finding that, over a four year period, the mean fee award in the Eleventh Circuit was 30% and the median award was 33%).

82.     Additionally, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request. As set forth in Plaintiffs' Counsel's declarations, Plaintiffs' Counsel expended a total of 1,678.80 hours in the prosecution and investigation of this action up through September 29, 2023. The resulting lodestar is $1,159,570.50. In light of this, the requested fee of 32% of the Settlement Fund, or $960,000, yields a negative multiplier of 0.83x. Such a multiplier is well below the range of multipliers awarded by courts in this Circuit and around the country in comparable securities class actions, is fair and reasonable based upon the significant risks in this litigation, and by Lead Counsel's substantial efforts to obtain the highly favorable Settlement – which far exceeds the rate of recovery for most securities class actions.

83.     The lodestar summaries were prepared from daily time records regularly prepared and maintained in the ordinary course of business. Plaintiffs' Counsel's hourly rates are the same as, or comparable to, the regular current rates charged for their services in non-contingent matters and/or the rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications that have been granted in this Circuit and others. *See, e.g., Chieftain Royalty Co. v. Marathon Oil Co.*, 2019 WL 7758915, at *12 (E.D. Ok. Mar. 8, 2019) (recognizing "partner rates ranging from $850 - $1,150 per hour" in shareholder and other complex litigation and citing cases and studies); *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *9 (C.D. Cal.

Oct. 25, 2016) (in securities class action, approving hourly rates of $750-985 for partners, $500-800 for of counsel/senior counsel, and $300-725 for other attorneys). Additionally, many of the firms' attorneys – at all levels – have worked for Lead Counsel for years and have extensive experience in securities class action litigation. Each attorney that prosecuted this action performed substantive work that directly benefitted the Settlement Class. The time spent by each attorney was reasonable, non- duplicative, beneficial to effective and efficient litigation, and was important to Plaintiffs' Counsel's and Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

84.     In sum, based on the excellent result achieved for the Settlement Class, the quality of work performed, and the risks of prosecuting the action against Defendants, Lead Counsel submits that its request for a one-third fee award is fair, reasonable, and consistent with other similar cases in this Circuit.

**B.     Lead Counsel's Request for Reimbursement of Litigation Expenses**

85.     Lead Counsel seeks reimbursement of $39,727.87 in litigation expenses. Lead Counsel respectfully submits that these expenses were reasonable and necessary considering the complexity of the litigation, and that reimbursement of these expenses would be appropriate and fair to the Class.

86.     Courts in this District and Circuit have held that counsel in complex class actions are entitled to be reimbursed for reasonable expenses of the exact type incurred here, such as "court reporter fees; document and database reproduction and analysis; e-discovery costs; expert witness fees; travel for meetings and hearings; paying the mediator; and other customary expenditures." *Equifax*, 2020 WL 256132 at *40.

87. Lead Counsel incurred these expenses at substantial risk to itself, and with no guarantee of receiving any reimbursement, or, indeed, any remuneration whatsoever. Lead Counsel could not have effectively prosecuted the Action without incurring these expenses.

88. Similarly, effective prosecution of the Action required expert services from, among others, Crowninshield Financial Research, an economics and market efficiency expert who assisted with an assessment of damages and loss causation, and, using their in-depth damages analysis, developed the Plan of Allocation.

89. Moreover, the expenses incurred by Plaintiffs in this action were reasonable and in line with typical expenses incurred in a securities class action that has progressed to this stage of litigation.

90. The requested expense reimbursement of $39,727.87 is also less than the $40,000 upper limit provided for in the Notice, and moreover, no potential Settlement Class members have objected to the requested expense reimbursement to date.

91. Finally, approval of the Settlement is independent from approval of Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses. Accordingly, any determination with respect to Lead Counsel's fee award will not affect the Settlement, if approved.

C. **Plaintiffs' Reimbursement Requests**

92. In accordance with the PSLRA, Plaintiffs James Michael DeLoach and Edward Oketola seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class in the amount of $5,000 total ($2,500 each). Plaintiffs expended considerable time and effort in actively supervising the litigation over a multi-year period, including by collecting and producing numerous documents.

93.     Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging plaintiffs to take an active role in bringing and supervising actions of this type. As set forth in their respective declarations, Plaintiffs have, throughout the litigation of the Action, been fully committed to pursuing the interests of the Settlement Class. Plaintiffs have actively and effectively complied with all of the many demands that arose during the litigation and the Settlement of this Action. Plaintiffs' efforts are precisely the type that courts have found to support reimbursement to class representatives, and fully supports Plaintiffs' request for reimbursement.

## VII.    CONCLUSION

94.     For all the reasons discussed above, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 32% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total litigation costs and expenses in the total amount of $39,727.87 should also be approved. Finally, Plaintiffs submit that, in accordance with the PSLRA, reimbursement to Plaintiffs in the total amount of $5,000 should also be approved.

We declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of October 2023.

Adam M. Apton

Ivy T. Ngo

27